IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| RED LION MEDICAL SAFETY, INC., <br> UNIVERSAL MEDICAL SERVICES, INC., <br> METROPOLITAN MEDICAL SERVICES OF <br> NC, INC., BIOMEDICAL CONCEPTS, <br> ANETHESIA SERVICE, INC., <br> DIVERSIFIED ANESTHESIA, LLC, d/b/a <br> DIVERSIFIED ANETHESIA; <br> PARAGON SERVICE, <br> BAY STATE ANESTHESIA, INC., <br> POPN, INC., Successor In Interest to <br> PENN BIOMEDICAL SUPPORT, INC., <br> GASMEDIX, LLC, <br> WEST COAST ANESTHESIA <br> SPECIALISTS, INC., <br> PALO VERDE BIOMEDICAL <br> CONSULTANTS, LLC, <br> HEARTLAND SALES & SERVICES, LLC <br><br>     Plaintiffs <br><br> vs. <br><br> GENERAL ELECTRIC COMPANY, INC., <br> GE HEALTHCARE a unit of <br> GENERAL ELECTRIC COMPANY; <br> GE TECHNOLOGY INFRASTRUCTURE, <br> a unit of GENERAL ELECTRIC COMPANY; <br> DATEX-OHMEDA, a unit of <br> GENERAL ELECTRIC COMPANY, and <br> ALPHA SOURCE, INC. <br><br>     Defendants | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § CIVIL NO.: 2:15CV308 <br> § JURY <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

   COME NOW, **RED LION MEDICAL SAFETY, INC**., **UNIVERSAL MEDICAL**

**SERVICES, INC., METROPOLITAN MEDICAL SERVICES OF NC, INC**., **BIOMEDICAL**

**CONCEPTS**, **ANESTHESIA SERVICES, INC.**, **DIVERSIFIED ANESTHESIA, LLC**,

1

**d/b/a DIVERSIFIED ANESTHESIA**, **PARAGON SERVICE**, **BAY STATE ANESTHESIA, INC**., **POPN, INC.**, **Individually and as Successor In Interest to PENN BIOMEDICAL SUPPORT, INC.**, **GASMEDIX, LLC**, **WEST COAST ANESTHESIA SPECIALISTS, INC., PALO VERDE MEDICAL CONSULTANTS, LLC**, and **HEARTLAND MEDICAL SALES & SERVICES LLC, MEDICAL APPLICATION REPAIR AND SALES, LLC, GULFSTREAM ANESTHESIA SERVICE, INC., DBA DOCTORS DEPOT, and SAS ACQUISITIONS, INC., DBA ANESTHESIA SPECIALTIES, AND TRINITY BIOMEDICAL SOLUTIONS, LLC** hereinafter referred to as Plaintiffs, complaining of and about **GENERAL ELECTRIC COMPANY, GE HEALTHCARE, a unit of GENERAL ELECTRIC COMPANY, GE TECHNOLOGY INFRASTRUCTURE, a unit of GENERAL ELECTRIC COMPANY, DATEX-OHMEDA, a unit of GENERAL ELECTRIC COMPANY, currently d/b/a GE MEDICAL** (hereinafter all jointly referred to as "GE"); and **ALPHA SOURCE, INC**., hereinafter called Defendants, and would show unto the Court the following:

## 1. JURISDICTION

The jurisdiction of this court is invoked, and this action is instituted under the provisions of Section 1337 of Title 28, United Stated Code (28 U.S.C. 1337) and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. 15, 22 and 26) to declare the rights of Plaintiffs, to prevent and restrain the unlawful acts of Defendants, and to recover damages sustained by Plaintiffs as a result of violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. 1 and 2), violations of Section 3 of the Clayton Act (15 U.S.C. 14), and Section 7 of the Clayton Act (15 U.S.C. 18).

## 2.  VENUE

Venue is proper pursuant to 28 U.S.C. §1391. Upon information and belief, Defendant General Electric Company, is the parent company of GE Healthcare and GE Technology Infrastructure; GE is a corporation, and its above-named divisions/subsidiaries/units, are business entities that reside, are found, have an agent or transact business in the Eastern District of Texas, and are qualified to do business in Texas.  GE does a substantial amount of business in the United States and in the Eastern District of Texas, including substantial sales of GE (a) anesthesia machines and equipment and substantial repair, service and parts distribution for said equipment and (b) Diagnostic Imaging machines and equipment and substantial repair, service and parts distribution for said equipment.  GE, as hereinafter set forth, has intentionally violated Section 1 and Section 2 of the Sherman Act, and Section 3 and 7 of the Clayton act through acts which, in part, occurred in the United States and in the Eastern District of Texas, and which have injured Plaintiffs, and each of them, in their trade and business, as well as consumers and competition.  Further, Defendant Alpha Source, Inc., is an alien corporation which does a substantial amount of business in the United States and the Eastern District of Texas.

## 3.  PARTIES

## A.  PLAINTIFFS

The following Plaintiffs, commonly known in the industry as Independent Service Organizations (hereinafter referred to as "ISOs"):

1. **Red Lion Medical Safety, Inc.,** is a corporation organized and in good standing under the laws of the State of Pennsylvania, duly authorized to do business in Delaware, and has its principal place of business in  Newark, Delaware.

2.  **Universal Medical Services, Inc**.(hereinafter "UMS), is a corporation organized and in good standing under the laws of the State of Pennsylvania, is duly authorized to do business in Pennsylvania, and has its principal place of business in Beaver Falls, Pennsylvania.

3.  **Metropolitan Medical Services of NC, Inc.** (hereinafter "Metro") is a corporation organized and in good standing under the laws of the State of  North Carolina  and has its principal place of business in Asheville, North Carolina and transacts business within the Eastern District of Texas;

4.  **Biomedical Concepts**, is a Louisiana corporation organized and in good standing under the laws of the State of Louisiana, and has its principal place of business in Mandeville, Louisiana.

5.  **Anesthesia Services, Inc.,** is a corporation organized and in good standing under the laws of the State of Oklahoma, and has its principal place of business in Oklahoma City, Oklahoma.

6.  **Diversified Anesthesia, LLC,  d/b/a/ DIVERSIFIED ANESTHESIA**, is a Limited Liability Company organized and in good standing under the laws of the State of Kentucky and has its principal place of business in Richmond, Kentucky;

7.  **Paragon Service**, is a sole proprietorship owned by Thomas Green, organized and in good standing under the laws of the State of Michigan, and has its principal place of business in Saline, Michigan;

8.  **Bay State Anesthesia, Inc.,** is a corporation organized and in good standing under the laws of the State of Massachusetts and has its principal place of business in North Andover, Massachusetts;

9.  **POPN, Inc.,** a Pennsylvania corporation, Successor In Interest to Penn Biomedical Support, Inc., is a corporation organized and in good standing under the laws of the State of Pennsylvania, and has its principal place of business in Blandon, Pennsylvania;

10. **GasMedix, LLC** is a Limited Liability Company organized and in good standing under the laws of the State of Indiana, and has its principal place of business in Newberg, Indiana;

11. **West Coast Anesthesia Specialists, Inc.,** is a corporation and in good standing under the laws of the State of California, and has its principal place of business in Corona, California.

12. **Palo Verde Medical Consultants, LLC**, is a Limited Liability Company organized and in good standing under the laws of the State of Arizona, and has its principal place of business in Phoenix, Arizona.

13. **Heartland Medical Sales & Services, LLC**, is a Limited Liability Company organized and in good standing under the laws of the State of Kentucky, and has its principal place of business in Louisville, Kentucky.

14. **Medical Application Repair and Sales, LLC,** is a Limited Liability Company, organized and in good standing under the laws of the state of South Carolina, and has its principal place of business in Lexington, South Carolina.

15. **Gulfstream Anesthesia Service, Inc., DBA Doctors Depot**, is a corporation and in good standing under the laws of the State of Florida,  and has its principal place of business in Jupiter, Florida.

16. **SAS Acquisitions, Inc., DBA Anesthesia Specialties**, is a corporation and in good standing under the laws of the State of Ohio, and has its principal place of business in Medina, Ohio.

17. **Trinity Biomedical Solutions, LLC,** is a limited liability company organized and in good standing under the laws of the State of Pennsylvania, and has its principal place of business in Butler, Pennsylvania.

## B.  DEFENDANTS

1.  Defendant, **General Electric Company**, is a New York corporation, with its headquarters in Fairfield, Connecticut, doing business within the Eastern District of Texas.  Defendant is being served by and through its attorney, Jonathan Gleklen, Arnold & Porter, 555 Twelfth Street, NW, Washington, DC  20004-1206.

2.      Defendant, **GE Healthcare** is a unit of General Electric Company.  Service upon Defendant is being served by and through its attorney, Jonathan Gleklen, Arnold & Porter, 555 Twelfth Street, NW, Washington, DC  20004-1206.

3.      Defendant, **GE Technology Infrastructure**, is a unit of General Electric Company, is a foreign company which does not maintain a registered agent in Texas. Defendant is being served by and through its attorney, Jonathan Gleklen, Arnold & Porter, 555 Twelfth Street, NW, Washington, DC  20004-1206.

4.      Defendant, **Datex-Ohmeda**, a unit of GE, is a Wisconsin corporation.  Defendant is being served by and through its attorney, Jonathan Gleklen, Arnold & Porter, 555 Twelfth Street, NW, Washington, DC  20004-1206.

5.      Defendant, **Alpha Source, Inc.**, (hereinafter "Alpha Source") is a Wisconsin corporation.  Defendant is being served by and through its attorney of record, Jennifer H. Doan, Haltom & Doan, 6500 Summerhill Road, Suite 100, Texarkana, TX  75503

## 4.  NATURE OF THE TRADE AND COMMERCE

4.1     There is a large market for the manufacturing and selling of anesthesia gas machines in the United States.  The two largest manufacturers are Defendant General Electric Company (in combination with the Defendants named above, GE Healthcare, GE Technology Infrastructure, and Datex-Ohmeda, hereinafter referred to jointly as "GE"), and Drager Medical Inc.  GE and Drager not only manufacture their own anesthesia and diagnostic imaging machines; each has an entity which provides essential maintenance, repairs, servicing, sale of parts, patient monitoring, and refurbishing of these high technology machines, in competition with Plaintiffs and others throughout the United States, including the Eastern District of Texas.

4.2     There is also a large market for the manufacturing and selling of diagnostic imaging (hereinafter referred to as "DI") machines.  The DI business includes X-ray, digital mammography, computed tomography, magnetic resonance and molecular imaging technologies.  Defendant GE is one of several manufacturers in this market; it also provides the maintenance, repairs, servicing, and sale of

parts, in competition with Plaintiff Universal Medical Services, Inc., and others. Upon information and belief, GE possesses approximately fifty to sixty percent of said market.

4.3 This action involves three relevant product submarkets: (a) one is the market for the maintenance, repairs, servicing, sale of parts, and patient monitoring for GE anesthesia machines, (hereinafter referred to as the "anesthesia maintenance/service market"); (b) another submarket is the refurbishing and sale of high-technology GE anesthesia gas machines. Plaintiffs are in direct competition with GE in these submarkets; (c) Plaintiff Universal Medical Services, Inc. (hereinafter referred to as "Universal"), in addition to the anesthesia market stated above, is in the business of maintaining, repairing, and servicing GE DI machines, which is the third relevant product market (hereinafter referred to as the "DI maintenance/service market"). Universal is in direct competition in this market with Defendant GE and several others.

The aforesaid competition takes place throughout the United States. The relevant geographic market is the United States.

4.4 GE became dominant in the anesthesia market by acquiring a company named Datex-Ohmeda, Inc. (hereinafter "Ohmeda") in 2003.  Ohmeda was by far the largest company manufacturing anesthesia gas machines in the United States, controlling approximately seventy percent thereof, with the remaining share controlled primarily by the second largest company, Drager. For many years ISO Plaintiffs could purchase, and Ohmeda (now GE) would sell directly to Plaintiffs, parts, tools, test equipment, supplies, service manuals, and specifications for Ohmeda anesthesia machines and equipment (hereinafter "parts").  However, from at least 1984 to mid-1997, Ohmeda unilaterally changed this policy, and placed approximately twelve percent of its parts on a "restricted" list; it refused to sell these parts, or service manuals, to ISOs, and would not permit ISOs from attending its training schools.  A Federal antitrust lawsuit was filed on November 1st, 1996 by several ISOs (including some of the Plaintiffs in the present action) alleging in part that Ohmeda was using its monopoly over its parts (the "tying" product) to force customers to buy Ohmeda's servicing (the "tied" product);

hence, among other antitrust claims, Plaintiffs alleged illegal tying, monopolization, and attempted monopolization under Sections one and two of the Sherman Act (15 U.S.C.§§1, 2).  In June of 1997, Ohmeda abandoned its new policy and instituted the Qualified Independent Service Organization (QISO) program.  Under that program, anyone who attended and passed the same training schools offered by Ohmeda to its technicians became qualified to buy all parts and manuals directly from Ohmeda.

4.5     On August 6, 1999, United States District Judge Levi denied Defendant's request for a summary judgment in the lawsuit, noting there were too many factual issues present (see 63 F. Supp. 2d 128). The case was ultimately settled.

4.6     On October 2d, 2006, the QISO program was abandoned by Ohmeda's new owner, GE, and a new policy, the Independent Service Provider (ISP) program was instituted.  Under that program, GE allowed ISOs service technicians to attend its training schools, and upon passage of a course the ISO could purchase GE parts and manuals. However, for each technician who applied for training, there was an annual "application" fee of fifteen thousand dollars, plus the cost of the course (with a ten percent discount on the latter).  These prohibitive and unjustified costs are not affordable by many Plaintiffs herein, and are further deliberate attempts to raise the costs of rivals in order to drive them from the market.  The ISOs reaction to this anticompetitive practice was immediate and understandably vigorous.  As of February19, 2007, it appears the policy was again changed and anyone could buy parts directly from GE, attend its training schools at listed prices, and receive manuals as well as telephone support.

4.7     Plaintiffs are engaged in the trade and business of providing maintenance, repairs, servicing, sale of parts, patient monitoring and refurbishing for anesthesia machines and equipment throughout the United States, including the Eastern District of Texas, as specified in paragraph 4.3 above. Refurbishing constitutes buying; reconditioning and selling used and reconditioned anesthesia machines and equipment.  At all times material to this action, Plaintiffs were and are so engaged in said trades and businesses.  Plaintiffs are in direct competition

with GE in the bidding on, sale of and provision of parts, repairs, maintenance, servicing, and refurbishing of GE anesthesia machines and equipment and in the purchase and sale of used GE anesthesia machines and equipment in the aforesaid geographic markets.  Plaintiff Universal is also in direct competition with GE in the DI maintenance/service market, throughout the United States, including the Eastern District of Texas.

4.8    The parts/equipment manufactured by GE are made only for GE machines; the parts made by Drager are also entirely controlled completely by Drager. The parts manufactured by these two companies are not interchangeable, have no substitutes and cannot be obtained by Plaintiffs from any source unauthorized by GE and Drager.   Both GE and Drager have monopoly control over their respective parts; without these parts being available under competitive conditions, Plaintiffs will be eliminated from the market, decreasing competition, output, and consumer choice.

## 5.  FIRST CLAIM FOR RELIEF

### (Contract, combination, or conspiracy—Sherman Act, §1; Clayton Act, §3)

Plaintiffs herein by reference incorporate paragraphs 1 through 4 of this Complaint, with the same force and effect as if said paragraphs were herein set forth at length.

## 6.  JURISDICTION AND VENUE

6.1    The jurisdiction of this court is invoked and this action is instituted under the provisions of Sections 1337 of Title 28, United States Code (28 U.S.C. §1337) and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§ 15, 22 and 26) to declare, to prevent and restrain and to recover damages sustained by plaintiffs as a result of violations of Section 1 of the Sherman Act (15 U.S.C. §1) and Section 3 of the Clayton Act (U.S.C. §14).

6.2    Plaintiffs would show that beginning early in 2011, GE changed its policy yet again; since then it refuses to sell non-imagining parts directly to Plaintiffs.  Letters were sent to Plaintiffs (except for Plaintiffs Palo Verde Biomedical Consultants,

LLC and Red Lion Medical Safety, Inc., which can still purchase directly purchase from GE) by GE and Defendant Alpha Source, Inc., indicating that effective April 1st, 2011, GE was appointing Alpha Source, Inc., as its sole distributor; a letter from Alpha Source, Inc., states that "GE Healthcare has recently appointed Alpha Source to be the sole source of non-imagining service parts to a specific segment of their market." By "a specific segment of their market," Alpha Source, Inc., was presumably referring to major GE third party competitors, Plaintiff ISOs herein and other GE competitors. On or about November, 2013, GE extended this new policy to DI equipment and parts as well.

6.3    This arrangement between GE and Alpha Source constitutes a contract, combination, or conspiracy under the Sherman Act, §1.  For many years, GE (and its acquired company, Datex-Ohmeda) sold its parts directly to Plaintiffs and other ISOs at wholesale/list prices.   This sudden and inexplicable change in policy, mandating that Plaintiffs could obtain GE parts only from GE's exclusive distributor Alpha Source (at highly inflated prices), is an unreasonable restraint of trade, especially since GE has a complete monopoly on its parts.   Considering GE controls nearly one hundred percent of its parts market, this exclusive dealing arrangement with Defendant Alpha Source constitutes an unreasonable restraint of trade; the inescapable result of this agreement between GE and Alpha Source will be the complete elimination of GE's anesthesia and DI maintenance/service rivals, Plaintiffs herein and other ISOs, and will lessen competition and consumer choice.   This unlawful contract, combination, or conspiracy will foreclose Plaintiffs and other GE rivals from access to GE's obtaining GE's monopoly parts at competitive prices. It is an unlawful agreement and will accomplish an unlawful result, destroying the Plaintiffs and others in competition with GE, eliminating consumers' choices and lessening output, and thus violating Sherman §1 as well as Clayton §3.   This illegal arrangement will create a substantial lessening of competition in interstate commerce and in the relevant markets; the arrangement will further GE's determination to illegally leverage its parts monopoly into the competitive anesthesia and DI maintenance/service markets, towards GE's goal of extending its monopoly into those two submarkets.   An additional result is the

creation of artificial barriers to entry by new competitors.

6.4   In order to buy parts/equipment from Alpha Source, Plaintiffs have to pay a premium of approximately eighteen to twenty percent above GE's published price list.   Not only are GE's direct customers able to pay much lower list prices; they additionally receive a discount of twenty to forty percent off GE's said list price, rendering competition from Plaintiffs incredibly difficult, if not impossible. Plaintiffs' ability to sell GE parts in the market at profitable margins is eliminated.

6.5   Also, Alpha Source does not keep a full stock of GE parts, and if the part ordered is not in its stock and the part is needed overnight from GE, the buyer must pay the enhanced price, and must also pay another flat fee of one thousand dollars for shipping per line item, regardless of the actual shipping cost.   This is highly evidentiary of GE's monopoly power over the sale of its parts.

6.6   Despite the obvious fact that a customer (usually a hospital) needs these parts as soon as possible in order to provide proper healthcare to its patients, Plaintiffs will demonstrate that Alpha Source has a history of lengthy delays in shipping the necessary parts to Plaintiffs.   A recent article in a medical magazine confirms that Alpha Source provides only limited parts from GE after hours; the order cut-off with Alpha Source for GE parts, delivered next-day, is 4:30 p.m. CST, Monday through Friday. The expedited shipping (same-day) cutoff is 11:30 a.m.   Also, since the advent of the exclusive deal between GE and Alpha Source in 2011, the latter's growth has been an astounding 88%.

6.7   This creates a deliberate competitive disadvantage to Plaintiffs and others in competition with GE, and a dangerous disservice to consumers, patients, and competition in general; upon information and belief, GE personnel who compete with Plaintiffs inform present and new potential customers of this policy to effectively create competitive disadvantages to Plaintiffs and potential new entrants.   This intentional disparagement of Plaintiffs by GE personnel is done with the specific intent to maintain/expand GE's monopoly position in the relevant markets.

6.8   The availability of said GE parts at competitive prices, and under competitive conditions, is critical to Plaintiffs in their business of reconditioning, selling, repairing, maintaining and servicing GE anesthesia machines and equipment, as well as to Plaintiff UMS in its additional business of DI maintenance/service. Absent a level playing field, Plaintiffs cannot operate their businesses in competition with GE.  Until recently, most parts for GE machines and equipment were distributed in the United States only by GE, and are manufactured by GE or by other entities solely for GE.

6.9   Defendant GE is the largest original equipment manufacturer ("OEM") of anesthesia gas machines and related monitoring, ventilation and/or drug delivery equipment both in the United States, where it has approximately eighty percent of the market, and the world, where it has approximately sixty percent of the market. Through various means described herein, GE has restrained competition in the product market for the maintenance and service of anesthesia gas machines (the "maintenance/service market") as well as in the relevant DI maintenance/service sub-markets described above.

6.10  As stated, GE manufactures, markets, sells and distributes various anesthesia and DI products.  These products include anesthesia and DI machines, as well as the supplies and parts for such equipment.  GE also provides repairs and service for such equipment, in direct competition with ISOs.  GE manufactures, markets, sells and distributes its equipment under its own brand names; GE also utilizes other entities, hereinafter referred to as "Third-Party OEMs," to manufacture parts exclusively for sale to GE. GE also manufactures or publishes, or causes to be manufactured or published, on original equipment manufacture basis (hereinafter "OEM"), all of the parts for the repair and service of its anesthesia and DI machines.  None of these products is manufactured or sold in the United States in any appreciable volume or on any basis other than directly through GE or its exclusive distributor, Alpha Source.   GE also reconditions and sells used GE anesthesia and DI machines, in direct competition with Plaintiffs.

6.11 The market for anesthesia gas machines and DI machines has been consolidating recently due to changes in the healthcare industry.  This consolidation and merger of hospitals, hospital beds and operating rooms, has lead to a decrease in the need for new anesthesia and DI hardware. In addition, budget constraints have forced users of anesthesia and DI machines increasingly to use old hardware, rather than replace it.  As a result, the maintenance/service market for these machines has recently expanded in size.  This market is highly profitable.

6.12 Maintenance, repair and service for anesthesia gas machines and DI machines are therefore provided by OEMs, asset management companies, ISOs and in-house biomedical service departments.

6.13 Within the industry for anesthesia machines and DI machines, purchasers of the machines and consumers of the parts and service for those machines are recognized according to the brand of equipment they own.  Members of the industry understand and agree that the brand of equipment differentiates the various purchasers and consumers.  Separate and distinct parts and service organizations have developed for service of each of the major anesthesia and DI machines brands.

6.14 Different marketing strategies are employed in attempting to sell anesthesia and DI machines (including parts and service) to owners of different brands of equipment. Distinct prices are employed based on the brands of equipment.  Different sensitivities to price changes exist as to the different brands of equipment and as to parts, maintenance and service for different brands of equipment.

6.15 GE anesthesia machines and equipment are unique products.  GE is one of the best brands of anesthesia machines and equipment and commands a reputation for quality; it is by far the largest firm in the anesthesia machines and equipment market.  It is differentiated in the industry as to users, price, marketing strategies, and price elasticity.  Importantly, parts and service for GE anesthesia machines and equipment are likewise differentiated from parts and service of other brands, and not interchangeable therewith.  Thus, if an owner of a GE machine needs a part, it must be replaced by a GE part, as the parts of each manufacturer are unique, non-interchangeable with other brands, and lack cross-elasticity of

demand.  The same is true for owners of GE DI equipment; the parts of each brand manufacturer is not substitutable with the parts of other manufacturers.

6.16 Owners of GE brand anesthesia and DI machines and equipment are locked into purchasing additional GE equipment, and to purchasing GE parts and service for their equipment because of a number of factor which include the initial high capital investment in the equipment versus its resale value, the uniqueness of GE anesthesia and DI machines and equipment, the control by GE of parts, the control by GE of service, the control by GE of resale of used GE equipment and parts, the difference in anesthesia and DI formats, the discontinuance of support for older units while newer units remain, the difference in operator skills between different brands of equipment, the difficulty of obtaining single-source repair and service for diverse equipment brands, and numerous other practical factors in the marketplace.  GE has on numerous occasions declared its existing machines "obsolete," and after doing so will not provide parts or support for these machines to Plaintiffs, on the premise that the parts are unavailable.  Yet, if an owner of that same machine requests parts for the "obsolete" machine, GE manages to have the parts available.

6.17 Competition in the manufacture and sale of GE anesthesia machines and equipment, as well as in parts, and maintenance/service of such equipment is dominated by GE.  Barriers to entry into the manufacture of GE anesthesia and DI machines and equipment, into the manufacture of parts and into repair and service for such equipment are high, due in part to regulatory requirements, but mainly because of the anticompetitive tactics of the existing duopoly.

6.18 The manufacture of said equipment and parts, and the repair and service of said equipment require high technical expertise and a long lead-time to develop. Additionally, approval by the Federal Government is required to manufacture anesthesia and DI machines and equipment.

6.19 GE has continued to sell parts for its anesthesia and DI machines directly to equipment owners who repair and service their own equipment, and to asset management companies, both receiving large discounts from GE's standard price list; but

14

6.20 GE has ceased selling parts to ISOs directly, as it had done for many years. Instead, Plaintiffs and other non-owner device purchasers of GE parts must now buy parts from GE's exclusive seller, Defendant Alpha Source, at highly increased, discriminatory prices (again, for some unknown reason, Plaintiffs Palo Verde Biomedical Consultants and Red Lion Medical Safety are at time of suit still able to purchase directly from GE).

6.21 In reliance upon the original policies of GE, permitting ISOs to directly buy GE Anesthesia and DI parts, some Plaintiffs:

(a) purchased said parts for the repair, servicing and reconditioning of GE anesthesia and DI machine;

(b) recruited, hired and trained qualified personnel, including many GE-trained technicians with expertise in the servicing of GE anesthesia and DI machines and equipment;

(c) developed customer bases for the service and sale of GE anesthesia and DI machines and equipment;

(d) bid for and received many contracts in the public and private sectors to repair, service and supply such equipment; and

(e) sold used and reconditioned GE anesthesia and DI machines and equipment.

6.22  GE had supplied repair and service parts for GE anesthesia and DI machines and equipment irrespective of whether the equipment had been purchased by the owner directly from GE or had been purchased as used or reconditioned equipment from Plaintiffs.  In reliance upon said policy, Plaintiffs developed their businesses, hired and trained qualified personnel and developed customer bases for the reconditioning of and of the sale of used and reconditioned GE anesthesia and DI machines and equipment.  Plaintiffs purchased, reconditioned and sold used and reconditioned GE anesthesia and DI machines and equipment in competition with GE and developed substantial inventories in said equipment as well as goodwill in the industry.

6.23 Plaintiffs have been awarded term contracts for the repair and service of GE anesthesia and DI machines and equipment in competition with GE by state and local governmental entities and private business organizations, usually through the

15

bid process.   Often, Plaintiffs and GE were the only bidders for such contracts. Upon information and belief, many governmental entities will not accept a bid from a firm which fails to use parts produced from the OEM; thus, being unable to purchase parts directly from GE, Plaintiffs are automatically excluded from the bidding process.  The substantial diminution of competition which follows from this refusal to deal by GE is a travesty to the competitive marketplace and harmful to consumers as well.

## 7.  UNLAWFUL ACTS OF DEFENDANT

7.1   GE has a change in policy under which it refuses to directly sell parts to anesthesia and DI equipment to Plaintiff ISOs (again, with the two exceptions of Plaintiffs Palo Verde Biomedical Consultants, LLC, and Red Lion Medical Safety, Inc.).  However, GE directly sells these parts to its internal service entity, as well as to GE government customers, asset management companies, GE equipment owners who repair and service their own anesthesia and DI equipment, and through its exclusive distributor, Alpha Source.

7.2   Many Plaintiff ISOs have attempted to place orders directly from GE. As stated, GE has refused either to directly sell its parts to Plaintiff ISOs or to permit GE Third-Party OEMs to provide said parts; yet GE sells said parts to others who are not in competition with GE.  GE has refused to give Plaintiffs legitimate economic or business justifications for its current changed policies.

7.3   ISO Plaintiffs have attempted to purchase GE parts through other companies which own and service their own GE anesthesia machines and equipment and through other entities, but have been largely unable to do so because of GE's policies and actions.

7.4   Plaintiffs must now purchase said GE parts from GE's exclusive agent, Alpha Source, on highly discriminatory terms.  Said parts are absolutely necessary for the maintenance and service of GE anesthesia and DI machines under Plaintiff ISOs' contracts with state and local governmental entities and with private entities.

7.5   If Plaintiff ISOs are unable to perform on contracts to service GE anesthesia and DI machines with state and local entities, they can be formally "black-listed" for such contracts, preventing them from submitting bids on any other government

contracts for a period of years.  The "black-listing" of Plaintiffs by state and local governments would eliminate them as competitors to GE in the sales, maintenance and service of GE anesthesia and DI machines in these markets.  As stated in paragraph 6.23 *supra*, many governmental entities insist on a firm's utilizing OEM parts in order to bid on projects; GE's refusal to sell directly to Plaintiffs eliminates from the bidding process, and is clearly a formidable barrier to entry.

7.6   GE has refused to repair, or provide service and parts for used GE anesthesia and Di machines sold by Plaintiffs or to provide these only on discriminatory, unreasonable and economically nonviable terms and conditions.  GE's actions in this respect have included, but are not limited to:

   (a)  the refusal to sell parts directly to ISO Plaintiffs by GE;

   (b)  the requirement by GE that Plaintiffs purchase GE parts from its designated exclusive dealer, Alpha Source, at supra-competitive prices, while at the same time providing said parts at large discounts to users of the machines;

7.7   GE's representatives have disparaged Plaintiffs by represented to owners of GE anesthesia and DI machines that ISO Plaintiffs are unable to get parts for GE anesthesia and DI machines, cannot attend GE's monopoly training schools, will be unable to repair or service such equipment, and will not be in business to fulfill their contracts for repair and service of such equipment.

7.8   Upon information and belief, GE's policies are designed to complete a plan to illegally eliminate Plaintiffs from the marketplace, all to the great detriment of competition, output and consumer welfare.

7.9   GE has refused repairs or service for GE anesthesia and DI machines where non-GE parts have been used or where Plaintiffs' services have been employed by owners of GE anesthesia and DI machines.

7.10 GE has entered into contracts, combinations and conspiracies with OEM suppliers of parts for GE anesthesia and DI machines to prevent them providing ISO Plaintiffs with parts for said machines.

7.11 GE has entered into contracts, combinations and conspiracies with owners of GE anesthesia machines and equipment who purchase parts for such equipment from GE to prevent the sale of such parts to Plaintiffs who recondition, repair and service GE anesthesia and DI machines.

7.12 GE has entered into contracts, combinations and conspiracies to prevent the sale of used and reconditioned GE anesthesia and DI machines by Plaintiffs through the aforesaid acts and practices of GE and by forbidding the sale of parts by customers of GE to persons who purchase used and reconditioned equipment from Plaintiffs.

7.13 GE has entered into contracts, combinations and conspiracies with organizations which repair and service GE anesthesia and DI machines to refuse to deal with Plaintiffs and to exclude Plaintiffs from such repair and service through the denial of parts to ISO Plaintiffs.

7.14 Upon information and belief, GE has also entered into contracts, combinations and conspiracies with entities financing GE anesthesia and DI machines and equipment to prevent Plaintiffs from doing repair and service of said equipment by requiring as a condition or understanding of said financing that GE's internal repair and service be used.

## 8.  INJURY

8.1 By reason of GE's aforesaid unlawful conduct and as a direct and proximate result of such conduct all Plaintiffs have lost sales, profits and value of their businesses. Plaintiffs have suffered and will continue to suffer irreparable harm through loss of and injury to their trade and business in that:

(a) Plaintiff ISOs have been and will be precluded from entering into contracts for the sale, service and repair of GE anesthesia and DI machines and equipment;

(b) Plaintiff ISOs have been and will be precluded from carrying out contracts already entered into for the sale, service and repair of GE anesthesia and  DI machines and equipment;

(c) All Plaintiffs have been and will continue to be irreparably harmed in their reputations and goodwill;

18

(d)     Plaintiffs and others will be eliminated from the sale, maintenance and service of GE anesthesia and DI machines and equipment; and,

(e)     Independent sources for GE equipment maintenance/service will be eliminated.

8.2     The aforesaid violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act have had and will continue to have the following effects, among others:

(a)     Denying Plaintiffs free access to the market for the reconditioning and sale of used GE anesthesia and DI machines and equipment;

(b)     Denying ISO Plaintiffs competitive access to the GE parts market for the maintenance and service of GE anesthesia and DI machines and equipment;

(c)     Denying the public free choice in the markets for reconditioned and used GE anesthesia and DI machines and equipment, and for the repair, maintenance and service of such equipment;

(d)     Impacting a substantial amount of interstate commerce both in the reconditioning and sale of used GE anesthesia and DI machines and equipment, and in the repair, maintenance and service of such equipment;

## 9.  PRAYER FOR RELIEF

WHEREFORE, as and for a First Claim for Relief plaintiffs pray this court to order, adjudge and decree that:

A.     Defendants GE and Alpha Source have violated Section 1 of the Sherman Act and section 3 of the Clayton Act.

B.     Plaintiffs be awarded damages, and that the Defendants pay Plaintiffs threefold the damages awarded;

C.     Plaintiffs be awarded reasonable attorneys fees;

D.     Plaintiffs recover interest on actual damages;

E.     Plaintiffs recover costs of suit; and

F.     Plaintiffs be awarded injunctive relief to prevent and restrain GE and Alpha source's unlawful actions and for such other and further relief as the court may deem just and proper.

## 10.  SECOND CLAIM FOR RELIEF
### (Monopolization - Sherman Act § 2)

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 9 above of this Complaint, with the same force and effect as if said paragraphs were herein set forth in full.

## 11.  JURISDICTION AND VENUE

11.1 The jurisdiction of this court is invoked and this action is instituted under the provisions of Sections 1337 of Title 28, United States Code (28 U.S.C. 1337) and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C.  15, 22 and 26) to declare, to prevent and restrain and to recover damages sustained by plaintiffs as a result of violations of Section 2 of the Sherman Act (15 U.S.C. §2).

11.2 The offence of monopolization under Sherman §2 consists of two major elements. First, a plaintiff must prove that the defendant possesses monopoly power in the relevant product and geographic market(s).  Secondly, a plaintiff must prove the willful acquisition or maintenance of that power by a defendant, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

11.3 As to the first element, it may be proven directly by evidence of the Defendant's control of prices or the exclusion of competition; or it may be proven circumstantially from one firm's large percentage share of the relevant market.  As illustrated above, GE has complete power over the price of its parts; as will be discussed *infra*, GE also has complete control over access to its training schools. Although monopolization does not require the actual use of a firm's monopoly power, but only the ability to control price or exclude competition when so desired, in the present case Defendant GE has willfully utilized its power over its parts' prices, has refused to deal with Plaintiffs, and has excluded Plaintiffs from its' monopoly-owned training schools for many months.   As a result of GE's anticompetitive practices, Plaintiff Palo Verde Biomedical Consults, LLC,  has actually been excluded from the market, proof of GE's power to monopolize.

11.4 On or about October 17th, 2014, GE announced it was opening its training schools to  some  third  parties,  at  its  Jupiter,  Florida  location,  but  not  the  Waukesha,

20

Wisconsin facility. This announcement was followed by a letter from GE dated October, 2014, which was received by Plaintiffs on October 31st, 2014.  The letter repeatedly stated that in regard to the courses to be taught at Jupiter, Florida, "Scheduling, frequency, and location of courses will remain at GE Healthcare discretion."  In the past, Plaintiffs have been told frequently that scheduled courses had been cancelled, or were overbooked, and hence unavailable to Plaintiffs. Additionally, the letter stated that to attend any of the classes, GE was insisting on a new condition:  for each class an ISO desired to enroll, the ISO had to produce a form document prepared by GE which required that the applying ISO obtain from its customer a verification to be signed by the customer stating "Your signature below verifies that the ISO individual seeking to register for a GE Healthcare clinical systems technical training class performs services on GE Healthcare equipment that is the subject of the requested class and does so **exclusively** at your site/network of sites." (emphasis not added).  This new policy requires that the customer of an ISO provide the verified GE form, containing the ISO customer's full business details; this obviously is a method whereby GE is seeking to assemble all of the ISOs customers' data bases.  Secondly, the astounding requirement that the customer verify that the ISO will work on the customer's equipment <u>exclusively</u> is something a customer cannot do, as customers know the ISOs have many other customers.  The singular objective of this new policy will assure ISOs cannot enroll in GE courses, and as a result customers (hospitals) will not be allowed to choose to use ISOs instead of GE technicians.  Clearly, this is an intent to exclude an entire class of competitors, the ISOs, from the relevant markets.

11.5 One additional difficulty regarding the classes is that from time to time, GE produces new machines.  As no hospitals have the new machines, when purchased by the hospitals, only GE technicians can do the service, as this new policy permits ISOs to work only on GE equipment at the customer's site.  This gives GE a large lead -time to obtain the maintenance/repair of the equipment.

11.6 Regarding Defendant GE's percentage share of the relevant product submarket, anesthesia maintenance/service,  in  the  relevant  geographic  market,  upon

information and belief Plaintiffs would show that GE has approximately sixty to seventy percent of said geographic market.

11.7 As to the second element, based on the conduct alleged, GE can hardly argue that its power is due to its "superior product, business acumen, or historic accident." GE has deliberately engaged in blatantly exclusionary conduct in order to eliminate Plaintiffs from the market place—exclusionary conduct consisting of attempting to exclude rivals on some basis other than efficiency.  Defendants' conduct herein is designed to foreclose competition, to gain a competitive advantage, or to destroy a competitor, and is hence illegal under Sherman §2.

11.8 As a direct result of Defendants' illegal conduct, Plaintiffs herein have sustained antitrust injury in the form of lost profits and goodwill, in interstate commerce.

11.9 Plaintiffs would show unto this Court that Defendant GE possesses monopoly in the relevant markets through its ownership and illegal utilization of its complete control over the prices of its monopoly parts, as well as its training schools.  These training schools are essential facilities and meet all the legal criteria thereof: Defendant GE has one hundred percent ownership and control, hence a true monopoly, of the its training schools.  Plaintiffs herein cannot duplicate the training schools.  Defendant GE has denied Plaintiffs access to the training schools for many months, despite having done so for years and offering no justification for denying access to the schools; GE has adequate facilities to admit Plaintiffs to said schools, as it has done so for numerous years, earning large profits in the process.  Its action of excluding Plaintiffs from its training schools are evidence of its intent to forego present short-term profits in order to gain a long-term monopoly in the relevant markets.

11.10   Defendant GE's refusal to deal with Plaintiffs in the sale of its monopoly parts, after having done so for many years, illustrates GE's intent to exclude Plaintiffs from the market.  Such refusal to deal is without legal justification, and is done to illegally leverage GE's monopoly over its parts and schools into the once competitive market for anesthesia and DI maintenance/service by raising its rivals cost and excluding them from GE's essential facilities, the training schools.

11.11  Plaintiffs would also show unto this Court that the monopoly power GE possesses and maintains was willfully acquired and maintained, as opposed to natural growth or development as a result of a superior product, business acumen, or historic accident.

## 12.  UNLAWFUL ACTS OF DEFENDANTS

12.1 The aforesaid conduct and acts of Defendants were engaged in within the Eastern District of Texas and the United States with the purpose and intent:

(a) to injure, suppress, destroy and irreparably harm Plaintiffs and others as vital competitors in the relevant markets, as well as eliminate competition and harm consumers in said markets;

(b) to engage deliberately in practices and conduct which would raise rivals cost for the purpose or excluding them as a competitive factor in the relevant markets;

(c) to monopolize the maintenance/service market for GE anesthesia and DI machines and equipment;

(d) to leverage into and monopolize said reconditioned and used equipment market as well as the maintenance/service market;

(e) to control prices or exclude competition; and,

(f) unlawfully to monopolize trade and commerce in said relevant markets in violation of Section 2 of the Act of Congress of July 2, 1890 (15 U.S.C. §2), commonly known as the Sherman Act.

## 13.  INJURY

13.1 By reason of GE's aforesaid unlawful conduct and as a direct and proximate result of such conduct, Plaintiffs have lost sales, profits and value of their businesses.  Plaintiffs have suffered, and will continue to suffer irreparable harm through loss of their trade and business, and the public will be damaged by:

(a) the elimination of Plaintiffs and others in the sales, repair and service of GE anesthesia and DI machines and equipment in the relevant markets;

(b) the elimination of independent sources for GE anesthesia and DI machines and equipment parts in the relevant markets; and,

23

(c)    the elimination of suppliers of and the supply of used and reconditioned GE anesthesia and DI machines and equipment in the relevant markets.

13.2   The aforesaid violations of Section 2 of the Sherman Acts have had, will   have, and will continue to have the following effects, among others:

(a) Defendant GE has achieved and maintained a monopoly in GE  anesthesia machines and equipment, in the parts and training schools therefore, and in the sales thereof in the relevant markets;

(b) Defendant GE has restrained, suppressed and eliminated actual and potential competition in the maintenance/service of GE anesthesia and DI machines and equipment, in the parts and training schools thereof, and in the sales thereof in the relevant markets;

(c) Plaintiffs and consumers have been denied the benefits of unrestricted competition in a free and open market for the maintenance/service of GE anesthesia and DI machines and equipment, in the parts therefore, and in the sales thereof in the relevant markets; and,

(d) Plaintiffs have been precluded from obtaining and carrying out substantial contracts entered into for the maintenance/service of GE anesthesia and DI machines and equipment and related accessories, for the parts therefore, and for the sale thereof in the relevant markets.

(e) Due to the preference of institutions which require anesthesia and DI maintenance/service to utilize one entity to be able to perform said services on all brands of anesthesia and DI equipment, the exclusion of Plaintiffs from the GE anesthesia and DI maintenance/service markets will have the anticompetitive effect of eliminating Plaintiffs from the maintenance/service of all brands of anesthesia and DI machines and equipment; thus consumer choice and competition will be greatly lessened.

## 14.  PRAYER FOR RELIEF

WHEREFORE, as and for a Second Claim for Relief, Plaintiffs pray this court   to order, adjudge and decree that:

24

A.  Defendant GE, assisted by its conspiracy with Defendant Alpha Source, has engaged in monopolization of the relevant markets in violation of Section 2 of the Sherman Act;

B.  Plaintiffs be awarded damages, when ascertained, and that GE Defendants and Alpha Source pay Plaintiffs threefold the damages;

C.  Plaintiffs be awarded reasonable attorney's fees;

D.  Plaintiffs recover interest on actual damages;

E.  Plaintiffs recover costs of suit; and,

F.  Plaintiffs be awarded injunctive relief to prevent and restrain GE's unlawful actions and for such other and further relief as the Court may deem just and proper, including a divestiture of GE's acquisition of Datex-Ohmeda, which acquisition Defendant GE has unlawfully utilized to consummate its illegal monopolization.

### 15.  THIRD CLAIM FOR RELIEF
**(Attempt to Monopolize - Sherman Act § 2)**

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 14 above of this Complaint, with the same force and effect as if said paragraphs were herein set forth in full.

### 16.  JURISDICTION AND VENUE

16.1  The jurisdiction of this court is invoked and this action is instituted under the provisions of Section 1337 of Title 28, United States Code (28 U.S.C. §1337) and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26) to declare, to prevent and restrain and to recover damages sustained by plaintiffs as a result of violations of Section 2 of the Sherman Act (15 U.S.C. §2).

16.2  To compete effectively in the anesthesia and DI maintenance/service markets, Plaintiffs must not only be trained to perform the maintenance and service of the hardware, but must also have competitive access to the replacement parts necessary to maintain an adequate parts inventory for the maintenance and service of the hardware.  Additionally, training schools for working on GE anesthesia and DI machines are owned and controlled exclusively by GE; there are no reasonably interchangeable alternatives to these schools.  For decades

25

GE training school were open to Plaintiffs and others, partially because untrained service representatives could present a health hazard to the general public.  In fact, many, perhaps most, hospitals will not allow service representatives to work on their GE anesthesia or DI equipment without being certified by GE.  Hence, the training schools are basically essential facilities, as there are no alternative schools to GE's; the inability to attend these training schools is effectively a barrier to entry into these maintenance/service markets.  As an example of GE's monopoly power, that is, the power to raise price or exclude competition, the cost of these training schools rose drastically over the years. For example, in 2002 the cost of attending a two- day class on the 7900 Ventilator was $2,050; in 2013, the cost rose to $4,556.  The cost of attending a five -day class on the Aestiva 7100 more than doubled, rising from $5360 in 2002 to $11,385. To attend a five-day class on an Anesthesia Delivery Unit, the cost rose from $6,420 in 2002 to $13,665 in 2013.  No explanation or justification, if any existed, was offered by GE for these incredible increases in prices; the result was unequivocally to raise rivals cost and to further GE's plan to exclude Plaintiffs from the markets. Permitting Plaintiffs and others to attend its training schools is highly lucrative to GE, and is mandatory for Plaintiffs to have access to the anesthesia maintenance/service market; hence it is profitable to both Plaintiffs and Defendant GE.  The fact that the monopolist, GE, refuses to enter into a lucrative business dealing with a competitor is an indicia of a specific intent to monopolize the market; it is the sacrifice of short-term profits to obtain long-term monopoly profits.  Unless GE's practices are prevented by this Court, there is a dangerous probability that GE will succeed in obtaining a monopoly in the relevant sub-markets.

16.3   By virtue of their experience, training and ability to service hardware, Plaintiffs have had the requisite skill to service GE hardware, and have been strong competitors of GE; this increases competition and output in the market and offers consumers additional choices as to whom to utilize for maintaining, servicing, repairing, sale of parts, and refurbishing anesthesia machines and equipment.

16.4   Nevertheless, ISOs are precluded from effectively competing in the GE maintenance/service market because GE has used its dominant position as an OEM in the Hardware Market to undermine competition from ISOs in the maintenance/service market by, among other things, making replacement parts for its hardware directly unavailable to ISOs.   Replacement parts can only be obtained from OEMs or those companies that manufacture the replacement parts for OEMs. GE has acted in concert with its Third-Party OEMs to prevent ISOs from purchasing GE-specific replacement parts.

16.5   Although GE at one point made its own training programs a prerequisite to the purchase of its replacement parts, without justification GE drastically increased the price of such training over the years, as more thoroughly discussed in paragraph 57 above; the courses were not offered on a consecutive basis, and were spread throughout the year.

16.6   GE's latest and perhaps most exclusionary practice occurred on or about June, 2013. Despite Plaintiffs condescending to pay the exorbitant monopoly prices charged by GE to attend its training classes, Plaintiffs' repeated requests to attend training schools on GE's three current anesthesia models, the Aespire, the Avance, and the Aisys, have been denied by GE. On these models, training schools are done only at GE's Waukesha, Wisconsin location; GE has completely denied Plaintiffs access to this location.   As stated in paragraph 16.2 above, these training schools are mandatory and constitute an essential facility; an inability to attend the schools results in customers being unable to utilize Plaintiffs' anesthesia maintenance/repair skills.   At the same time, some of Plaintiffs rivals, such as hospital bio-medical engineers and asset management companies, are not required to take courses at all. Arbitrary exclusion from the training schools will eliminate Plaintiffs from the anesthesia maintenance/repair markets, as the ultimate consumer, hospital, will not permit technicians without this training to maintain/service its machines.

16.7   Evidentiary of GE's exclusionary practices is the fact that although Plaintiffs have complied with all of GE's requirements pertaining to training programs, GE still refuses to sell GE parts directly to Plaintiffs, and has contractually precluded its

Third-Party OEMs from selling said parts to Plaintiffs, or to anyone else except the end-user.

16.8 GE's policy constitutes the use of its dominant market power in the GE parts market to reduce competition in the GE maintenance/service market at the expense of Plaintiffs, consumers, and competition in general.  Exclusion from the training schools eliminates any possibility of Plaintiffs survival in the anesthesia and DI maintenance/service markets, resulting in competitive harm to Plaintiffs, consumers who wish to utilize Plaintiffs' services, and competition in said markets.

16.9 The purchase of anesthesia gas machines is a substantial financial investment. The cost of GE anesthesia hardware ranges from approximately $35,000 to $90,000; the cost of DI machines can be a million dollars or more.  The costs of Drager's hardware are approximately the same.  Many owners of anesthesia gas and DI machines own multiple machines, produced by more than one manufacturer.

16.10 Hospitals are the largest purchasers of anesthesia and DI machines.   The machines are also purchased by out-patient surgery centers and individual physicians and groups of physicians.   Hospitals generally own anywhere from two to twenty-five anesthesia machines.   An average sized hospital, one with approximately 400 beds, owns eight to ten anesthesia machines. As stated above, usually a hospital owns machines produced by more than one manufacturer, e.g., six GE machines and two Drager machines.   The consolidation trend of hospitals in the healthcare industry has increased the necessity for Plaintiffs to obtain parts from GE at competitive prices; there are groups owning numerous hospitals, some of which may use only Drager machines, and some of which own only GE machines.  In order to compete with GE for these contracts, or keep existing contracts, a service provider would have to have fair access to GE parts and training; if unable to provide GE parts, a rival could lose the entire group of hospitals, to its great financial detriment.   This situation would also result in hospitals being denied its free choice of a maintenance/service entity.

16.11   Anesthesia and DI machines are unique in that parts for GE hardware cannot be used in hardware produced by other manufacturers, such as Drager, and vice-versa.   In addition, specialized knowledge is required before a technician is qualified to service a particular brand or model of hardware.

16.12   Anesthesia gas machines are extremely durable and, with proper maintenance and servicing, can have a useful life of anywhere from ten to fifteen years. Anesthesia gas machines do, however, require regular maintenance and service, and occasionally repair.   Users of such hardware may either maintain and service their hardware in-house, or contract with either OEMs, asset management companies, and ISOs for such services.

16.13   Institutions which contract with outsiders for maintenance and service of their high-technology medical equipment frequently prefer to deal with only one organization for that purpose.   Therefore, in order to effectively compete in the maintenance/service market, ISOs must be able to maintain and service all brands of hardware, those principally being GE and Drager.

16.14   In selecting a maintenance and service provider for its GE anesthesia and DI equipment, those owners which do not have an in-house biomedical technician of GE hardware can consider only GE itself and other firms which are capable of maintaining and servicing GE hardware, as they must maintain or have immediate access to a complete inventory of GE parts and employ technicians skilled in the service of GE hardware.   The same holds true for owners of Drager hardware.   A vast majority of customers do not have an in-house biomedical technician.

16.15   Therefore, in order to compete effectively, entities which maintain and service anesthesia and DI machines, such as Plaintiffs herein, must stock inventories of replacement parts for all types of hardware being maintained/serviced.   Any service provider not maintaining such an inventory is unable to adequately respond to many types of service problems, and thus is unable to effectively compete, or is totally excluded, from service contracts for anesthesia and DI machines.

16.16  As stated in paragraph 6.2 above, GE-specific replacement parts built to the specifications of GE hardware can only be obtained from GE's exclusive distributor, Alpha Source.

16.17  GE's policy of refusing to sell replacement parts directly to ISOs, and preventing Third-Party OEMs from selling any of its parts to ISOs, creates a market situation wherein the only replacement parts generally available to ISOs are through GE's exclusive distributor, Defendant Alpha Source.

16.18  As the sole supplier and holder of numerous allegedly proprietary rights in certain GE computer software engineering changes, replacement parts and documentation, GE controls 100 percent of the original sales of those products.

16.19  New vintage models are technically more advanced and require "up to the minute" documentation, technical support, access to software revision upgrades (that are numerous during early machine releases) and numerous product enhancements.  The failure of GE to timely provide these services further places Plaintiffs at a significant competitive disadvantage with GE.

16.20  Certain GE documentation, including maintenance manuals, technical service bulletins, technical service procedures and other documentation, is allegedly protected under the federal copyright laws.  GE retains ownership of its manuals and other service documentation and does not allow it to be reproduced.  By virtue of its alleged proprietary rights in this GE documentation, GE maintains a significant advantage over its competitors in the maintenance/service market, as reference to this documentation and subsequent revisions is essential to the proper maintenance and service of GE hardware.

16.21  Access to replacement parts at competitive prices directly from GE is essential to maintain/service GE hardware. Alpha Source has proven itself incapable of meeting the demands of Plaintiffs in providing rapid service at competitive prices.

16.22  Likewise, in order to compete effectively, companies which maintain and service anesthesia and DI machines must employ technicians who have the specific knowledge to service the hardware of each OEM.   ISOs must either hire technicians with special expertise or train its own technicians to maintain and service the hardware of a particular OEM.   As stated above, this training is

expensive and time-consuming.  Given the infrequency GE offers the training classes, it could easily take an ISO three to four years to train a new technician; this is clearly a barrier to entry and growth.

16.23   Some Plaintiff ISOs have the requisite expertise and access to necessary parts to service hardware manufactured by OEMs other than GE.  Many existing customers of Plaintiff ISOs have requested that Plaintiffs also service their GE hardware.  With the proper access to parts, Plaintiff ISOs would be capable of properly servicing GE hardware without the burden and fear of "chasing" a part in the "black market" in the event a product fails.  In this regard, Plaintiffs would show the Court that nearly all GE machines incorporate subassemblies.  Failures of these subassemblies are the reason a majority of service calls are necessitated.  GE mandates that these subassemblies can be repaired only by GE.  It has been GE's policy to charge exorbitant rates to repair subassemblies submitted for repair by rivals; yet GE charges customers substantially less if the repair is done by GE. Also, GE takes several months to repair a subassembly submitted by a rival, necessitating rivals to keep a much increased shelf stock. This anticompetitive conduct by GE has the effect of raising the costs of its rivals, injuring the goodwill of ISOs, and is destructive to the competitive process in general.

16.24   GE has developed and implemented a plan to totally exclude Plaintiff ISOs from competing in the GE maintenance/service markets. GE has developed and implemented this plan to buttress its monopoly position in the GE parts market and to gain complete control over the GE maintenance/service market.

16.25   Pursuant to that plan, GE has engaged in the following anticompetitive, exclusionary acts and conduct with the specific intent to monopolize and to restrain competition and drive Plaintiffs out of the GE maintenance/service markets:

(a)      refusing to directly sell any GE replacement parts to Plaintiff ISOs, while selling  said parts directly to end-users at highly discounted, discriminatory prices;

(b)    refusing to permit ISOs to attend its monopoly training schools, which is mandatory to maintain, service, sell parts, and refurnish  customers' machines;

(c)    previously instituting a training requirement that was a continuing pretext to restrict parts sales to ISOs, then recently changing its policy by refusing to sell parts directly to Plaintiff who must now buy said parts from GE's exclusive representative, Alpha Source, at highly inflated prices;

(d)    charging exorbitant prices to make repair services for the repair of parts, subassemblies, components or modules available to ISOs;

(e)    consistently making "obsolete" its current models, and then refusing to sell parts of these machines to Plaintiffs, even though GE has the parts available if a customer permits GE to do the repair

(f)    contracting with its Third Party OEMs not to sell parts, components or modules to ISOs, or anyone else except end-users;

(g)    Upon information and belief, GE  provides  highly  discounted  prices  for parts and service to some of its customers; in fact, it is believed that under some of its programs, GE parts and service are offered below average variable cost. At the same time, GE, through its exclusive distributor Alpha Source, Inc. has charged supra-competitive prices to ISOs in the parts market, where it has a monopoly.   By thus raising its rivals cost, GE is seeking to maintain and even extend its monopoly power.

16.26  GE's conduct was intended to have, and has had, the effect of reducing the ability of Plaintiffs to compete against GE.   GE's acts, described above, were intended to restrain Plaintiffs from competing with GE in the GE maintenance/service market, and increase GE's dominance of the GE maintenance/service Market.

16.27  Owners of GE hardware would benefit from a choice of being able to utilize an ISO, and the services of such firms would increase competition with respect to the maintenance and service of GE hardware.  By GE's continuing exclusionary practices of granting consumers free services, parts, and preferential warranties, which Plaintiffs cannot do, and mandating that Plaintiffs cannot purchase parts directly from GE but must instead purchase said required parts at highly inflated prices from Alpha Source, Inc., will eventually and illegally eliminate all Plaintiffs herein from the market.  This will have the effect of leaving consumers at the total

mercy of a monopoly.  Given the barriers to entry in this industry and the present monopoly position of GE, GE could subsequently charge supra-competitive prices for both parts and service, without fear of new entry.

16.28   Consumers would benefit from price competition between ISOs and GE in the GE maintenance/service markets.  Consumers, as well as competition, will to be harmed if Plaintiff ISOs continue to be subjected to the anticompetitive conduct of GE and Alpha Source, Inc. in the maintenance/service markets.

16.29   GE's acts have harmed, are harming, and threaten to continue to harm competition in the GE maintenance/service markets.  Plaintiffs and other existing and potential competitors, as well as consumers and competition, have been damaged by GE's anticompetitive and exclusionary acts.  As a result of GE's actions, Plaintiffs have been precluded and are being precluded from competing effectively or competing altogether in the GE maintenance/service markets, and will be forced to withdraw from that market because they cannot expect to operate profitably over the long term.  Some GE rivals have already been forced to withdraw from the market, due to GE's exclusionary tactics.

16.30   As a result of GE's actions, potential competitors are being prevented or deterred from entering the maintenance/service markets.  This reduces the number of competitors and consolidates the monopoly power of GE in the GE maintenance/service markets.

16.31   As a result of GE's actions, consumers have been harmed because of a lack of choice of hardware maintenance and service providers, and will be harmed further by continued exclusion of ISOs, from the GE maintenance/service markets.  GE's actions are designed to prevent ISOs from competing effectively with GE, and to increase the costs of the ISOs and other rivals, thereby forcing them to either operate at smaller profit margins or increase their prices and lose business to GE.  By precluding the entry of new competitors and preventing Plaintiffs from growing in the GE maintenance/service markets, and by restraining existing competitors in the GE maintenance/service markets, GE has made monopoly profits in the GE parts market, and will eventually, unless restrained, obtain a monopoly in the maintenance/service markets.

16.32 Because users of high-technology medical equipment often prefer that a single provider meet their service needs, GE is able to use its dominant position in the OEM market for further competitive advantage through its ability to be a single source of maintenance and service in mixed-equipment environments.  Plaintiffs are precluded from competing effectively against GE for customers with mixed-equipment environments because of GE's anticompetitive activities.

16.33 GE has no efficiency or other legitimate business justification for the above-alleged exclusionary acts.

16.34 For, <u>inter alia</u>, the following reasons the GE policy precludes Plaintiffs from effectively competing in the GE maintenance/service markets:

(a)    The GE policy of denying rivals equal access to its monopoly training schools constitutes an insurmountable barrier to entry.  Although many ISOs have trained technicians, GE is making it difficult—if not impossible—for current and new technicians to become trained on GE' newest machines, by either denying them access, or only limited access which precludes the entry of new ISOs and growth by existing ones, such as Plaintiffs.

(b)    Training on a particular type of GE hardware does not qualify the trained individual to work on another type of GE hardware.

(c)    Changing its decades old policy of selling parts directly to ISOs at GE list prices, and mandating that ISOs can now obtain GE parts via its exclusive distributor, Alpha Source, at supra-competitive prices, will eliminate GE's rivals from the GE maintenance/service markets; this is further aggravated by GE selling parts directly to Plaintiffs customers at discriminatorily low prices.

16.35 The current GE policy toward Plaintiffs is exclusionary and monopolistic; there is no good faith effort by GE to discontinue its illegal practices. Instead there are continuing deliberate changes in policy, as discussed above, to destroy Plaintiffs and thereby exclude an entire class of competitors, which is destructive to competition, reduces output, and which raises great antitrust concerns in a

competitive, free enterprise system.

16.36 The GE policy is restrictive and excludes the ISO's from effectively competing in the GE maintenance/service markets; it precludes fair and open competition from Plaintiff ISOs, and will eventually eliminate all competition in GE anesthesia and DI machine maintenance/service.

16.37 The maintenance and service of GE anesthesia gas machines is a distinct relevant product/service submarket (the maintenance/service market"). The relevant geographic market is nationwide. The maintenance and service of GE DI machines is a distinct relevant product/service submarket. The relevant geographic market is nationwide.

16.38 Plaintiffs are in direct competition with GE in the maintenance/service markets. The competition takes place throughout the United States, including the Eastern District of Texas.

16.39 The maintenance/service market for GE anesthesia and DI machines produces revenues far exceeding one hundred million dollars per year in the United States. GE controls 100% of the replacement parts, subassembly exchange parts, technical training schools, technical software, and technical data subscription service revenues for GE anesthesia and DI machines.

## 17. UNLAWFUL ACTS

The aforesaid conduct and acts of GE and Alpha Source were engaged in with the purpose and specific intent to injure, suppress, destroy and irreparably harm Plaintiffs as vital competitors in the relevant markets; and, to control prices and to unlawfully monopolize trade and commerce in said relevant markets in violation of Section 2 of the Act of Congress of July 2, 1890 (15 U.S.C. 2), commonly known as the Sherman Act. Said conduct and acts of GE has created and creates a dangerous probability that GE will succeed in injuring, suppressing, destroying and irreparably harming Plaintiffs as vital competitors in the relevant markets (including the Eastern District of Texas) and will allow GE to control prices and monopolize trade and commerce in said relevant markets, all to the great detriment of competition and consumers.

35

## 18.  INJURY

18.1 By reason of GE's aforesaid unlawful conduct and as a direct and proximate result or such conduct, Plaintiffs have lost sales, profits and value of their businesses. Plaintiffs have, and will continue to suffer irreparable harm through loss of their trade and business, and the public will be damaged by:

(a) weakening or elimination of Plaintiffs and others in the repair and service of GE anesthesia machines and equipment in the relevant markets;

(b) the weakening or elimination of independent sources for parts for GE anesthesia machines and equipment; and,

(c) the weakening or elimination of suppliers of and the supply of used and reconditioned GE anesthesia machines and equipment.

18.2 The foresaid violations of Section 2 of the Sherman Act have had, will have, and will continue to have the following effects, among others:

(a) There will be a dangerous probability that defendant GE will achieve a monopoly in the repair and service of GE anesthesia machines and equipment, in the parts therefore, and in the sales thereof in the relevant markets;

(b) Defendants have and will restrain, suppress and eliminate actual and potential competition in the repair and service of GE anesthesia machines and equipment, in the parts therefore, and in the sales thereof in the relevant markets;

(c) The public has been and will be denied the benefits of unrestricted competition in a free and open market in the repair and service of GE anesthesia machines and equipment, in the parts therefore, and, in the sales thereof in the relevant markets;

(d) Plaintiffs have been and will be denied the benefits of unrestricted competition in a free and open market for the repair and service of GE anesthesia machines and equipment, in the parts therefore, and, in the sales thereof in the relevant markets; and,

(e) Plaintiffs have been and will be precluded from obtaining and carrying out substantial contracts entered into for the repair and service of GE anesthesia

machines and equipment and related accessories, for the parts therefore, and for the sale thereof in the relevant markets.

## 19.  PRAYER FOR RELIEF

WHEREFORE, as and for a Third Claim for Relief, plaintiffs pray this court to order, adjudge and decree that:

A. Defendants GE and Alpha Source have engaged in attempted monopolization of the relevant markets in violation of Section 2 of the Sherman Act;

B. Plaintiffs be awarded damages, when ascertained, and that Defendants pay Plaintiffs threefold the damages;

C. Plaintiffs be awarded reasonable attorney's fees;

D. Plaintiffs recover interest on actual damages;

E. Plaintiffs recover costs of suit; and,

F. Plaintiffs be awarded injunctive relief to prevent and restrain Drager Defendant's unlawful actions and for such other and further relief as the court may deem just and proper.

## 20.  FOURTH CLAIM FOR RELIEF
**(Combinations, Contracts, Conspiracies in Restraint of Trade; Combination and Conspiracy to Monopolize - Sherman Act §1 and §2)**

Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 19 of this Complaint, with the same force and effect as if said paragraphs were herein set forth in full.

## 21.  JURISDICTION AND VENUE

The jurisdiction of this court is invoked and this action is instituted under the provisions of Section 1337 of title 28, United States Code (28 U.S.C. §1337)) and Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§15, 22 and 26) to declare, to prevent and restrain and recover damages sustained by Plaintiffs as a result of violations of Section 1 and 2 of the Sherman Act ( 15 U.S.C. §§1, 2).

37

## 22.  UNLAWFUL ACTS

The aforesaid conduct and acts of GE and others in contract, combination and conspiracy with GE unreasonably restrained trade in the United States, including the Eastern District of Texas, and were done with the purpose and intent to control prices and to unlawfully monopolize trade and commerce in said relevant markets in violation of Sections 1 and 2 of the Act of Congress of July 2, 1890 (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act.

## 23.  INJURY

23.1 By reason of GE's aforesaid unlawful conduct and as a direct and proximate result or such conduct, Plaintiffs have lost sales, profits and value of their businesses. Plaintiffs have, and will continue to suffer irreparable harm through loss of their trade and business, and the public will be damaged by:

(a)  weakening or elimination of Plaintiffs and others in the repair and service of GE anesthesia machines and equipment in the relevant markets;

(b)  the weakening or elimination of independent sources for parts for GE anesthesia machines and equipment; and,

(c)  the weakening or elimination of suppliers of and the supply of used and reconditioned GE anesthesia machines and equipment.

23.2 The aforesaid violations of Sections 1 and 2 of the Sherman Act have had, will have, and will continue to have the following effects, among others:

(a)  There will be a dangerous probability that defendant GE will achieve a monopoly in the repair and service of GE anesthesia machines and equipment, in the parts therefore, and in the sales thereof in the relevant markets;

(b)  Defendants have and will restrain, suppress and eliminate actual and potential competition in the repair and service of GE anesthesia machines and equipment, in the parts therefore, and in the sales thereof in the relevant markets;

(c)  The public has been and will be denied the benefits of unrestricted competition in a free and open market in the repair and service of GE

anesthesia machines and equipment, in the parts therefore, and, in the sales thereof in the relevant markets;

(d)   Plaintiffs have been and will be denied the benefits of unrestricted competition in a free and open market for the repair and service of GE anesthesia machines and equipment, in the parts therefore, and, in the sales thereof in the relevant markets; and,

(e)   Plaintiffs have been and will be precluded from obtaining and carrying out substantial contracts entered into for the repair and service of GE anesthesia machines and equipment and related accessories, for the parts therefore, and for the sale thereof in the relevant markets.

## 24.  PRAYER FOR RELIEF

WHEREFORE, as and for a Fourth Claim for Relief, plaintiffs pray this court to   order, adjudge and decree that:

A.   GE and Alpha Source Defendants have engaged in unreasonable contracts, combinations and conspiracies in restraint of trade in the relevant markets and have unreasonably combined and conspired to monopolize trade in the relevant markets in violation of Sections 1 and 2 of the Sherman Act.

B.   Plaintiffs be awarded damages, when ascertained, and that Defendants pay Plaintiffs threefold the damages;

C.   Plaintiffs be awarded reasonable attorney's fees;

D.   Plaintiffs recover interest on actual damages;

E.   Plaintiffs recover costs of suit; and,

F.   Plaintiffs be awarded injunctive relief to prevent and restrain Defendants unlawful actions and for such other and further relief as the court may deem just and proper.

## 25.  FIFTH CLAIM FOR RELIEF
### (Illegal Acquisition—CLAYTON ACT 7 (15 U.S.C. §18)

25.1   Plaintiffs incorporate herein by reference the allegations of paragraphs 1 through 24 of this Complaint, with the same force and effect as if said paragraphs were herein set forth in full.

25.2    The jurisdiction of this court is invoked and this action is instituted under the provisions of Section 1337 of Title 28, United States Code (28 U.S.C. 1337) and Sections 4, 12 and 16 of the Clayton Act (15 U.S.C.  15, 22 and 26) to declare, to prevent and restrain and recover damages sustained by plaintiffs as a result of violations of Section 7 of the Clayton Act (15 U.S.C. § 18).

25.3    Section 7 of the Clayton Act (U.S.C. 18) declares, "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

25.4    Defendant GE has a long history of acquiring the assets and or facilities of competitors or other companies, such as the acquisition of Defendant Datex-Ohmeda.  Plaintiffs herein contend that said acquisition violates Clayton 7, as subsequently and presently utilized by GE in an exclusionary fashion, and is one of many illegal methods whereby Defendants maintain and increase their monopoly power, as described above.   In the seminal case of <u>California v. American Stores</u>, 495 U.S. 271, 296(1990), the issue arose as to the power of a Federal district court to order a divestiture in a *private* antitrust case.  Reviewing the history of the Clayton Act, particularly with regard to the injunctive §16, the United States Supreme Court stated, "We hold that such a remedy is a form of 'injunctive relief' within the meaning of § 16 of the Clayton Act."

25.5    Instead of entering the markets de novo, thereby increasing output and competition, GE chose instead to acquire the largest producer, Datex-Ohmeda. The subsequent and continuing exclusionary conduct engaged in by Defendant GE, as described *supra,* is indicative of an acquisition that "may be substantially to lessen competition, or tend to create a monopoly," in the relevant markets and created barriers to entry for potential new competitors.  By combining its vast resources with the leading anesthesia manufacturer, Datex-Ohmeda, GE Defendants acquired increased market power which they are utilizing to eliminate Plaintiffs and others from the market, by raising their rivals cost, and the many other anticompetitive acts described above.  The elimination of Plaintiffs and other GE competitors will undoubtedly result in the proscribed effect of Clayton Section 7-- "the effect of such acquisition may be to substantially to lessen competition and tend to create a monopoly." Not only are Plaintiffs thereby injured in their business or property, the consuming public will have fewer choices as well, due to the resultant decreased competition.

## 26.  PRAYER FOR RELIEF

WHEREFORE, as a Fifth Claim for Relief, Plaintiffs request the Court to exercise its equity powers as established by law, to set aside the illegal monopolization/attempted monopolization created partially through the aforesaid acquisition engaged in by Defendants, in order to restore competition in the relevant markets, and in furtherance of protecting competition and the public welfare.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiffs prays that Defendants be cited to appear and answer herein;  and that upon final hearing hereof, Plaintiffs have and recover of and from Defendants for all damages as alleged herein, for attorneys' fees, costs of court; punitive and/or exemplary damages, both pre- and post-judgment interest at the legal rate thereon for all damages, and for such other and further relief to which Plaintiffs may be justly entitled to receive, at law or in equity, special or general.

Respectfully Submitted,

**PROVOST & UMPHREY LAW FIRM, LLP**
490 Park Street (77701)
P.O. Box 4905
Beaumont, Texas 77704-4905
Phone:  (409) 835-6000
Fax:      (409) 838-8888

By:      s/ Paul F. Ferguson, Jr.
Paul F. Ferguson, Jr.
TBN:  06919200

**PAUL BARTLETT, JR.**
TBN:  01849000
203 Zornia Drive
San Antonio, Texas 78213-2113
Phone:  (210) 341-6703
Fax:  (210) 525-8011
ATTORNEYS FOR PLAINTIFFS

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

By:      s/ Paul F. Ferguson, Jr.
Paul F. Ferguson, Jr.

42

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served upon all parties on this 22nd day of May, 2015, in accordance with Fed.R.Civ.P.


By:   s/ Paul F. Ferguson, Jr.
      Paul F. Ferguson, Jr.