UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

---

| | |
|---|---|
| RED LION MEDICAL SAFETY, INC., § | |
| UNIVERSAL MEDICAL SERVICES, INC., § | |
| METROPOLITAN MEDICAL SERVICES OF § | |
| NC, INC., BIOMEDICAL CONCEPTS, § | |
| ANETHESIA SERVICE, INC., § | |
| DIVERSIFIED ANESTHESIA, LLC, d/b/a § | |
| DIVERSIFIED ANETHESIA; § | |
| PARAGON SERVICE, § | |
| BAY STATE ANESTHESIA, INC., § | |
| POPN, INC., Successor In Interest to § | |
| PENN BIOMEDICAL SUPPORT, INC., § | |
| GASMEDIX, LLC, § | |
| WEST COAST ANESTHESIA § | |
| SPECIALISTS, INC., § | |
| PALO VERDE BIOMEDICAL § | |
| CONSULTANTS, LLC, § | |
| HEARTLAND SALES & SERVICES, LLC, § | |
| § | |
| Plaintiffs, § | |
| § | CIVIL NO.: 2:15-CV-308 |
| v. § | |
| § | Oral Hearing Requested |
| GENERAL ELECTRIC COMPANY, INC., § | |
| GE HEALTHCARE a unit of § | |
| GENERAL ELECTRIC COMPANY; § | |
| GE TECHNOLOGY INFRASTRUCTURE, § | |
| a unit of GENERAL ELECTRIC COMPANY; § | |
| DATEX-OHMEDA, a unit of § | |
| GENERAL ELECTRIC COMPANY, and § | |
| ALPHA SOURCE, INC., § | |
| § | |
| Defendants. § | |

---

**DEFENDANT GENERAL ELECTRIC COMPANY, INC.'S
MOTION TO DISMISS AND MEMORANDUM IN SUPPORT THEREOF**

Defendants General Electric Company, GE Healthcare, GE Technology Infrastructure, and Datex-Ohmeda (collectively "GE") hereby move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all claims against GE in the Second Amended Complaint ("SAC") filed by Red Lion Medical Safety, Inc., et al. ("Plaintiffs") on May 22, 2015.  A memorandum of points and authorities in support of this motion follows.

Pursuant to Local Rule CV-7(a), GE submits as a separate exhibit a proposed order granting this motion to dismiss.  Pursuant to Local Rule CV-7(g), GE hereby requests an oral hearing on this motion.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF ISSUES ........................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 3

STANDARD OF REVIEW ........................................................................................... 4

LEGAL ARGUMENT.................................................................................................... 6

    I.      EXCLUSIVE DISTRIBUTORSHIPS ARE LAWFUL. ............................................7

    II.     THE ANTITRUST LAWS DO NOT REQUIRE GE TO HELP
         ITS COMPETITORS.....................................................................................11

    III.    THE ANTITRUST LAWS DO NOT PROHIBIT GE FROM
         OFFERING CUSTOMERS BETTER DEALS THAN
         PLAINTIFFS CAN OFFER ........................................................................15

    IV.    PLAINTIFFS FAIL ADEQUATELY TO PLEAD THE
         RELEVANT MARKETS OR GE'S POWER IN THOSE
         MARKETS ...................................................................................................17

         A.     Plaintiffs Fail to Allege Relevant Product Markets. .......................................17

         B.     Plaintiffs Fail to Allege a Relevant Geographic Market.................................20

         C.     Plaintiffs Fail Adequately to Allege Market Power.........................................21

         D.     Plaintiffs Fail Adequately to Allege GE's Alleged
                Agreements with Parts Suppliers, Owners of GE
                Equipment, Other Service Providers, and Financing
                Providers. ......................................................................................................23

    V.     THE FIFTH CLAIM ("ILLEGAL ACQUISITION") IS BARRED
         BY THE STATUTE OF LIMITATIONS AND BECAUSE
         PLAINTIFFS FAIL TO ALLEGE THE REQUIRED
         SUBSTANTIAL LESSENING OF COMPETITION .................................................24

CONCLUSION.................................................................................................................. 26

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aladdin Oil Co. v. Texaco, Inc.,*
   603 F.2d 1107 (5th Cir. 1979) ...........................................................................8

*Almeda Mall, Inc. v. Houston Lighting & Power Co.,*
   615 F.2d 343 (5th Cir. 1980) .............................................................................1

*Apani Sw., Inc. v. Coca-Cola Enters.,*
   300 F.3d 620 (5th Cir. 2002) ...............................................................18, 19, 21

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...........................................................................................5

*Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.,*
   677 F. Supp. 1477 (D. Or. 1987) ....................................................................26

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ...........................................................................................5

*Barr Labs v. Abbott Labs,*
   978 F.2d 98 (3d Cir. 1992) .................................................................................2

*Bayou Bottling v. Dr. Pepper Co.,*
   725 F.2d 300 (5th Cir. 1984) ...........................................................................17

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ..............................................................................5, 17, 24

*Berry v. Indianapolis Life Ins. Co.,*
   608 F. Supp.2d 785 (N.D. Tex. 2009) .............................................................24

*Big River Indus. v. Headwaters Res., Inc.,*
   971 F. Supp. 2d 609 (M.D. La. 2013) ..................................................8, 19, 23

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993) .........................................................................................16

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ...................................................................................20, 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ...........................................................................................6

*Christy Sports v. Deer Valley Resort,*
    555 F.3d 1188 (10th Cir. 2009) ............................................12

*Commonwealth of Pa. v. PepsiCo,*
    836 F.2d 173 (3d Cir. 1988) ............................................5

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ............................................25

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Corp.,*
    854 F.2d 802 (6th Cir. 1988) ............................................8

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
    36 F.3d 1147 (1st Cir. 1994) ............................................1, 10, 15

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
    761 F. Supp. 185 (D. Mass. 1991) ............................................2, 12

*Drury Inn v. Olive Co.,*
    878 F.2d 340 (10th Cir. 1989) ............................................7

*E&L Consulting v. Doman Industries, Ltd.,*
    472 F.3d 23 (2d Cir. 2006) ............................................9

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.,*
    129 F.3d 240 (2d Cir. 1997) ............................................8

*Felder's Collision Parts, Inc. v. All Star Adver. Agency, Inc.,*
    777 F.3d 756 (5th Cir. 2015) ............................................6, 16, 17

*Fernandez–Montes v. Allied Pilots Ass'n,*
    987 F.2d 278 (5th Cir.1993) ............................................5

*Four Corners Nephrology Assoc. v. Mercy Med. Ctr.,*
    582 F.3d 1216 (10th Cir. 2009) ............................................12

*Fox Film Corp. v. Doyal,*
    286 U.S. 123 (1932) ............................................14

*Hornsby Oil Co. v. Champion Spark Plug Co.,.*
    714 F.2d 1384 (5th Cir. 1983) ............................................20

*In re Indep. Serv. Orgs. Antitrust Litig.,*
    203 F.3d 1322 (Fed. Cir. 2000) ............................................15

*In re Mun. Bond Reporting Antitrust Litig.,*
    672 F.2d 436 (5th Cir. 1982) ............................................6, 20

*In re Pilgrim's Pride Corp.*,
    728 F.3d 457 (5th Cir. 2013) ...................................................................6

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    940 F. Supp. 2d 367 (E.D. La. 2013) ......................................................23

*In re Refined Petroleum Prods. Antitrust Litig.*,
    649 F. Supp.2d 572 (S.D. Tex. 2009) ......................................................24

*Int'l Travel Arrangers v. NWA, Inc.*,
    991 F.2d 1389 (8th Cir. 1993) ................................................................17

*Israel Travel Advisory Serv., Inc. v. Israel Identity Tours Inc.*,
    61 F.3d 1250 (7th Cir. 1995) ....................................................................6

*Jebaco, Inc. v. Harrah's Operating Co.*,
    587 F.3d 314 (5th Cir. 2009) ....................................................................5

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir.2008) ..................................................................24

*Marucci Sports, L.L.C. v. NCAA*,
    751 F.3d 368 (5th Cir. 2014) ....................................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................16

*Midwestern Mach. Co. v. NW Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ..................................................................25

*Montano Cigarette, Candy & Tobacco, Inc. v. Core-Mark Mid-Continent, Inc.*,
    No. 3:08-cv-426, 2008 WL 4793696 (D. Conn. Oct. 31, 2008)...............17

*Muenster Butane, Inc. v. Stewart Co.*,
    651 F. 2d 292 (5th Cir. 1981) ...................................................................8

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) .............................................................12, 13

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
    555 U.S. 438 (2009).................................................................................14

*PSKS, Inc. v. Leegin Creative Leather Prods.*,
    615 F.3d 412 (5th Cir. 2010) .......................................................18, 19, 22

*Reborn Enters., Inc. v. Fine Child, Inc.*,
    590 F. Supp. 1423 (S.D.N.Y. 1984)..........................................................8

iv

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004) .................................................................8

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
  28 F.3d 1379 (5th Cir. 1994) ...............................................................23

*SCFC v. Visa*,
  36 F.3d 958 (10th Cir. 1994) .................................................................6

*Schor v. Abbott Labs*,
  457 F.3d 608 (7th Cir. 2006) ...............................................................12

*Seaboard Supply Co. v. Congoleum Corp.*,
  770 F.2d 367 (3d Cir. 1985)...................................................................8

*Serv. & Training, Inc. v. Data Gen. Corp.*,
  963 F.2d 680 (4th Cir. 1992) ...............................................................15

*Spectrofuge Corp. v. Beckman Instruments*,
  575 F.2d 256 (5th Cir.1978) .................................................................20

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)......................................................................18, 22

*Sports Ctr., Inc. v. Riddell, Inc.*,
  673 F.2d 786 (5th Cir. 1981) ...............................................................11

*Star Tobacco Inc. v. Darilek*,
  298 F. Supp.2d 436 (E.D. Tex. 2003) .............................................19, 21

*Stearns Airport Equip. Co. v. FMC Corp.*,
  170 F.3d 518 (5th Cir. 1999) .......................................................16, 17, 23

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
  940 F. Supp. 1026 (E.D. Tex. 1996)......................................................23

*Stewart v. Abend*,
  495 U.S. 207 (1990)..............................................................................14

*Stitt Spark Plug Co. v. Champion Spark Plug*,
  840 F.2d 1253 (5th Cir. 1988) .............................................................17

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*,
  309 F.3d 836 (5th Cir. 2002) .........................................................21, 22

*Telecom Technical Servs., Inc. v. Siemens Rolm Co.*,
  388 F.3d 820 (11th Cir. 2004) .........................................................2, 10

*United States v. Arnold, Schwinn & Co.*,
388 U.S. 365 (1967), *overruled on other grounds by Cont'l T.V. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977)................................................................................................8

*United States v. Baker Hughes, Inc.*,
731 F. Supp. 3 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990)............................25

*United States v. E. I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957)............................................................................................18

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)............................................................................................22

*United States v. Marine Bancorporation*,
418 U.S. 502 (1974)............................................................................................21

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)............................................................................................25

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)......................................................................................12, 13

*Wallace v. IBM*,
467 F.3d 1104 (7th Cir. 2006) ............................................................................16

*Westman Comm'n Co. v. Hobart Int'l*,
796 F.2d 1216 (10th Cir. 1986) ..........................................................................10

*Z Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) ..............................................................................25

**STATUTES**

Clayton Act, 15 U.S.C. §§ 12-27 ..............................................................18, 25, 22

Sherman Act, 15 U.S.C. §§ 1-7 .............................................................13, 14, 18, 22

**RULES**

Federal Rule of Civil Procedure 12(b)(6) ....................................................3, 5, 24, 25

**OTHER AUTHORITIES**

Dep't of Justice & Federal Trade Commission, *2010 Horizontal Merger Guidelines* ..............26

Dep't of Justice & Federal Trade Commission, *Statements of Antitrust Enforcement Policy in Health Care* (1999) ..................................................................................2

**INTRODUCTION**

As courts have held time and again, the antitrust laws were never intended to be used as a remedy for ordinary commercial disputes, nor were they meant as a means to protect the profits of individual companies.  Rather, the antitrust laws were meant to ensure that anticompetitive conduct in the marketplace does not harm consumers.  As the Fifth Circuit has emphasized, "A showing of lost profits to the [plaintiff] is insufficient by itself to establish a compensable injury under the antitrust laws since there is no parallel injury to competition."  *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 354 (5th Cir. 1980).

Yet in this suit, Plaintiffs are a group of downstream sellers of GE parts and repair services -- independent service organizations (ISOs) -- who seek to constrain GE's freedom to market its own products in the manner that it deems most efficient, in order to protect their own profits.  They seek to invoke the federal antitrust laws as a weapon to condemn commonplace, lawful business practices, which are similar to the practices that are used by many suppliers in many other industries.  They condemn GE's decision to sell through an exclusive distributor rather than directly; they condemn GE's alleged refusal to train Plaintiffs' employees; and they condemn GE's willingness to offer better terms to consumers than Plaintiffs offer to consumers.  None of these acts violates the antitrust laws.

Not surprisingly, antitrust claims by ISO plaintiffs similar to the claims here have consistently been rejected by federal courts, based on the long-established principle that the antitrust laws are intended to prevent harm to consumers, not to protect the profits of suppliers.  *E.g.*, *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1189 (1st Cir. 1994) (rejecting claim based on defendant's refusal to sell parts to ISO plaintiffs: "[w]e cannot presume that elimination of an intermediate seller of [spare parts and repair services] harms consumers");

*accord Telecom Technical Servs., Inc. v. Siemens Rolm Co.*, 388 F.3d 820, 827 (11th Cir. 2004) (refusal to sell parts to ISOs does not cause harm to consumers, and thus does not violate antitrust laws); *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 761 F. Supp. 185, 189-92 (D. Mass. 1991) (rejecting antitrust claim based on defendant's refusal to train plaintiffs' employees or provide diagnostic tools to plaintiffs).  This well-established precedent compels dismissal of Plaintiffs' claims here.

Plaintiffs allege no facts suggesting that any of the conduct that GE allegedly engaged in has harmed consumers.  To the contrary, a manufacturer's decision to appoint an exclusive distributor is the sort of efficiency-enhancing practice that courts and commentators have often recognized to be beneficial to consumers. The fact that GE's conduct has allegedly squeezed the profits that Plaintiffs desire to make for themselves is simply irrelevant.  Even if Plaintiffs could prove that they have suffered business losses as a result of GE's practices, such proof would not establish a claim for relief under the antitrust laws.  Nor does the fact that this case involves the healthcare industry confer upon Plaintiffs any special exemption from the operation of ordinary antitrust principles.[1]  The Second Amended Complaint should be dismissed in its entirety.

## STATEMENT OF ISSUES

Whether the Second Amended Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(6), based on any or all of the following grounds:  (i) None of the claims in the case alleges any cognizable injury to competition under the antitrust laws; (ii) None of the claims in

---

[1] *See, e.g., Barr Labs v. Abbott Labs*, 978 F.2d 98 (3d Cir. 1992) (applying general antitrust principles to dismiss exclusive dealing and predatory pricing claims against antibiotic manufacturer); Dep't of Justice & Federal Trade Commission, *Statements of Antitrust Enforcement Policy in Health Care*, Introduction (1996) ("general antitrust principles" should be applied to "all types of health care provider networks";  health care industry should not be treated either "more strictly or more leniently" than other industries).

the case adequately alleges that GE possessed market power in a proper relevant market; and/or
(iii) The Fifth Claim is barred by the statute of limitations.

## STATEMENT OF FACTS[2]

GE makes and sells medical devices, including anesthesia machines and diagnostic
imaging ("DI") machines.  Second Amended Complaint (henceforth "SAC ") ¶¶ 4.1-4.2.  It
acquired the anesthesia machine business in a transaction with Datex-Ohmeda, Inc. in 2003,
prior to which GE did not compete in the market for anesthesia machines.  SAC ¶¶ 4.3.
Hospitals are the largest purchasers of anesthesia and DI machines.  SAC ¶ 16.10.

GE provides customers with repair and maintenance services for these anesthesia and DI
machines.  There are many other companies who also offer such repair and maintenance
services, including Plaintiffs, other ISOs, asset management companies, and in-house teams
employed directly by hospitals or the other end users ("in house biomedical service
departments").  SAC ¶¶ 4.1, 6.12, 16.12 ; *see also* ¶ 16.6 (calling hospital bio-medical engineers
and asset management companies "Plaintiff[']s  rivals").  Any of these companies, including
Plaintiffs, may obtain the GE parts that they need by purchasing them from GE's exclusive parts
distributor, Defendant Alpha Source.  SAC ¶ 6.2.  Prior to 2011, GE sold parts directly to
machine-owning end users and also to third parties, including the Plaintiffs and other ISOs.  *See*
SAC  ¶¶ 6.19-6.20.  In April 2011, GE notified the third-party purchasers that it had appointed
Alpha Source to be its exclusive parts distributor.  SAC ¶ 6.2.  Alpha Source sells GE parts to

---

[2] The Statement of Facts is based on the allegations of the Second Amended Complaint, which GE accepts as true
for purposes of this motion only.  GE would note, however, that important allegations of the Second Amended
Complaint's allegations are in fact demonstrably false.  For example, Alpha Source is no longer GE's exclusive
distributor of parts for anesthesia and diagnostic imaging equipment.

Plaintiffs.  Although Plaintiffs complain about the level of some of the services they receive from Alpha Source, SAC ¶ 6.4-6.6, there is no allegation that Alpha Source has ever refused to sell any parts to Plaintiffs.

GE conducts training courses in which it teaches service technicians how to maintain and repair its anesthesia and DI machines.  *See* SAC ¶¶ 4.6, 11.4.  Over the years, GE has sometimes permitted independent ISO employees to attend such training courses and sometimes has refused to train other companies' employees.  Starting in October 2014, GE implemented a policy in which it would allow independent ISOs to send their employees to be trained by GE, as long as the ISO obtained certification from an end-user customer that wanted its service provided by that ISO.  SAC ¶ 11.4.  Plaintiffs complain that they are unable to get training on three new anesthesia models, SAC ¶ 16.6; that GE cancels or has long wait times for trainings, SAC ¶ 11.4; and that GE "mandates" that some types of repairs ("subassembly repairs") can only be done by it, SAC ¶ 16.23.  Plaintiffs also complain that GE offers its customers attractive terms of sale -- such as discounted prices, free services, and valuable warranties -- that Plaintiffs are unable to match.  SAC ¶ 16.25-16.27.

Plaintiffs allege that as a result of GE's practices they have "lost sales, profits and value of their businesses."  SAC ¶¶ 8.1, 13.1, 16.29.

## STANDARD OF REVIEW

A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Although allegations of material fact are taken as true, "legal conclusion[s] couched as a factual allegation … are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79  (2009).  A "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must instead contain "sufficient factual matter" apart from legal conclusions "to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993).

In an antitrust case, "[a] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983).  As the Supreme Court has noted:

> [T]he costs of modern federal antitrust litigation and the increasing case load of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.

*Twombly,* 550 U.S. at 558.  Simply put, antitrust litigation is "too expensive a process to waste time on fanciful claims."  *Commonwealth of Pa. v. PepsiCo*, 836 F.2d 173, 182 (3d Cir. 1988); *see also Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 321 (5th Cir. 2009) (specificity in pleading is required because some "threshold proof is necessary to protect antitrust litigation from frivolous claims"); *see also In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 n.7 (5th Cir. 1982) ("the very nature of antitrust litigation would encourage summary disposition of such cases," in light of the cost and expense of antitrust litigation and the "special temptation for the institution of vexatious litigation…").

## LEGAL ARGUMENT

It is well established that a "producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other."  *SCFC v. Visa*, 36 F.3d 958, 972 (10th Cir. 1994).  The antitrust laws serve to advance consumer welfare by encouraging vigorous competition; the antitrust laws do not serve to protect against injury to individual competitors.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws … were enacted for the protection of competition not competitors."); *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014) ("[R]elief is not available for [plaintiff] because the only plausible injury it asserts is its own. Only injuries to the market are cognizable."); *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462 (5th Cir. 2013) ("healthy competition depends on individual firms aggressively pursuing their own interests"). Indeed, aggressive competition will inevitably result in harm to individual competitors; but far from being unlawful, "[a]cts harmful to business rivals generally help consumers," and thus such acts are not a concern of the antitrust laws.  *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours Inc.*, 61 F.3d 1250, 1256 (7th Cir. 1995); *see also Felder's Collision Parts, Inc. v. All Star Adver. Agency, Inc.*, 777 F.3d 756, 764 (5th Cir. 2015) (reasoning that "antitrust law welcomes" lower prices even though they "no doubt" caused plaintiff to " hav[e] a tougher time selling" its competing product); *Drury Inn v. Olive Co.,* 878 F.2d 340, 343 (10th Cir. 1989) (the antitrust laws "cannot supply private parties with a tool to redress ordinary business torts").

The focus of this suit is clear: Plaintiffs wish to prevent GE from competing vigorously, and instead wish to impose restrictions upon GE that will *help* Plaintiffs and insulate them from the rigors of competition.  Their claims are artificially divided into five separate counts, the first four of which make essentially the same factual allegations.  Specifically, the first four claims

allege that GE's distribution practices constitute agreements in restraint of trade (First Claim), monopolization (Second Claim), attempted monopolization (Third Claim), and conspiracy to monopolize (Fourth Claim); but these four claims are all based on the same alleged practices by GE -- namely, that (i) GE appointed an exclusive distributor to resell GE parts, from whom Plaintiffs had to purchase; (ii) GE limited the right of Plaintiffs to attend training sessions conducted by GE; and (iii) GE engaged in aggressive competition by selling products at price terms that were too low for Plaintiffs to match.  The Fifth Claim alleges that GE violated the antitrust laws by acquiring another company (Datex-Ohmeda) eleven years ago.  As set forth below, none of these practices -- whether viewed separately or together -- constitute a violation of any antitrust law.

## I.      EXCLUSIVE DISTRIBUTORSHIPS ARE LAWFUL.

The core allegation by Plaintiffs is that GE supposedly violated the antitrust laws by refusing to sell parts directly to Plaintiffs; they allege that GE appointed an "exclusive" distributor (defendant Alpha Source) and that Plaintiffs were required to buy GE parts from the exclusive distributor rather than from GE.  Plaintiffs also complain that they cannot obtain parts directly from GE's suppliers, but that GE is the exclusive distributor of those parts (which it then resells to Plaintiffs through Alpha Source).

The antitrust laws do not prohibit a supplier -- regardless of how large it is -- from deciding to distribute its goods through an "exclusive distributor."  Exclusive distributors have long been used by manufacturers, in many industries, as an efficient means of selling their products; not surprisingly, courts have consistently recognized that the appointment of an exclusive distributor is presumptively lawful.  *See, e.g.*, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods.*, 129 F.3d 240, 245 (2d Cir. 1997) ("exclusive distributorship arrangements are

presumptively legal"); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("exclusive distributorships are presumptively legal"); *Crane & Shovel Sales Corp. v. Bucyrus-Erie Corp.,* 854 F.2d 802, 807 (6th Cir. 1988) (manufacturer's decision to eliminate entire set of distributors does not violate antitrust laws); *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 374 (3d Cir. 1985) ("The unilateral decision of a single manufacturer to rearrange its distribution structure by limiting or increasing the number of its dealers…does not violate the Sherman Act."); *see also United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376 (1967) (a manufacturer "may select his customers, and for this purpose he may 'franchise' certain dealers to whom, alone, he will sell his goods"), *overruled on other grounds by Cont'l T.V. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977); *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1117 (5th Cir. 1979) (appointment of exclusive distributor is lawful); *Muenster Butane, Inc. v. Stewart Co.*, 651 F. 2d 292, 296-97 (5th Cir. 1981) ("This circuit has held…that the complete elimination of an authorized distributor or dealer by a supplier does not violate the Sherman Act."); *Big River Indus. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609 (M.D. La. 2013) (dismissing antitrust claim challenging exclusive distributorship); *Reborn Enters., Inc. v. Fine Child, Inc.*, 590 F. Supp. 1423, 1443 (S.D.N.Y. 1984) ("A manufacturer can establish a system of exclusive distributorships without violating section 1 of the Sherman Act").

Indeed, in *E&L Consulting v. Doman Industries, Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006), the Court rejected claims that the defendant's appointment of an exclusive distributor violated the antitrust laws, even though the defendant in that case had a much larger share of the market than GE is alleged to have in this case. .  As the Court explained, every manufacturer can lawfully decide not to appoint any distributors at all, and instead act as its own "exclusive distributor."

The appointment of an independent company to act as the "exclusive distributor" has no impact on competition:

> [Defendant] is alleged to have a market share in green hem-fir lumber amounting to 95% in the northeastern United States. Appellants do not assert that [Defendant's] market share is somehow an illegal monopoly and seek no relief on that ground. But, they allege, the exclusive distributorship with Sherwood further harms competition. However, appellants' hypothesizing of an unreasonable effect on competition fails because such a vertical arrangement provides no monopolistic benefit to [Defendant] that it does not already enjoy and would not continue to enjoy if the exclusive distributorship were enjoined. To put it another way, had [Defendant] established its own in-house distribution system with the same monopoly that Sherwood is alleged to possess, there would have been no increase in the restriction of output of green hem-fir lumber and in the resultant misallocation of resources.

*Id.* at 29.

The only "harm" that Plaintiffs allege has occurred as a result of GE's appointment of Alpha Source as an exclusive distributor or as a result of GE serving as the exclusive distributor of parts from its suppliers is a diminution in their own profits.  Specifically, they allege that they pay a higher price to a distributor than they would theoretically pay if they bought from GE or its suppliers directly and that they are sometimes dissatisfied with Alpha Source's timeliness in filling their orders.  That is not an allegation of the harm to competition required to state an antitrust claim.  *See, e.g.*, *E & L Consulting,* 472 F.3d at 30 (allegation that customers had fewer suppliers to choose from and paid higher prices "is not a sufficient allegation of harm to competition caused by the exclusive distributorship").  There is no allegation, nor could there be, that GE's appointment of Alpha Source as its exclusive distributor or its service as the exclusive distributor of its suppliers has harmed end consumers of parts in any way.  To the contrary, Plaintiffs allege that GE continues to sell directly to consumers -- i.e., to the owners of GE equipment.  *See* Comp. ¶7.1 (GE continues to sell directly to GE equipment owners who repair and service their own equipment). Only those companies seeking to make a profit on reselling

GE parts and bundling those parts with service on GE equipment -- such as the Plaintiffs here -- are affected by GE's appointment of an exclusive distributor.

GE's appointment of an exclusive distributor also falls within the time-honored right of every manufacturer under the antitrust laws to decide to whom it will sell its products.  Simply put, it is not an antitrust violation for a manufacturer to decide unilaterally to sell to one customer and not to sell to another customer.  That is why courts have repeatedly rejected purported antitrust lawsuits based on claims by middlemen that the defendant's refusal to sell parts to them violates the antitrust laws.  *Telecom Technical Servs., Inc.*, 388 F.3d at 827 (refusal to sell parts to ISOs does not cause harm to consumers, and thus does not violate antitrust laws); *Data Gen. Corp.*, 36 F.3d at 1189 (rejecting claim based on defendant's refusal to sell parts to ISO plaintiffs); *Westman Comm'n Co. v. Hobart Int'l*, 796 F.2d 1216, 1229 (10th Cir. 1986) ("manufacturers should be free to choose and terminate their distributors free of antitrust scrutiny so long as their motivation does not involve illegal pricing or tying arrangements").  Regardless whether a manufacturer acts as its own "exclusive distributor," or appoints an independent company to act as its "exclusive distributor," the competitive process is the same. Indeed, it is beyond question that GE had the legal right not to appoint any distributor at all; it could have decided simply to sell parts directly to Plaintiffs at the same prices that Alpha Source is currently selling the parts to Plaintiffs.  If GE had done so, Plaintiffs would be in exactly the same position they are in now, and even under their own theory they would not have suffered any cognizable antitrust injury.  *See, e.g.*, *Sports Ctr., Inc. v. Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir. 1981) ("Obviously, every manufacturer has a natural monopoly over the distribution of its products. That monopoly, however, does not contravene the antitrust laws.")  It is no wonder that courts

have consistently recognized the right of manufacturers to distribute their products through an exclusive distributor.

## II.     THE ANTITRUST LAWS DO NOT REQUIRE GE TO HELP ITS COMPETITORS

The second practice that Plaintiffs attack is GE's supposed unwillingness to train Plaintiffs' employees.   In truth, Plaintiffs do not actually allege a refusal by GE to train Plaintiffs' employees; rather they allege that GE will provide training to them, but under conditions that Plaintiffs find burdensome.  *E.g.*, SAC ¶11.4 (GE provides training to Plaintiffs, but "plaintiffs have been told frequently that scheduled courses have been cancelled, or were overbooked"; GE requires Plaintiffs to provide customer verifications in order to participate in GE training sessions).

Such allegations do not state a claim for relief under the antitrust laws.  The antitrust laws have never imposed an obligation on manufacturers to assist their competitors, through training or otherwise.   The antitrust laws encourage aggressive competition, not friendly cooperation. Even if GE were a monopolist -- which it clearly is not -- it would not be  obliged to help its competitors.  As one court has summarized:   "[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete…. Cooperation is a problem in antitrust, not one of its obligations."  *Schor v. Abbott Labs*, 457 F.3d 608, 610 (7th Cir. 2006); *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors"; even monopolists have "no duty to extend a helping hand to new entrants"  and no duty to "help the rivals compete with it."); *Data Gen. Corp.*, 761 F.

Supp. at 192 ("The case law has consistently affirmed that a manufacturer is under no obligation to … disclose its knowledge about its products so that competition may arise….").

The Supreme Court has confirmed that the antitrust laws do not require manufacturers to provide assistance to their competitors.  "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406-08 (2004) (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919)).  In *Trinko,* the plaintiff alleged that the defendant (Verizon) violated the antitrust laws by refusing to provide interconnection services to its rivals, with the purpose and effect of hindering competition.  The Supreme Court ruled that the antitrust laws imposed no obligation upon a manufacturer -- even if it is a monopolist -- to provide services to competitors in order to help them compete.  Absent extraordinary circumstances not at issue in this case, "there is no duty to aid competitors."  *Id.* at 411.[3]  The Supreme Court ruled:  "We conclude that Verizon's alleged insufficient assistance in

_____

[3] In dicta, the *Trinko* Court indicated that a cause of action might be cognizable in rare instances where a monopolist acts *against its own short-term profit interests* by cutting off customers to whom it had previously sold willingly, in order to destroy their ability to offer consumers products that consumers desire.  That is not what is alleged in this case.  To the contrary, Plaintiffs have *not* been cut off from the supply of GE products at all; they admit that they continue to purchase GE products, through GE's exclusive distributor.  Second, Plaintiffs are seeking to force GE to sell to them at a *lower* price than they currently pay for GE parts; in short, they want to *shift* profits from the defendants to themselves. The case law makes clear that a manufacturer has no duty to assist its potential competitors under these circumstances, and certainly no obligation to structure its sales policies in a manner that increases the profitability of its competitors rather than itself.  *See, e.g.*, *Four Corners Nephrology Assoc. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1226 (10th Cir. 2009) (no antitrust violation where defendant hospital refused to allow competing physicians to use its facilities; even a monopolist has the right to refuse to deal with competitors in order to maximize its own profits); *Christy Sports v. Deer Valley Resort*, 555 F.3d 1188, 1197 (10th Cir. 2009) ( no antitrust violation where defendant terminated business relationship with plaintiff in order to make more money for itself).

the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id.* at 407-10.

Similarly, in *Olympia Equip. v. Western Union*, the Court rejected an antitrust claim predicated upon the fact that the defendant had initially provided assistance to competitors (e.g., by providing proprietary customer lists) and then later reversed course and refused to provide such assistance.  797 F.2d at 374-80.  The Court ruled that since the defendant "had no duty to encourage the entry of new firms," it did not violate the antitrust laws by initially providing some assistance and then withdrawing the assistance at a later date.  *Id.* at 376.  As the Court summarized:  "the law would be perverse if it made [defendant's] encouraging gestures [to competitors] the fulcrum of an antitrust violation." *Id.*

In *Data General Corp. v. Grumman Systems Support Corp.*, an antitrust claim was made against a computer manufacturer based on allegations similar to those made by Plaintiffs here. 761 F. Supp. 189-92.  Specifically, a third-party service firm alleged that a computer manufacturer violated Sherman Act Section 2 by excluding the plaintiffs' employees from its training classes and by licensing critical diagnostic tools only to ultimate consumers (i.e., owners of defendant's equipment) and not to third-party service firms such as the plaintiffs. The Court rejected the antitrust claim, concluding that a manufacturer (even a monopolist) is under no duty to make it easier for other firms to compete against it in repairing and maintaining the defendant's computers.  *Id.* at 192.  The Court also rejected the argument (similar to that made here) that a manufacturer's superior knowledge and control over its products and technology could constitute an "essential facility" that the manufacturer must share with competitors.  *Id.* (a manufacturer cannot be forced to "share its knowledge" with competitors).

The law is clear:  GE cannot be forced to train its rivals or to assist its rivals in becoming more profitable.  *See, e.g.*, *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) (a manufacturer "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.").  GE has already gone well beyond its legal obligations in providing some training opportunities to the Plaintiffs.  The fact that Plaintiffs want even more training assistance from GE is not a concern of the antitrust laws. We are aware of no antitrust case that has ever imposed such an extreme obligation upon a manufacturer, and this Court should not be the first to do so.

Finally, Plaintiffs' demand that GE provide training is conclusively undermined by their acknowledgement that GE "maintenance manuals, technical service bulletins, technical service procedures and other documentation," are "allegedly protected under the federal copyright laws." SAC ¶ 16.20.  GE has no obligation to supply its copyrighted works to its competitors, because "nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright.  In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work."  *Stewart v. Abend*, 495 U.S. 207, 228-29 (1990).  *See also Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property.").   As such, a manufacturer's refusal to supply copyrighted works to its competitors cannot violate the antitrust laws.  *See, e.g.*,  *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1329 (Fed. Cir. 2000) ("Xerox's refusal to sell or license its copyrighted works was squarely within the rights granted by Congress to the copyright holder and did not constitute a violation of the antitrust laws."); *Data Gen. Corp.*, 36 F.3d at 1187-88 (copyright provides a "presumptively valid business

justification" for manufacturer's refusal to license diagnostic software"); *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992) (affirming summary judgment on antitrust claims because refusal to license ISO "is protected as an exclusive right of a copyright owner").

### III.    THE ANTITRUST LAWS DO NOT PROHIBIT GE FROM OFFERING CUSTOMERS BETTER DEALS THAN PLAINTIFFS CAN OFFER

Finally, Plaintiffs contend that GE has supposedly violated the antitrust laws by offering attractive prices and terms to customers, which Plaintiffs are unable to match. *See* SAC ¶16.25 (alleging that GE offered "highly discounted" terms to customers); *id.* at ¶16.27 (alleging that GE grants consumers "free services, parts, and preferential warranties, which plaintiffs cannot do"). In their eyes, such attractive terms of sale (which obviously benefit consumers) "will eventually and illegally eliminate all Plaintiffs herein from the market." *Id.*

In essence, Plaintiffs appear to allege that GE violated the antitrust laws by doing exactly what the antitrust laws are designed to accomplish: ensuring that sellers provide low prices and valuable services to consumers. The Supreme Court has emphasized that claims by competitors that are predicated upon "unreasonably low" pricing by defendants should be treated with great skepticism. "[C]utting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Accordingly, claims attacking a competitors' low prices "chill the very conduct the antitrust laws are designed to protect." *Id.*

As courts have repeatedly held, "the goal of antitrust law is to use rivalry to keep prices low for consumers' benefit." *Wallace v. IBM*, 467 F.3d 1104, 1107 (7th Cir. 2006); *see also Felder's Collision Parts, Inc. v. All Star Adver. Agency, Inc.*, 777 F.3d 756, 760-61 (5th Cir.

2015) ("Low prices benefit consumers and are usually the product of the competitive marketplace that the antitrust laws are aimed at promoting.").   Allowing Plaintiffs to pursue claims designed to thwart GE's right to provide attractive terms of sales to its customers "would turn the Sherman Act on its head."   *Wallace*, 467 F.3d at 1107.  Plaintiffs make the conclusory allegation that GE's low prices are "exclusionary," because Plaintiffs cannot match such terms. But low pricing can violate the antitrust laws only under the narrow doctrine of "predatory pricing," which the Second Amended Complaint does not come close to alleging.  As a threshold matter, a claim for "predatory pricing" must allege that  a monopolist (i) sells its full line of products at a price "below cost" for a sustained period of time, (ii) that the below-cost prices drove its competitors out of business, and that (iii) having destroyed its competitors, the monopolist is able to recoup all its losses by raising its prices to artificially high levels.  *E.g., Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999).  No such facts are alleged in this case, nor could they be. [4]   Rather, Plaintiffs complain that GE -- as the original

---

[4] Plaintiffs make the conclusory allegation that "upon information and belief," it is "believed" that GE has offered "some" products at prices below cost.  This vague allegation falls far short of the minimum pleading requirements necessary to state a claim for predatory pricing under the antitrust laws.  *See Twombly*, 550 U.S. at 555; *Montano Cigarette, Candy & Tobacco, Inc. v. Core-Mark Mid-Continent, Inc.*, No. 3:08-cv-426, 2008 WL 4793696, at *3 (D. Conn. Oct. 31, 2008) (dismissing predatory pricing claim due to lack of specific factual allegations supporting claim of "below cost" pricing); *see also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 527 (5th Cir. 1999) ("The Supreme Court has expressed extreme skepticism of predatory pricing claims.").  But even putting to one side the impermissibly vague nature of this allegation, a claim of predatory pricing cannot be proved merely by showing that "some" sales by a defendant were below cost.  Rather, predatory pricing under the antitrust laws requires evidence that the defendant sold its full range of products below cost.  *See, e.g.*, *Bayou Bottling v. Dr. Pepper Co.*, 725 F.2d 300, 305 (5th Cir. 1984) (claim of predatory pricing dismissed where defendant only sold some of its products below cost, and not its full line); *Stitt Spark Plug Co. v. Champion Spark Plug*, 840 F.2d 1253, 1256 (5th Cir. 1988) (predatory pricing claim must show that defendant sold both its original equipment and its replacement equipment below cost); *see also Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1395-96 (8th Cir. 1993) (predatory pricing claim must show that all of defendant's tickets were sold below cost, not just its lowest priced tickets).

manufacturer of its own equipment and parts -- is able to offer customers better terms than Plaintiffs, who are mere resellers of GE products.  This is an economic truism, not an antitrust violation.  *See generally Felder's Collision Parts*, 777 F.3d at 764 (affirming dismissal of a predatory pricing claim by dealers of aftermarket auto parts against a manufacturer that decreased prices of those parts to auto dealers).

In sum, the first four claims in the Second Amended Complaint should be dismissed for failure to state a claim for relief under the federal antitrust laws.  But in addition to these fundamental, substantive flaws, the first four claims also suffer from a slew of pleading defects that independently justify dismissal.

## IV.   PLAINTIFFS FAIL ADEQUATELY TO PLEAD THE RELEVANT MARKETS OR GE'S POWER IN THOSE MARKETS

All of Plaintiffs' claims must be dismissed because they have failed to adequately plead the relevant markets required to establish a violation of Section 1 or Section 2 of the Sherman Act and of Section 3 or Section 7 of the Clayton Act.  Even if Plaintiffs had adequately pled the relevant markets -- and they have not -- their Sherman Act claims must be dismissed because Plaintiffs have not adequately alleged GE's market power in a proper relevant market.

### A.   Plaintiffs Fail to Allege Relevant Product Markets.

All of Plaintiffs' antitrust claims require that they adequately plead proper antitrust relevant markets.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457-59 (1993) (Sherman Act Section 2 claims require "proof of market power in a relevant market"); *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 417 (5th Cir. 2010) ("To state an antitrust claim [under Section 1 of the Sherman Act in a rule of reason case, the plaintiff's] complaint must plausibly define the relevant product and geographic markets."); *United States v. E. I. du*

*Pont de Nemours & Co.*, 353 U.S. 586, 594 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act.").  A barebones allegation of the relevant market will not suffice to survive a motion to dismiss.  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted."  *Apani Sw., Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 628 (5th Cir. 2002); *accord PSKS, Inc.*, 615 F.3d at 417-18.

In paragraph 4.3 of the Second Amended Complaint, Plaintiffs define "three relevant product submarkets" for servicing GE anesthesia machines, servicing GE DI machines, and refurbishing and selling GE anesthesia machines.  But the allegations regarding these relevant markets are not sufficient to survive a motion to dismiss under *Apani* and *PSKS*.  Plaintiffs make no allegation whatsoever regarding interchangeability or cross-elasticity of demand for their alleged markets for servicing GE DI machines or refurbishing and selling GE anesthesia machines, justifying dismissal under *Apani*.  We have nothing more than Plaintiffs' *ipse dixit* allegation of the relevant market, and that is not enough.  *See, e.g.*, *PSKS*, 615 F.3d at 618-18 (affirming dismissal for failure to allege relevant market based on  reasonable interchangeability); *Apani*, 300 F.3d at 628 (same); *Star Tobacco Inc. v. Darilek*, 298 F. Supp.2d 436, 446 (E.D. Tex. 2003) (dismissing antitrust claim because counterclaimants "failed to plead facts sufficient to support their definition of the relevant market in this dispute.").  And while Plaintiffs make a barebones allegation that "parts and service for GE anesthesia machines and equipment are likewise differentiated from parts and service of other brands, and not

18

interchangeable therewith," SAC ¶ 6.15, Plaintiffs have "fail[ed] to differentiate the [alleged market] by its pertinent characteristics of elasticity or substitutability," relying only on "an unsupported legal conclusion of the product's reasonable interchangeability" that is insufficient to survive a motion to dismiss.  *Big River Indus. v. Headwaters Res.*, 971 F. Supp. 2d 609, 617 (M.D. La. 2013).  Even if Plaintiffs' barebones assertion that GE parts and service are not interchangeable with parts and service for other brands were sufficient (and it is not), Plaintiffs do not explain why there is a market for all parts for GE equipment or all services for GE equipment, for it is common sense that a circuit board is not "reasonably interchangeable" with a power supply, and that a customer with a GE Avance anesthesia machine would not find service for a GE Aestiva anesthesia machine "reasonably interchangeable."

A relevant product market definition must also consider elasticity of supply, the ability of suppliers of related products to enter in response to supracompetitive prices.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n.42 (1962) ("The cross-elasticity of production facilities may also be an important factor in defining a product market.").  The Fifth Circuit has recognized that "[t]he outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes (cross-elasticity of demand), and the ability of other existing producers or new entrants to expand output from their present facilities or to build new capacity (elasticity of supply)."  *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983); *see also In re Mun. Bond Reporting Antitrust Litig.*,  672 F.2d 436, 441 (5th Cir. 1982); *Spectrofuge Corp. v. Beckman Instruments*, 575 F.2d 256 (5th Cir.1978).  Here Plaintiffs acknowledge that firms that service GE equipment also service non-GE equipment, SAC ¶ 13.2 (noting "preference of institutions which require anesthesia and DI maintenance/service to utilize one entity to be able to perform said services on

all brands of anesthesia and DI equipment"), but impermissibly ignore this factor in their definition of the relevant markets.   Because firms that service non-GE anesthesia and DI equipment or sell refurbished non-GE equipment can and do sell and service GE equipment, Plaintiffs' GE-only relevant markets are fatally deficient.  *See generally Spectrofuge*, 575 F.2d at 282-83 (noting "very serious doubts as to whether the relevant market here could be confined as a matter of law to servicing Beckman instruments or Beckman UCs" because of cross-elasticity of supply).   Because Plaintiffs have failed to allege a relevant product market, their complaint must be dismissed.

### B.        Plaintiffs Fail to Allege a Relevant Geographic Market

A proper antitrust relevant market has both product and geographic dimensions, *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962), and even if Plaintiffs had adequately alleged a relevant product market (and they have not), the Second Amended Complaint would nevertheless be subject to dismissal for failure to allege a relevant geographic market.  *See, e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 839-40 (5th Cir. 2002) (affirming dismissal for failure to provide evidence sufficient to demonstrate relevant geographic market); *Star Tobacco Inc. v. Darilek* , 298 F. Supp. 2d 436, 447 (E.D. Tex. 2003) (dismissing complaint because "the court is forced into speculation regarding market definition because Defendants have not pled facts sufficient to define the geographic market relevant to this dispute").

Here Plaintiffs allege that the relevant geographic market for each of their three product markets is the United States, alleging that "[t]he aforesaid competition takes place throughout the United States. The relevant geographic market is the United States."  SAC ¶ 4.3.  This is not an adequate justification for the alleged relevant market, which must be defined by evaluating

where "local customers can practically turn for alternatives," *United States v. Marine Bancorporation*, 418 U.S. 502, 619 (1974), and the "area of effective competition." *Apani*, 300 F.3d at 628. *See also Star Tobacco Inc.* , 298 F. Supp. 2d at 446 ("Defendants must allege facts regarding the relevant geographic market.  The Supreme Court has stated that the relevant geographic market 'must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies.'") (quoting and citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Simply alleging that competition takes place throughout the United States is not enough. Surgical procedures are likewise offered "throughout the United States," but the "area of effective competition" for a hospital is plainly not nationwide because a patient in Texas cannot turn to a surgeon based hundreds of miles away. *See, e.g.*, *Surgical Care Ctr. of Hammond*, 309 F.3d at 840 ("Absent a showing of where people could practically go for inpatient services, St. Luke's failed to meet its burden of presenting sufficient evidence to define the relevant geographic market.").  It is likewise plain that a hospital in Texarkana cannot turn to Plaintiff Red Lion (located in Delaware) to provide service.  Nothing in the Second Amended Complaint provides any detail regarding the "area of effective competition," and certainly nothing suggests that the relevant markets should be seen as anything other than local.  For that reason, Plaintiffs have failed adequately to allege relevant geographic markets and their Second Amended Complaint must be dismissed.

### C.      Plaintiffs Fail Adequately to Allege Market Power

In addition to pleading proper relevant markets, Plaintiffs must allege that GE has market power (for the Sherman Act Section 1 and Clayton Act Section 3 claims in Counts 1 and 4), monopoly power (for the monopolization claim under Section 2 of the Sherman Act in Count 2),

or a dangerous probability of obtaining a monopoly (for the attempted monopolization claim and conspiracy to monopolize claim under Section 2 of the Sherman Act in Counts 3 and 4) in the relevant markets alleged.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457-59 (1993) (dangerous probability required for attempted monopolization);  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("possession of monopoly power" required for monopolization); *PSKS*, 615 F.3d at 418-19 ("To allege a vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power."); *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1038 (E.D. Tex. 1996) (no claim for conspiracy to monopolize unless defendants collectively possess a 50% or greater market share).   The "starting point" for establishing market power or monopoly power is substantial market share, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 397 (E.D. La. 2013), though "[t]he size of defendant's market share may of course be relevant in determining the ease with which he may drive out a competitor through his scheme—but it does not, standing alone, allow a presumption that this can occur."  *Stearns*, 170 F.3d at 528 n.9.

Here Plaintiffs make no allegation whatsoever regarding GE's market share in their alleged relevant markets for service of DI equipment or for refurbished equipment.   Although Plaintiffs do allege that GE has "sixty to seventy percent" of their alleged relevant market for service of anesthesia equipment, because that is not a proper market, Plaintiffs' allegation of GE's share is irrelevant.  *See, e.g.*, *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1386 (5th Cir. 1994) ("An assessment of market power requires a definition of the relevant market."); *Big River Indus.*, 971 F. Supp. 2d at 617 ("BRI's Complaint must be dismissed for failure to allege sufficient facts regarding Headwaters' market power . . . since the Court has found that the Complaint insufficiently defines the relevant market.").

### D. Plaintiffs Fail Adequately to Allege GE's Alleged Agreements with Parts Suppliers, Owners of GE Equipment, Other Service Providers, and Financing Providers.

In paragraphs 7.10-7.14 of the Second Amended Complaint, Plaintiffs make barebones allegations that GE has "entered into contracts, combinations, and conspiracies" with parts suppliers, owners of GE equipment, other service providers, and financing providers to refuse to deal with Plaintiffs.  Plaintiffs provide none of the factual details of these alleged agreements, none of the "who, what, when, and where" required after *Twombly.  Twombly* held that, in order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide "enough factual matter (taken as true) to suggest that an agreement was made," *i.e.* "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."   *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555.  "Bare assertions of conspiracy are not enough to state a claim under the Sherman Act."   *In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp.2d 572, 591 (S.D. Tex. 2009).  Plaintiffs have not come close to satisfying the requirement of *Twombly* to allege the "who, what, when, where" of a conspiracy.  *See Twombly*, 550 U.S. at 564 n.10 ("[T]he pleadings mentioned no specific time, place, or person involved in the alleged conspiracies."); *see also Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir.2008) (affirming dismissal of antitrust conspiracy allegations because the complaint did "not answer the basic questions: who, did what, to whom (or with whom), where, and when?"); *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp.2d 785, 795 (N.D. Tex. 2009) (dismissing antitrust claim because "the conspiracy claim identifies no specific time or place in which any meeting of the minds between the Insurance Defendants occurred and no individuals from any Insurance Defendants who allegedly participated in such meetings, conversations, or communications").

V.     **THE FIFTH CLAIM ("ILLEGAL ACQUISITION") IS BARRED BY THE STATUTE OF LIMITATIONS AND BECAUSE PLAINTIFFS FAIL TO ALLEGE THE REQUIRED SUBSTANTIAL LESSENING OF COMPETITION**

In their final claim, Plaintiffs contend that GE's acquisition in 2003 of an anesthesia gas machine manufacturer (Datex-Ohmeda)  violates Clayton Act Section7.  This claim should be dismissed on either of two independent grounds:  (i) the claim is clearly time-barred under the four-year statute of limitations that is applicable to all private antitrust claims, and (ii) on its face, the acquisition did not lessen *any* competition at all, and therefore could not possibly violate Clayton Act Section7.

All private suits for violation of the federal antitrust laws, including claims arising under Clayton Act Section7, are governed by a four-year statute of limitations.  15 U.S.C. §15b.  In any claim challenging a merger or acquisition, it is well established that the four-year statute of limitations begins to run on the date that the merger or acquisition is completed.  *See, e.g.*, *Midwestern Mach. Co. v. NW Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004) (dismissing antitrust challenge to acquisition that occurred more than four years prior to suit); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1049-50 (8th Cir. 2000) (antitrust statute of limitations expires four years after acquisition occurred); *see Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598-99 (6th Cir. 2014) (four-year antitrust limitations period runs from date of acquisition, not date of price increases imposed by post-merger firm).  Here, Plaintiffs seek to challenge an acquisition by GE that occurred more than 11 years ago, in 2003.  Plaintiffs do not allege, nor could they, that there is any doctrine that has tolled the statute of limitations for any portion of this eleven-year period. This claim is clearly time-barred and must be dismissed.

Furthermore, the challenge to this acquisition is deficient as a matter of law, and thus is independently barred by Fed. R. Civ. P. 12(b)(6).  By its express terms, Clayton Act Section7

only prohibits those acquisitions that are likely "substantially to lessen competition."  15 U.S.C. §18.  An acquisition cannot cause a substantial lessening of competition unless, *inter alia*, the acquisition results in a "significant" increase in the acquiring firm's market share. *See, e.g., United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963) ("significant" increase in market concentration required to show acquisition is unlawful); *United States v. Baker Hughes, Inc.*, 731 F. Supp. 3, 11 (D.D.C.), *aff'd,* 908 F.2d 981 (D.C. Cir. 1990) ("substantial market effect" required for acquisition to violate Clayton Act Section 7).

Yet according to Plaintiffs' own allegations, GE's acquisition of Datex-Ohmeda resulted in *no increase at all* in market concentration.  As the Amended Complaint expressly alleges, GE was not in the market for anesthesia machines when it acquired Datex-Ohmeda.  *See* SAC ¶ 4.4. The acquisition simply changed the ownership of an existing company (Datex-Ohmeda), with no impact on the number of competitors in the market or the market share of any competitor.  As a matter of law, the acquisition resulted in no increase in market concentration, no increase in the market share of any competitor, and thus no "lessening" of competition at all.  It therefore could not violate the antitrust laws. *See, e.g.*, *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.*, 677 F. Supp. 1477, 1489-90 (D. Or. 1987) (acquisition that foreclosed only 2% of relevant market affected "only a de minimis share of the market [and] will not tend substantially to lessen competition"); Dep't of Justice & Federal Trade Commission, *2010 Horizontal Merger Guidelines* §5.3 (mergers resulting in only a "small change in concentration" are "unlikely to have adverse competitive effects and ordinarily require no further analysis").  Accordingly, even if Plaintiffs' challenge to this 11-year-old acquisition were not time-barred (which it is), it should be dismissed for failure to state a claim for relief under Clayton Act Section 7.

## CONCLUSION

For the reasons set forth above, GE respectfully requests that the Court dismiss the Second Amended Complaint in its entirety.

Dated:  June 5, 2015

Respectfully submitted,

*/s/ Christopher J. Schwegmann*
John T. Cox III (tcox@lynnllp.com)
Texas Bar No. 24003722
Christopher J. Schwegmann
(cschwegmann@lynnllp.com)
Texas Bar No. 24031515
**LYNN TILLOTSON PINKER & COX, LLP**
22100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 - Telephone
(214) 981-3839 - Facsimile

**ATTORNEYS FOR DEFENDANTS GENERAL ELECTRIC COMPANY, GE HEALTHCARE, GE TECHNOLOGY INFRASTRUCTURE, AND DATEX-OHMEDA**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, the foregoing was served on all counsel of record who have consented to electronic service.

*/s/ Christopher J. Schwegmann*
Christopher J. Schwegmann