IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RED LION MEDICAL SAFETY, INC., | § | |
| UNIVERSAL MEDICAL SERVICES, INC., | § | |
| METROPOLITAN MEDICAL SERVICES OF | § | |
| NC, INC., BIOMEDICAL CONCEPTS, | § | |
| ANETHESIA SERVICE, INC., | § | |
| DIVERSIFIED ANESTHESIA, LLC, d/b/a | § | |
| DIVERSIFIED ANETHESIA; | § | |
| PARAGON SERVICE, | § | |
| BAY STATE ANESTHESIA, INC., | § | |
| POPN, INC., Successor In Interest to | § | |
| PENN BIOMEDICAL SUPPORT, INC., | § | |
| GASMEDIX, LLC, | § | |
| WEST COAST ANESTHESIA | § | |
| SPECIALISTS, INC., | § | |
| PALO VERDE BIOMEDICAL | § | |
| CONSULTANTS, LLC, | § | |
| HEARTLAND SALES & SERVICES, LLC | § | |
| | § | |
|     Plaintiffs | § | CIVIL NO.: 2:15CV308 |
| | § | JURY |
| vs. | § | |
| | § | |
| GENERAL ELECTRIC COMPANY, INC., | § | |
| GE HEALTHCARE a unit of | § | |
| GENERAL ELECTRIC COMPANY; | § | |
| GE TECHNOLOGY INFRASTRUCTURE, | § | |
| a unit of GENERAL ELECTRIC COMPANY; | § | |
| DATEX-OHMEDA, a unit of | § | |
| GENERAL ELECTRIC COMPANY, and | § | |
| ALPHA SOURCE, INC. | § | |
| | § | |
|     Defendants | § | |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' SEPARATE
MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND
<u>MEMORANDUM IN SUPPORT</u>**

Paul F. Ferguson, Jr., State Bar  No. 06919200,  Provost & Umphrey Law Firm, LLP, 490 Park Street, Beaumont. Texas 77701.  Telephone (409)-835-6000. Facsimile (409)-838-8888.  E-mail  CFerguson@pulf.com

Paul Bartlett , Jr., State Bar No. 01849000, Law Office of Paul Bartlett, Jr., 203 Zornia Drive, San Antonio, Texas, 78203.  Telephone (210)-341-6703.  Facsimile (210)-525-8011.  E-mail pbjatp@swbell.net
Attorneys for Plaintiffs


Plaintiffs submit this consolidated response in opposition to Defendants' separate motions to dismiss, as Alpha Source and GE Defendants base their motions to dismiss on common and overlapping theories and authorities.  To avoid repetition in responding to these similar and coordinated motions to dismiss, a single response is filed.

***JURY TRIAL DEMANDED***

### TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………..ii

PRELIMINARY  STATEMENT……………………………………………………………1

LEGAL ARGUMENT……………………………………...………………………………1

    I.    The Proper Pleading Standard for Antitrust Claims ……………......1

    II.    Plaintiffs Adequately Pleads Their Restraint of Trade and Illegal Exclusive Dealing Claims………………………..………………….…2

    III.    Plaintiffs Sufficiently Pleads Their Section 2 Claims…………………8

    IV.    Plaintiffs Sufficiently Pleads the Relevant Product and Geographic Markets……………………………………………………………...17

    V.    Plaintiffs Sufficiently Pleads Their Section 7 Clayton Claim………..19

    VI.    CONCLUSION………………………………………………….…20

# TABLE OF AUTHORITIES

CASES

Allen v. Dairy Farmers of America,
    748 F. Supp. 2d 323, 340 (D. Vt. 2010) ................................................................. 19

Amarel v. Connell,
    102 F. 3d 1494, 1509 (9th Cir. 1996) ................................................................. 8

Aspen Skiing Company v. Aspen Highlands,
    472 U.S. 585, 605 n.32 (1985) .............................................................. 10, 12, 14

Ballard v. Wall,
    413 F.3d 510, 514 (5th Cir.2005) ................................................................. 2

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544, 127 S. CT.1955, 1969, L.Ed. 2d 929(2007) .......................................... 2

Blue Shield of Virginia v. McCready,
    457 U.S. 465, 472 (1982) ................................................................. 7

Brown Shoe Co. v. United States,
    370 U.S. 294 (1962), ................................................................. 6, 7

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,
    429 U.S. 477, 485-486,  and n. 10, (1977)… ....................................................... 7

California v. American Stores Company,
    495 U.S. 271 (1990) ................................................................. 20

Civil Action No 1:98cv01744 RCL, in the District of Columbia) .................................. 21

Credit Bureau Reports, Inc. v. Retail Credit Company, Inc.,
    476 F. 2d 989 (5th Cir. 1973) ................................................................. 20

Double D Spotting Serv., Inc. v. Supervalu, Inc.,
    136 F.3d 554, 560 (8th Cir. 1998) ................................................................. 18

E & I Consulting, LTD v. Domain Industries Limited,
    472 F.3d 23(3d Cir. 2014) ................................................................. 5

Eastman Kodak Co. v. Image Technical Servs., Inc.,
    504  U.S. 451, 482…(1992) ................................................................. 6, 11, 18

ii

Electronics Communications Corp. v. Toshiba American Consumer Product, Inc.,
129. F.3d 240(2d Cir. 1997 ...............................................................................................5

Hospital Building Company v. Trustees of the Rex Hospital,
425 U.S. 738, 746 (1993)................................................................................................ 19

Hospital Corporation Of America v. Federal Trade Commission,
807 F.2d 1381, 1385(7th Cir. 1986................................................................................6

Image Technical Services, Inc. v. Eastman Kodak Co.,
1996 WL 101173 (N.D. Cal. 1996) ..................................................................12

Interior Design Edu. Research v. Savannah Coll. Of Art & Design,
244 F.3d 521, 531 (6th Cir. 2001)............................................................................... 18

International Salt,
332 U.S. at 400................................................................................................................ 12

LePage's, Inc. v. 3M.,
324 F.3d 141 (3d Cir 2003).............................................................................................4

Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,
334 U.S. 219,236 (1948).................................................................................................7

Midwestern Machinery, Inc. v. Northwest Airlines, Inc.,
167 F.3d 439, (8th Cir. 1999) ...................................................................................... 20

Minnesota Mining and Manufacturing Company v. Appleton Papers, Inc.,
35 F. Supp. 2d 1138,1147 (D.Minn. 1999) ....................................................................8

Muenster Butane, Inc. v. The Stewart Company,
651 F.2d 292, 295(5th Cir. 1981) ................................................................................5

Northern Pacific R. Co. v. U.S.,
356 U.S. 1(1958)............................................................................................................ 11

Ollie v. Plano Independent School District,
564 F. Supp. 2d 658, 659(E.D.  Tex. 2008) ...................................................................2

Pfizer Inc. v. India,
434 U.S. 308, 313-314 (1978) .........................................................................................7

Priester  v. Lowndes,
354 F.3d 414, 418 (5th Cir. 2004)................................................................................2

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
    124 F.3d 430, 436 (3d Cir. 1997 ........................................................................... 18

Red Lion v. Ohmeda,
    63 F. 2d 1218(E.D. Cal., 1999), .............................................................................. 12

Reiter v. Sonotone Corp.,
    442 U.S. 330, 337 (1979) ......................................................................................... 7

Seagood Trading Corp. v. Jerrico, Inc.,
    924 F.2d 1555, 1569 (1991) ..................................................................................... 3

Times –Picayune Publishing Co. v. United States,
    345 U.S.594(1953) ................................................................................................. 11

Todd v. Exxon Corporation,
    275 F.3d 191, 199-200 ........................................................................................... 18

Tops Markets., Inc. v. Quality Markets., Inc.,
    142 F.3d 90, 98 (2d Cir. 1998) ................................................................................. 9

United States v. Aluminum Co. of America,
    377 U.S. 271…(1964) ............................................................................................... 7

United States v. Colgate & Co.,
    250 U.S. 300, 307 (1919) ....................................................................................... 10

United States v. Dentsply,
    399 F. 3d 181, 187(3d Cir. 2003) ............................................................................. 4

United States v. E.I DuPont De Nemours & Co.,
    351 U.S. 377, 391 ..................................................................................................... 9

United States v. E.I. du Pont de Nemours & Co. (General Motors),
    353 U.S. 586 (1957) ............................................................................................... 20

United States v. Grinnell Corp.,
    384 U.S. 563, 86 S. Ct. 1698, L. Ed. 2d 778 (1966) ........................................... 4, 9

United States v. Pabst Brewing Co.,
    384 U.S. 546…(1966) ............................................................................................... 7

United States v. Paramount Pictures, Inc.,
    334 U.S. (1948) ...................................................................................................... 11

United States v. Von's Grocery Co.,
  384 U.S. 270…(1966)..................................................................................7

Verizon Communications, Inc. v. Law Offices of Curtis Trinko, LLP,
  540 U.S. 398, 414 (2004)......................................................................... 17

Verizon v. NTRGRITY,
  219 F. Supp. 2d 616, 630(D.N.J., 2002), .............................................. 10

ZF Meritor, LLC v. Eaton Corporation,
  696 F.3d 254, 294 (3rd Cir. 2012) cert. denied 133 S.Ct.2025 (2013)....................5

## STATUTES

15 U.S.C., Sec. 1 (Sherman Act)........................................................... 1, 2

15 U.S.C., Sec. 2 (Sherman Act)......................................1, 4, 9, 13, 15, 16

15 U.S.C., Sec. 3 (Clayton Act) ................................................................1

15 U.S.C., Sec. 4 (Clayton Act) ................................................................4

15 U.S.C., Sec. 7 (Clayton Act) ..................................................... 1, 19, 20

## OTHER AUTHORITIES

3 P. Areeda & D. Turner. Antitrust Law 78 (1978)........................................10, 17

72 Antitrust L.J. 3 ...................................................................................6

Areeda & Hovenkamp, Antitrust Law, ¶373d1, at 278 (1995) ..............................8

Gavil, A.I.;  *Exclusionary Distribution Strategies by Dominant Firms:  Striking a
Better Balance*,  ABA:  Antitrust L.J. Vol. 72, No. 1 (2004) …...…………………6

## RULES

Fed. R. Civ. P., 12(b)(6) ..........................................................................2

## ***PRELIMINARY STATEMENT***

The essence of the two separate Motions to Dismiss (attached as Exhibits 1 & 2) is based on Defendants misinterpretation of Twombly and Iqbal.  Additionally, Defendants choose to ignore numerous present United States Supreme Court antitrust cases which support Plaintiffs' stated causes of action.  For these reasons, the two Motions to Dismiss under 12(b)(6) should in all things be denied.

In the case at bar, Plaintiffs have alleged in its Second Amended  Complaint (DKT. No. 18)( "Complaint" or "SAC") plausible antitrust cases against Defendants GE under Sections 1 and 2 of the Sherman Act, as well as Section 7 of the Clayton Act; and violations of Sections 1 and 3 against Defendant Alpha Source.  Plaintiffs allege numerous specific illegal anticompetitive acts engaged in by Defendants in identified relevant markets dominated by Defendant GE.  In its SAC, Plaintiffs state specifically how Defendant GE, with a complete monopoly on GE parts and monopoly training schools, utilizes its monopoly power to raise the cost of its rivals to leverage its existing monopoly into what was once a competitive market, the market for servicing/maintaining  GE anesthesia machines and diagnostic equipment ("DI").  To foster this antitrust activity, GE has entered into an illegal exclusive dealing arrangement with Defendant Alpha Source; as fully described in its SAC, the effect of these combined efforts of GE will be the complete elimination of a class of competitors, such as Plaintiff independent service organizations ("ISOS").  As a result, consumers will have less choice in choosing a service provider for its GE anesthesia and DI equipment, and will be at the mercy of GE due to the substantial lessening---if not elimination--- of competition.

### *LEGAL ARGUMENT*

**I. The Proper Pleading Standard for Antitrust Claims**

As stated by Judge Schell in *Ollie v. Plano Independent School District*, 564 F. Supp. 2d 658, 659(E.D.  Tex. 2008):

> Motions to dismiss under Rule 12(b)(6) are disfavored and are rarely granted. *Priester v. Lowndes*, 354 F.3d 414, 418 (5th Cir. 2004).  In passing on a Rule 12(b)(6) motion, a court must accept all of the plaintiff's allegations as true. *Ballard v. Wall*, 413 F.3d 510, 514 (5th Cir.2005).  A claim will survive an attack under Rule 12(b)(6) if it "**may be supported by showing any set of facts consistent with the allegations in the complaint."**  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. CT.1955, 1969, L.Ed. 2d 929(2007).  In other words, a claim may not be dismissed based solely on a court's supposition that the pleader is unlikely "**to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."**  *Id.* **at n. 8**…The complaint must be factually suggestive, so as to "**raise a right to relief above the speculative level**," *Id.* **at 1965**, and into the "realm of plausible liability." *Id.* **at 1966 n. 5**. (Emphasis in original)

**II.  Plaintiffs Adequately Pleads Their Restraint of Trade and Illegal Exclusive Dealing Claims**

In paragraphs 5-6 of its SAC, Plaintiffs allege that Defendants entered into "a contract, combination…or conspiracy" in restraint of trade, in violation of Sherman Section One and Clayton Section Three.  Specifically (to which Defendants admit) GE and Alpha Source entered into an exclusive dealing arrangement.  As stated in paragraph 6.2 of the SAC, in early 2011 Plaintiffs received letters from both GE and Alpha Source specifically stating that GE was appointing Alpha Source as its "sole source" for non-imaging GE parts to "a specific segment of the market," effective April 1st, 2011. This policy was extended to DI parts in 2013.  (Interestingly, in Alpha Source's motion, it states in its Introduction at page 1 that "…from March 1, 2011 through February 29, 2014, Alpha Source merely served as exclusive distributor for certain products sold by GE."  This assertion that its exclusive position ceased on February 29, 2014 comes as a revelation to Plaintiffs, who have never received notice from

GE that it had rescinded the exclusive distributorship with Alpha Source; as of this date, GE still refuses to deal directly with Plaintiffs.)

Since GE, a direct horizontal competitor of Plaintiffs in the service/maintenance market for anesthesia and DI equipment, had directly sold its parts to Plaintiffs for many years at list prices, this constituted a major change in policy.  As stated in paragraphs 5-6 of its SAC, GE refused to deal with Plaintiffs. Instead, Plaintiffs had to obtain GE parts from Alpha Source, at price mark-ups in the twenty percent range.  If Plaintiffs needed parts shipped overnight, Alpha Source's stated policy was to add an additional one thousand dollars for the part.  This obviously placed Plaintiffs at a great competitive disadvantage with GE's competing service/maintenance unit.

As stated in paragraph 6.9 of Plaintiff's SAC, Defendant-GE is the largest original equipment manufacturer of anesthesia gas machines in the United States, with a market share of approximately eighty percent.  This clearly makes GE the dominant manufacturer in the nation.  As Paragraph 6.2 points out, GE is the sole manufacturer of its parts; using the test of cross-elasticity of demand and reasonable interchangeability.  There simply are no substitutes for GE's parts.  The second largest manufacturer is Drager, which also has a complete monopoly on its parts.  As stated *supra*, the parts of GE and Drager are not interchangeable and have no cross-elasticity of demand. With these facts in mind, Plaintiffs address the allegations contained in the two motions to dismiss.

In assessing legality in antitrust cases, the courts place great emphasis in its   analysis upon whether the business practice under scrutiny is "vertical" or whether it is "horizontal" in nature.  As the 11th Circuit has enunciated:

> Horizontal combinations are agreements among competitors; these agreements generally restrain trade at the same level of distribution…Vertical combinations, on the other hand, are agreements between firms occupying different levels in the chain of distribution…Horizontal restraints are more likely to be fitted with per se illegality.  _Seagood Trading Corp. v. Jerrico, Inc_., 924 F.2d 1555, 1569 (1991).

The rationale for this difference in treatment should be obvious; in the vertical context, there must be communication and cooperation between the manufacturer, its wholesalers and retailers, as they have a community of interest and are not in direct competition with one another.  In the horizontal context, on the other hand, the firms are by definition direct competitors.

With these facts in mind, Plaintiffs address the specific allegations contained in the two motions to dismiss.

Defendants take the position that "exclusive distributorships are lawful." (see page 7 of GE's Motion) This unequivocal position is not in accord with current antitrust law.

A case in point is _United States v. Dentsply_, 399 F. 3d 181, 187(3d Cir. 2003), (cert. denied, 546 U.S. 1089, 2006), where exclusive dealing contracts were found to violate Section 2 of the Sherman Act, the court stating "Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly.  _United States v. Grinnell Corp_., 384 U.S. 563, 86 S. Ct. 1698, L. Ed. 2d 778 (1966)".  The court went on to explain:

> The factual pattern here is quite similar to that in _LePage's, Inc. v. 3M_., 324 F.3d 141 (3d Cir 2003).  There, a manufacturer of transparent tape locked up high volume distribution channels by means of substantial discount on a range of its other products….. We concluded that the use of exclusive dealing and bundled rebates to the detriment of the rival manufacturer violated Section 2.  _See LePage's_, at 159.  Similarly, in Microsoft, the Court of Appeals for the D.C. Circuit concluded that, through the use of exclusive contracts with key dealers, a manufacturer foreclosed competitors from a substantial percentage of  the available opportunities for product distribution.  _See Microsoft_, 253 F. 3d at 70-71.

It is clear that GE and Drager together have most of the market for anesthesia machines, making for a very concentrated market.  It is a fact that each of these entities has monopoly control over its parts, which are not interchangeable and have no substitutes.  Under GE's changed policy, Plaintiffs are coerced into buying GE parts from Alpha Source, under very disadvantageous circumstances.

Given these facts, a fairly recent opinion cites a leading case on exclusive dealing which disagrees with Defendants' bald assertion that "exclusive distributorships are legal".  In _ZF Meritor, LLC v. Eaton Corporation_, 696F.3d 254, 284 (cert. denied, 133 S.Ct.2025, 2013), the court stated:

> Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion.  See _Tampa Electric._, 365 U.S. at 329…; _LePage's_, 324 F.3d at 159.  For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals.  _Tampa Elec._, 365 U.S. at 329; _Dentsply_, 399 F.3d at 187.

It is probable that GE's assertion that "exclusive distributorships are legal" emanates from the fact that in all the cases it cites in its argument, every case cited has to do with <u>vertical</u>, as opposed to <u>horizontal</u>, issues.      For example, in _Electronics Communications Corp. v. Toshiba American Consumer Product, Inc.,_ 129. F.3d 240(2d Cir. 1997), while the court dismissed the case for failure to state a claim, the court noted that "This is a so-called vertical restraint." _Id._ At 243.  In _E & I Consulting, LTD v. Domain Industries Limited_, 472 F.3d 23(3d Cir. 2014), which involved a tying claim as well as a Robinson-Patman claim, the Court stated "The complaint alleges a vertical restraint between a supplier (Doman) and a distributor (Sherwood). _Id._ At 29.  The rest of the cases cited by GE all involve similar vertical restraints and reasoning.   As stated above, horizontal restraints typically are more suspect under the antitrust laws; where the restraint is vertical, as stated in _Muenster Butane, Inc. v. The Stewart Company_, 651 F.2d 292, 295(5th Cir. 1981):

> Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product…Vertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market to prevail.

Unlike the vertical cases relied on by Defendants, as will be demonstrated the main cases made the basis of Plaintiffs' Complaint involve horizontal restraints between direct competitors.  For Example, in _Eastman Kodak Company v. Image_

*Technical Services*, 504 U.S. 451, 470 n. 18(1992), the United States Supreme Court explained:

> ….Unlike *Continental T.V.*, this case does not concern vertical relationships between parties on different levels of the same distribution chain.  In the relevant market, service, Kodak and the ISOs are direct competitors; their relationship is horizontal.  The interbrand competition at issue here is competition over the provision of service.   Despite petitioner's best effort, repeating the mantra "interbrand competition" does not transform this case into one over an agreement the manufacturer has with its dealers that would fall under the rubric of *Continental T.V.*

Another rubric argued by Defendants is that "The antitrust laws …were enacted for the protection of competition not competitors."  As the preeminent antitrust authority Professor Andrew I. Gavil points out in his article entitled "Exclusionary Distribution Strategies By Dominant Firms:   Striking A Better Balance," 72 Antitrust L.J. 3, n.262 page 53:

> The actual source of this oft-repeated and misused mantra is Chief Justice Earl  Warren's opinion in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), where the Court explicitly recognized that protecting competition does not mean ignoring the fate of competitors.  *Id*. At 344 ("It is competition, not competitors, which the [Clayton] Act protects.  But we cannot fail to recognize Congress' desire to promote competition through protection of viable, small, locally owned businesses.")

As Gavil further states…"the mantra is an empty slogan.  There can be no competition without competitors." *Id*. At 31.

Echoing this sentiment, Judge Richard Posner sustained a Federal Trade Commission (the "Commission") ruling requiring a divestiture under Clayton Section 7 in *Hospital Corporation Of America v. Federal Trade Commission*, 807 F.2d 1381, 1385(7th Cir. 1986).

Hospital Corporation of America, the largest proprietary hospital chain in America, had acquired two hospital corporations in Chattanooga, Tennessee; the defendant already owned one hospital there, giving it control over three as a result of the acquisitions.  In sustaining the Commission's ruling, the court stated:

6

The Commission may have made its task harder (and opinion longer) than strictly necessary, however, by studiously avoiding reliance on any of the Supreme Court's section 7 decisions from the 1960s except *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321…(1963), which took an explicitly economic approach to the interpretation of the statute.   The other decisions of that decade—in particular *Brown Shoe Co. v. United States*, 370 U.S. 294…(1962); *United States v. Aluminum Co. of America*, 377 U.S. 271…(1964); *United States v. Von's Grocery Co*., 384 U.S. 270…(1966), and *United States v. Pabst Brewing Co*., 384 U.S. 546…(1966)—seemed, taken as a group, to establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely to bring about or shore up collusive or oligopoly pricing.   The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words "may…substantially…lessen competition." None of those decisions have been overruled.

As pointed out in paragraph 6.3, "the inescapable result of this agreement between GE and Alpha Source will be the elimination of GE's anesthesia and DI maintenance/service rivals…and will lessen competition and consumer choice."

Defendant Alpha Source Motion (see page 2) raises the issue of Plaintiffs' standing.  Plaintiffs would respectfully refer the court to the seminal case of *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982):

As we noted in *Reiter v. Sonotone Corp*., 442 U.S. 330, 337 (1979), "[o]n its face, §4 contains little in the way of restrictive language."  And the lack of restrictive language reflects Congress' "expansive purpose" in enacting §4; Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victim of antitrust violations. *Pfizer Inc. v. India*, 434 U.S. 308, 313-314 (1978)  See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 485-486,  and n. 10, (1977)…As we have recognized, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers…The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co*., 334 U.S. 219,236 (1948)

Consistent with the congressional purpose, we have refused to engraft artificial limitations on the §4 remedy.

Defendant Alpha Source states that Plaintiffs have not alleged "**antitrust** injury—that is, an injury to competition affecting the price paid by consumer or the supply of good or services."  Plaintiff would refer Alpha Source to paragraph 8.1 (e), wherein it is specifically pled that Defendants conduct will result in "Independent sources for GE equipment maintenance/service will be eliminated." As pointed out in paragraph 6.3, "the inescapable result of this agreement between GE and Alpha Source will be the elimination of GE's anesthesia and DI maintenance/service rivals…and will lessen competition and consumer choice." Clearly, the elimination of Plaintiffs ISOs—GE's main competitors in the service/maintenance market—will give GE a free hand in charging supra-competitive prices to consumers.  Plaintiffs would refer the court to consider the following quotations from *Minnesota Mining and Manufacturing Company v. Appleton Papers, Inc*, 35 F. Supp. 2d 1138,1147 (D.Minn. 1999):

> Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury.   See Areeda & Hovenkamp, Antitrust Law, ¶373d1, at 278 (1995) ( "Standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff…so that the defendant could maintain or create a monopoly") *Amarel v. Connell*, 102 F. 3d 1494, 1509 (9th Cir. 1996) ( "[W]hen defendants engage in…anticompetitive acts  in an attempt to gain a monopoly, the competitor who is being driven out of the market is the party with standing.").

GE's motion contains extensive recitations of cases which discuss the legality under the antitrust laws of a manufacturer replacing one distributor with another. (See pages 7-8 of the GE Motion).  While these cases may be interesting, they have nothing to do with the present case. Plaintiffs herein are complaining that after years of voluntarily choosing to sell parts to them directly, Defendant GE changed its policy and forced Plaintiffs to buy only from a newly appointed distributor, Defendant Alpha Source, under anticompetitive terms which will eliminate Plaintiffs from the market.   That this elimination of the ISOs as competitors of GE in the service/maintenance market will harm competition and result in a loss of consumer welfare is obvious.

### III.  Plaintiffs Sufficiently Plead Their Section 2 Claims

In paragraphs 11-14 of its Complaint, Plaintiffs properly plead its monopolization claims.  In paragraph 11.2, Plaintiffs state the two major elements of a Sherman Section 2 claim.   A to the first element, that the Defendant possesses monopoly power in the relevant product and geographic market(s), the case of <u>United States v. Grinnell</u>, 384 U.S. 563, 571(1966) is instructive:

> In <u>United States v. E.I DuPont De Nemours & Co</u>., 351 U.S. 377, 391…we defined monopoly power 'as the power to control prices or exclude competition'.   The existence of such power ordinarily may be inferred from the predominant share of the market.

<u>Tops Markets., Inc. v. Quality Markets., Inc</u>., 142 F.3d 90, 98 (2d Cir. 1998) states market power "may be proven *directly* by evidence of the control of price…or it may be *inferred* from one firm's large percentage share of the relevant market."

In paragraphs 4.8 of its SAC, Plaintiffs claim—at this pre-discovery period—that GE has 100% control of the parts for its anesthesia and DI equipment.  Paragraph 11.3 asserts GE has 100% control of its training schools for anesthesia and DI training, from which Plaintiffs have been basically excluded due to GE's exclusionary policies and practices.  Clearly this is an "inference" of the possession of monopoly power.

As direct evidence of said power, Paragraph 11.3 states that one of Plaintiffs, Palo Verde Biomedical Consults, LLC, has already been eliminated from the market.  As <u>Kodak</u>, states, "It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition from the aftermarkets, since respondents offer direct evidence that Kodak did so."  <u>Kodak</u>, *Id.* at 477.  Plaintiffs will present such proof at trial.

As to the second element of monopolization, the various actions of Defendant Kodak including: (a) refusing to deal with Plaintiffs, which drastically raised Plaintiffs costs and reduced parts availability (b) reducing or eliminating Plaintiffs capacity to obtain the necessary training from GE's monopoly schools, can

hardly be described as obtaining its power due to its superior product, business acumen, or historic accident.  Its power came from its exclusionary practices; as the Supreme Court stated in _Aspen Skiing Company v. Aspen Highlands_, 472 U.S. 585, 605 n.32 (1985):

> "Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunity of rivals, but also (2) either does not further competition on the merits or does so in and unnecessarily restrictive way." 3 P. Areeda & D. Turner, Antitrust Law 78 (1978)

In paragraphs 15-19, Plaintiffs properly plead its attempted monopolization claim.  Plaintiffs allege that GE engaged in anticompetitive conduct against Plaintiffs, as described _supra_; that GE has a specific intent to eliminate competition by sacrificing profits it could have made selling parts to Plaintiffs, and not permitting Plaintiffs to attend its training schools, is indicative of specific intent to monopolize--  see _Verizon v. NTRGRITY_, 219 F. Supp. 2d 616, 630(D.N.J., 2002), stating "The alleged monopolist may not refuse to deal with a competitor if it has the specific intent to either maintain or create a monopoly….Evidence of this specific intent is abundant  when a business refuses to engage in a deal that would profit both the business and the competitor. (Quoting <u>Aspen</u> at 601-603).

Paragraph II of the GE motion asserts "The Antitrust Laws Do Not Require GE To Help Its Rivals."  To begin, GE's motion (page 12) makes the assertion "[ As a general matter, the Sherman Act 'does does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal," quoting as authority the case of _United States v. Colgate & Co_., 250 U.S. 300, 307 (1919).   That statement does in fact appear in <u>Colgate</u>—however, Defendants have chosen to omit the beginning of the sentence, which conditions the statement by these words: "_In the absence of any purpose to create or maintain a monopoly_," which of course changes the Defendants' truncated version of <u>Colgate</u>. _See Colgate_ at 307. And of course, the basis of Plaintiffs' Complaint is that GE has a monopoly on its parts and training schools, and through its refusal to deal with Plaintiffs, is attempting to create a new monopoly

in the service/maintenance market. In essence, GE is leveraging its present monopoly power to create a new monopoly by engaging in various anticompetitive acts to exclude Plaintiffs from the service/maintenance market.

There are three leading cases relied upon by Plaintiffs herein, including two from the Unites States Supreme Court, which are pertinent to the case at bar. The first one is factually similar to this case.

In _Eastman Kodak Company v. Image Technical Services, Inc._, 504 U.S. 451(1992), Defendant/Petitioner Kodak manufactured and sold photocopiers and micrographic equipment.  Kodak also sold service and replacement parts for its equipment.  In the early 1980s, eighteen independent service organizations (ISOs) began servicing Kodak copying and micrographic equipment in competition with Kodak.  Kodak subsequently instituted policies to limit the availability of parts to the ISOs and to make it more difficult for the ISOs to compete with Kodak.  Responded ISOs instituted an antitrust action against Kodak for monopolization.  As in the case at bar, Kodak controlled all the parts necessary for servicing its equipment, and there were no alternative sources for the parts.

The dissent in Kodak took the position that because Kodak had an "inherent" monopoly in parts for its equipment, Kodak's attempts to expand its power in to other markets were not precluded by the antitrust laws.

The majority opinion took a harsh view towards the dissents reasoning, stating:

> Even assuming, despite the absence of any proof from the dissent, that all manufacturers possess some inherent market power in the parts market, it is not clear why that should immunize them from the antitrust laws in another market.  The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if "a seller exploits his dominant position in one market to expand his empire into the next."  _Times – Picayune Publishing Co. v. United State_s, 345 U.S.594(1953)…._Northern Pacific R. Co. v. U.S._, 356 U.S. 1(1958)…._United States v. Paramount Pictures, Inc._, 334 U.S. (1948)…._Kodak_ at 480 n. 29.

The Court went on and addressed the very issue raised by Defendants, stating "It is true that as a general matter a firm can refuse to deal with its

competitors.  But such a right is not absolute:  it exists only if there are legitimate competitive reasons for the refusal. *See Aspen Skiing Co.*, 472 U.S., at 602-605. *Kodak* at 481 n. 32. (underlining added) Defendant GE has proffered no such business justification for its refusal to deal with Plaintiffs.

In direct refutation of Defendant GE's assertion that "The Antitrust Laws Do Not Require GE To Help Its Competitors," on remand a ten year permanent injunction was entered ordering Kodak to sell all of its parts to the ISOs at reasonable prices.   In his Post-Judgment Memorandum On Motion For Permanent Injunction (see 1996 WL 101173, N.D. Cal. 1996), Judge Tashima ordered Kodak to sell all its parts to the ISOs for a ten year period at reasonable prices, reasoning:

> At trial, plaintiffs established that they cannot provide service unless they have access to "all parts."  In order to restore competition to the service market, the decree should cover all parts, including copyrighted and patented parts.  Kodak's refusal to sell its protected parts is connected with an illegal parts policy adopted to further monopolistic ends.  Thus, the court may enjoin what would otherwise be a permissible parts policy.

The court further curtails Kodak's ability to charge monopoly prices, stating:

> Kodak erroneously assumes that it is still entitled to charge monopolistic prices.   Regardless of whether Kodak could have legally charged monopolistic prices on its protected parts in the past, Kodak now stands before the court an adjudged violator of the Sherman Act.  To remedy the effects of Kodak's past illegal conduct, the court may enjoin an otherwise permissible pricing policy.  *International Salt*, 332 U.S. at 400.

On appeal,  (Kodak II), see 125 F.3d 1195 (9th Cir. 1997), the court affirmed the injunction, with modifications including selling all parts at "nondiscriminatory pricing."

The second case, <u>*Red Lion v. Ohmeda*</u>, 63 F. 2d 1218(E.D. Cal., 1999), is very similar factually to the <u>Kodak</u> case.  In both cases, the defendants were moving for summary judgment; and in both cases, the motions were denied. <u>Kodak</u> was tried to a jury, which resulted in Plaintiffs recovering over seventy million dollars.  In <u>Red Lion</u>, after the defendant's motion for summary judgment was denied, the case was settled.

In the <u>Red Lion</u> case, as here, Plaintiffs were ISOs which competed with Defendant Ohmeda (acquired by Defendant GE in 2003) for the service/maintenance of anesthesia machines.    The suit was filed on November 1, 1996, and even then, Ohmeda was the largest manufacturer of anesthesia machines in the nation; Drager was, as now, the second largest.   As in the present case, parts for the service/maintenance of anesthesia machines were not interchangeable, thus giving the two leading manufacturers a complete monopoly on its own parts.   Ohmeda classified about 12% of its parts as " service restricted;" this included parts "which require installation, replacement or adjustment by trained personnel using specialized procedures to help maintain patient safety and proper operation of the equipment."  <u>Red Lion</u>, at 1221-122. This restrictive parts policy was the thrust of the suit, as  plaintiff ISOs argued the purpose of the policy was for Ohmeda to dominate the service market in violation of the antitrust laws.

Following the institution of the lawsuit, Ohmeda changed its parts policy and established the Qualified Independent Service Organization ("QISO") program. Under this program, Ohmeda offered its training programs to ISOs, and any ISO who passes the school could then buy all parts directly from Ohmeda.

According to plaintiffs, however, "Ohmeda's QISO training is infrequently given, prohibitively expensive, and unhelpful to most experienced technicians. Plaintiffs assert that it costs approximately $40,000 to train a single technician on the full line of Ohmeda equipment…not including lost income and travel expenses.  Plaintiffs allege that the classes are given only a few times a year and are often full…As a result, it may take 'up to three years' to fully train a single technician.'…plaintiffs contend that if a trained technician leaves one ISO for another, Ohmeda requires that the technician be retrained."  *Id.* at 1222. Plaintiffs therefore, among other claims, asserted that Ohmeda had monopolized the market for service on Ohmeda anesthesia equipment in violation of §2 of the Sherman Act.

In denying Ohmeda's motion for summary judgment, Judge Levi relied primarily on the Kodak decision for his legal authority.   The conclusion of the court was:

> Two related principles follow from the Kodak analysis: first, parts and service can be considered separate markets.  *See Kodak I*, 504 U.S. at 462-63, 481-82…and second, a single brand, by itself, can constitute a separate market for parts or service, *see id.* at 482.

> …And although Ohmeda has recently begun to allow ISOs to purchase parts directly under the QISO program, plaintiffs assert that the program takes many years to complete, is prohibitively expensive, and can be canceled by Ohmeda at any time without notice…This is enough evidence of barriers to entry to expansion to avoid summary judgment.  *Red Lion* at 1233.

The court then reviewed the business justifications offered by Ohmeda (the jury in Kodak having rejected Kodak's justifications as "pre-textual") and concluded that "on this record, plaintiffs have established a triable issue as to the legitimacy of Ohmeda's business justifications." *Id.* at 1235.

The court therefore denied Ohmeda's motion for a summary judgment; as previously stated the case was subsequently settled.

Another major case refuting Defendant GE's claim of not having to help a rival is the United States Supreme Court opinion *Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, 472 U.S. 585 (1985)( hereinafter denoted "Aspen").  The defendant, Aspen Skiing Company ("Ski Co."), owned three of the four ski areas in Aspen, Colorado.  For many years it voluntarily entered into an arrangement with its sole competitor, Aspen Highlands Skiing Company ("Highlands"), to offer skiers an all-Aspen  6-day ticket, which conveniently permitted a skier to  ski any of the four areas.  Revenues were then allocated on usage.  In the 1978-1979 season, an official from Ski Co. informed a Highlands official that Ski Co. was going to make Highland "an offer that [it] could not accept." Aspen at 592.  In essence, the 6-day all Aspen ski arrangement was over.  Ski Co. took additional steps to make it difficult for Highlands to compete, even refusing to sell any lift tickets to Highlands, either at operator's discount or retail.  As stated in the case, "When the Highlands official inquired why Ski Co.

was taking this position considering that highlands was willing to pay full retail value for the daily lift tickets, the Ski Co. official answered tersely: 'we will not support our competition.'" *Id.* at 594.   Highlands revenue steadily declined thereafter, and in 1979 Highland filed a complaint in Federal Court, charging Ski Co. with a violation of Sherman Section Two.   A jury trial found Ski Co. guilty of monopolizing down-hill skiing in Aspen, and awarded Highlands a $2.5 million verdict; the trial court also awarded Highlands an injunction requiring the parties to offer jointly a 4-area, 6-out-of-7-day coupon booklet. *Id.* at 598, n. 23.

The jury found that Ski Co. possessed monopoly power.   In one of the jury instructions regarding whether  Ski Co. had "willfully acquired, maintained, or used that power by anti-competitive or exclusionary means of for anti-competitive or exclusionary purposes," the instruction explained:

> "Willful Acquisition, Maintenance or Use of Monopoly Power:  Do you find by a preponderance of the evidence that the defendants willfully acquired, maintained or used monopoly power by anticompetitive or exclusionary means or for anticompetitive or exclusionary purposes, rather than primarily as a consequence of a superior product, superior business sense, or historic accident? *Id.* at 2855.

The jury found in the affirmative. *Id.*

 In another instruction, the Court explained:

> Nor is a corporation which possesses monopoly power under a duty to cooperate with its business rivals.   Also a company which possesses monopoly power and which refuses to enter into a joint operating agreement with a competitor or otherwise refuses to deal with a competitor in some manner does not violate Section 2 <u>if valid business reasons exist for that</u> <u>refusal</u>. *Id.* at 2854 (underlining added).

> In other words, if there were legitimate business reasons for the refusal, then the defendant, even if he is found to possess monopoly power, has not violated the law.   We are concerned with conduct which unnecessarily excludes of handicaps competitor.   This is conduct which does not benefit consumers by making a better product or service available—or in other ways—and instead has the effect of impairing competition.

> To sum up, you must determine whether Aspen Skiing Corporation gained, maintained, or used monopoly power in a relevant market by arrangements and policies which rather than being a consequence of a superior product,, superior business sense, or historic element, were

designed primarily  to further any domination of the relevant market or sub-market.  Id. at 2884-85.

Under this instruction, the jury found the second element of Section 2 was present.

The Court continued its analysis and stated:

In the actual case that we must decide, the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor.  Rather, the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years. Id. at 2858.

The Court continued by stating "Ski Co's decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market."  Id.  The Court explained the import of such a decision by stating:

In any business, patterns of distribution develop over time, these may reasonably be thought to be more efficient than alternative patterns of distribution that do not develop.  The patterns that do develop and persist we may call the optimal patterns.  By disturbing optimal distribution pattern one rival can impose costs upon another, that is, force the other to accept higher costs. Bork 156.  Id. at n. 32. (underlining added)

As to Ski Co's purported business justification for its refusal to deal with its rival, the Court reasoned:

Perhaps most significant, however, is the evidence relating to Ski Co. itself, for Ski Co.  did not persuade the jury that its conduct was justified by any normal business purpose.  Ski Co was apparently willing to forgo daily ticket sales both to skiers who sought to exchange the coupons contained in Highlands' Adventure Pack, and to those who would have purchased Ski Co. daily lift tickets from Highlands if Highlands had been permitted to purchase them in bulk.  The jury may well have concluded that Ski co. elected to forgo theses short-run benefits because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor. Id. at 2860.

 The Court, based on this analysis, affirmed the finding jury's finding that Ski Co. was guilty of monopolization in violation of Sherman Section 2.  Id. at 2862.

These three cases taken together clearly disprove Defendant GE's bald assertion that "The Antitrust Laws Do Not Require GE To Help Its Competitors."

16

The circumstances and facts of the cited cases fit within the case at bar.  With a monopoly on its parts and training schools, and despite years of dealing directly with Plaintiffs and providing access to its schools, GE made a change in its policy of distribution which has the effect of raising its rivals cost, creating barriers to entry by denying access to its schools, with the ultimate result constituting exclusionary conduct.  This anticompetitive conduct will result in the elimination of GE's strongest competitors in the relevant market, thus destroying competition and reducing consumer choice and welfare.

Defendant GE's III argument is that "The Antitrust Laws Do Not Prohibit GE From Offering Customers Better Deals Than The Plaintiffs Can Offer."  That blanket statement is subject to the same analysis discussed in the three cases Plaintiffs cite *supra.*  Plaintiffs do not complain of legitimate competitive behavior in its SAC—it does complain of illegal exclusionary conduct by GE.  By exclusionary, Plaintiffs would refer to a statement in <u>Aspen</u> where such conduct is described:

"Thus, 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."  3 P. Areeda & D. Turner. Antitrust Law 78 (1978).  *Aspen* at 2859.  As the Court stated in <u>Verizon Communications, Inc. v. Law Offices of Curtis Trinko</u>, LLP, 540 U.S. 398, 414 (2004), the "means of illicit exclusion, like the means of legitimate competition, are myriad."

Defendant GE, in its III argument, mainly discusses cases involving "predatory pricing".  Plaintiffs' SAC does not at this pre-discovery phase of the case claim GE has engaged in such conduct.  Plaintiffs merely request the legal right to compete on the merits—GEs' conduct in preventing that is the basis of Plaintiffs' claims.

## IV.     Plaintiff Sufficiently Plead the Relevant Product and Geographic Markets

In GE's IV. Legal Argument, GE argues that Plaintiffs fail adequately to plead the relevant markets or GE's power in those markets.

In response, Plaintiffs cite an opinion by then Circuit Judge Sotomayor on the issue of relevant markets:

> Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.  *See Found. for Interior Design Edu. Research v. Savannah Coll. Of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504  U.S. 451, 482…(1992); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (noting that courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery";  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers") (citing *Eastman Kodak*, 504 U.S. at 482…)
> *Todd v. Exxon Corporation*, 275 F.3d 191, 199-200.

The <u>Todd</u> opinion does indicate dismissal on the pleadings may be proper in certain "cases where there is involved (1)  failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be  limited in a particular way." *Id.* at 200.

In the case at bar, paragraph 4.3 defines three product sub-markets in which Plaintiffs and Defendant GE are direct competitors.  Said paragraph also states the relevant geographic market, namely, the United States.  Paragraph 4.8 states that the parts/equipment manufactured by GE are made only for GE machines, and the parts made by Drager are also entirely controlled completely by Drager; furthermore, that the parts of these manufacturers are not interchangeable, have no substitutes and cannot be obtained by Plaintiffs from any other source unauthorized by GE or Drager.  The paragraph concludes that these facts give GE monopoly power over its parts.  Paragraph 6.15 points out that if an owner of

18

a GE machine needs a GE part, it must be replaced by a GE part, "as the parts of each manufacturer are unique, non-interchangeable with other brands, and lack cross-elasticity of demand."  Plaintiffs have therefore properly alleged the relevant product and geographic market, and the accompanying monopoly power of GE over its parts.  Whether Defendants agree with Plaintiffs definition of the relevant markets or the possession of monopoly power is of no concern; Plaintiffs' allegations have clearly created a question of fact for the fact-finder, as stated in Todd *supra*.  Defendants' arguments go to the merits of Plaintiffs' claims, not the adequacy of its pleading.

As to the factual issue of market power, the courts take a similar view— "Dismissals for insufficient pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." Allen v. Dairy Farmers of America, 748 F. Supp. 2d 323, 340 (D. Vt. 2010).

In the final part of GE's argument IV, section D claims Plaintiffs have failed adequately to plead GE's alleged agreements with parts suppliers, owners of GE equipment, other service providers, and financing providers.  Basically, Defendant GE asserts that Plaintiffs have not alleged the "who, what, when, where" of a conspiracy.

At this pre-discovery phase, such information is premature.  As stated in Hospital Building Company v. Trustees of the Rex Hospital, 425 U.S. 738, 746 (1993), "…and in antitrust cases, where the 'proof is largely in the hands of the alleged conspirators',…dismissals prior to giving the plaintiff  ample opportunity for discovery should be granted very sparingly."  The court thus denied defendants motion to dismiss.

## V.  Plaintiffs Sufficiently Plead Their Section 7 Clayton Claim

Plaintiffs next address the final assertion by Defendant GE, that "THE FIFTH CLAIM ("ILLEGAL ACQUISITION") IS BARRED BY THE STATUTE OF LIMITATIONS AND BECAUSE PLAINTIFFS TO ALLEGE THE REQUIRED SUBSTANTIAL LESSENING OF COMPETITION."

Regarding GE's Claim that Plaintiffs Fifth Claim is barred by the four year statute of limitations, the case of _United States v. E.I. du Pont de Nemours & Co. (General Motors_), 353 U.S. 586 (1957), is instructive.   The complaint alleged that the purchase of a twenty-three percent interest in the General Motors Corporation between 1917-1919 violated Clayton Section 7, and the requested relief was divestiture.  The suit was not filed until 1949, some thirty years after the acquisition.  On appeal from the trial court's dismissal of the case, the United States Supreme Court ruled that the lower court was in error.  The Court, finding a violation, reasoned:

> We hold that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce.  Thus, although do Pont and General Motors are not competitors, a violation of the section has occurred if, as a result of the acquisition, there was at the time suit a reasonable likelihood of a monopoly of any line of commerce.  _Id._ at 876-877. (Underlining added).

In essence, the equitable relief of divestiture can be requested beyond the four-year statute of limitations.  _See Midwestern Machinery, Inc. v. Northwest Airlines, Inc_., 167 F.3d 439, (8th Cir. 1999), following this holding of du Pont.

Defendants do not question the right of private plaintiffs to request divestiture, which has been found in the affirmative.   _See California v. American Stores Company_, 495 U.S. 271 (1990); _Credit Bureau Reports, Inc. v. Retail Credit Company, Inc._, 476 F. 2d 989 (5th Cir. 1973).  Hence, Plaintiffs request relief is not time barred.

As to Defendant GE's assertion that Plaintiffs "failed to allege the required substantial lessening of competition," Plaintiffs would refer to paragraph 25.5 of its complaint.  Therein is specifically plead the required "substantial lessening of competition."   Plaintiffs allege that GE, in acquiring the largest anesthesia manufacturer in the country, was increasing its power to exclude competition.

Plaintiffs' concerns about the effect of GE' acquisition of Ohmeda is not frivolous.   In 1998 United States instituted a Section 7 suit against GE's acquisition of a competitor, InnoServ Technology, Inc. (_see_ Civil Action No

1:98cv01744 RCL, in the District of Columbia).   In the Complaint, the United States indicates that "GE is the largest manufacturer of medical imaging equipment…and is the leading service provider of GE imaging equipment;" that GE's service unit, GEMS, "is the leading service provider of imaging equipment manufactured by GE."  In paragraph 10. the government states "GE is the largest manufacturer of imaging equipment…throughout the United States."

Although the case was settled by consent, the fact that the United States is concerned about GE's acquisitions and market power, sustain Plaintiffs in their belief that upon trial, Plaintiffs will prove that GE's acquisition of Ohmeda may be to "substantially lessens competition," and therefore a divestiture should be ordered to protect competition.

## VI.  CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court DENY Defendants' Motions to Dismiss Plaintiffs Second Amended Complaint.

Dated: June 16, 2015

Respectfully Submitted,

**PROVOST & UMPHREY LAW FIRM, LLP**
490 Park Street (77701)
P.O. Box 4905
Beaumont, Texas 77704-4905
Phone:  (409) 835-6000
Fax:   (409) 838-8888

By:   *s/ Paul F. Ferguson, Jr./Paul Bartlett, Jr.*
Paul F. Ferguson, Jr.
TBN:  06919200

**PAUL BARTLETT, JR.**
TBN:  01849000
203 Zornia Drive
San Antonio, Texas 78213-2113
Phone:  (210) 341-6703
Fax:  (210) 525-8011
ATTORNEYS FOR PLAINTIFFS

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing instrument was served upon all parties on this 16th day of June, 2015, in accordance with Fed.R.Civ.P.


By:    s/ *Paul F. Ferguson, Jr., Paul Bartlett, Jr.*
       Paul F. Ferguson, Jr. &
       Paul Bartlett, Jr.