IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| RED LION MEDICAL SAFETY, INC., §<br>UNIVERSAL MEDICAL SERVICES, INC., §<br>METROPOLITAN MEDICAL SERVICES OF §<br>NC, INC., BIOMEDICAL CONCEPTS, §<br>ANESTHESIA SERVICE, INC., §<br>DIVERSIFIED ANESTHESIA, LLC, d/b/a §<br>DIVERSIFIED ANESTHESIA; §<br>PARAGON SERVICE, §<br>BAY STATE ANESTHESIA, INC., §<br>POPN, INC., Successor In Interest to §<br>PENN BIOMEDICAL SUPPORT, INC., §<br>GASMEDIX, LLC, §<br>WEST COAST ANESTHESIA §<br>SPECIALISTS, INC., §<br>PALO VERDE BIOMEDICAL §<br>CONSULTANTS, LLC, §<br>HEARTLAND SALES & SERVICES, LLC, §<br> §<br>          Plaintiffs, §<br> §<br>     v. §<br> §<br>GENERAL ELECTRIC COMPANY, INC., §<br>GE HEALTHCARE a unit of §<br>GENERAL ELECTRIC COMPANY; §<br>GE TECHNOLOGY INFRASTRUCTURE, §<br>a unit of GENERAL ELECTRIC COMPANY; §<br>DATEX-OHMEDA, a unit of §<br>GENERAL ELECTRIC COMPANY, and §<br>ALPHA SOURCE, INC., §<br> §<br>          Defendants. § | CIVIL NO.: 2:15-CV-308 |

**JURY INSTRUCTIONS**

## 1.   INTRODUCTION

MEMBERS OF THE JURY:

You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you.  On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of the case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist you in understanding the evidence and the parties' contentions.

### 1.1 General Instructions

A verdict form has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.

Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.  With respect to each question asked, your answers and your verdict must be unanimous.

1

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

### 1.2 Considering witness testimony

By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the wording of it or speculate as to what the witness would have testified to, if permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some

2

other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

### 1.3 Instruction Regarding Juror Questions

As I told you in the preliminary instructions, I have given you the opportunity to give me written questions anonymously after a witness testified when you had an important question of the witness that was strictly limited to the substance of the witness's testimony. Remember that I asked you not to be offended if I did not present your question to be answered by the witness. That has happened in this case, and so I want to instruct you further that I have entered orders in this case that prohibit the parties from presenting evidence to the jury that is not relevant to the questions that you will be answering in this case. You should not speculate on the answer to any unasked question and you should not speculate on or consider any

facts or events outside the testimony and exhibits you have heard and seen in this courtroom.

### 1.4 How to examine the evidence

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked of a witness in advance of trial. Deposition testimony is entitled to the same consideration and is to be judged by you as to credibility and weight as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence – such as testimony of an eyewitness. The other is indirect or circumstantial evidence – the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.

4

As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

### 1.5 Demonstrative Exhibits

Certain exhibits shown to you are illustrations. We call these types of exhibits "demonstrative exhibits." Demonstrative exhibits are a party's description, picture, or model to describe something involved in this trial. If your recollection of the evidence differs from the exhibit, rely on your recollection.

### 1.6 Expert Witnesses

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert has been or will be paid for reviewing the case and testifying, or from evidence that he or she testifies regularly as an expert witness and that income from such testimony represents a significant portion of the expert's income.

5

1.   **Summary of Contentions**

All Plaintiffs (with the exception of Gulfstream Anesthesia Service, Inc. (d/b/a Doctor's Depot)) and GE provide service, maintenance and repair for GE anesthesia equipment.   Certain Plaintiffs—Metropolitan Medical Services of NC, Paragon Service, Gulfstream Anesthesia Service, Inc. (d/b/a Doctor's Depot), Heartland Medical Sales & Services, LLC, Biomedical Concepts and Medical Application Repair and Sales—are also in the business of reconditioning, refurbishing and selling refurbished GE anesthesia machines.   GE sells new and refurbished GE anesthesia machines.

Plaintiffs contend that GE has used various kinds of conduct, including denying Plaintiffs access to GE anesthesia service parts and GE anesthesia machine service training, and disparaging Plaintiffs, to unlawfully restrain competition, maintain a monopoly, attempt to maintain a monopoly and restrict Plaintiffs' access to and success in the relevant markets for GE anesthesia servicing and anesthesia machine sales.   Plaintiffs contend that GE's challenged conduct was not motivated by any legitimate business reasons.

GE disputes Plaintiffs' contentions.   GE disputes the relevant markets that Plaintiffs allege and contends that Plaintiffs have access to parts and training, that its actions were justified by legitimate business reasons and are not anticompetitive. GE further contends that its marketing is truthful and normal competitive activity,

and that its conduct was procompetitive, supported by legitimate business reasons, and lawful.

## 2.   Burden of Proof

As I told you at the beginning of this trial, in any legal action, facts must be proved by a required amount of evidence, known as the burden of proof.

When a party has the burden of proof on any claim or defense by a preponderance of the evidence, that means the evidence must persuade you that the claim or defense is more likely than not true.

Plaintiffs must prove every essential part of its claims by a preponderance of the evidence. GE bears the burden of proving its mitigation defense by a preponderance of the evidence.

In determining whether any fact has been proved, you should, unless otherwise instructed, consider all of the evidence, including the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them.

## I.   ANTITRUST INSTRUCTIONS

### A.   Sherman Act - General

#### 1.   Purpose

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition

produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

**B.     Sherman Act - Section 2**

1.     Monopolization - General

a.     Elements

Plaintiffs allege that they were injured by GE's unlawful monopolization of the markets for (1) GE anesthesia machine servicing and (2) the sale of anesthesia machines in the United States. To prevail on its  monopolization claim, a plaintiff must prove each of the following elements by a preponderance of the evidence:

(1)     the alleged market is a valid antitrust market;

(2)     GE possessed monopoly power in that market;

(3)     GE willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct; and

(4)     the plaintiff was injured in its business or property because of defendant's anticompetitive conduct.

If you find that a plaintiff has failed to prove any of these elements, then you must find for GE and against that plaintiff on this claim. If you find that a plaintiff has proved each of these elements by a preponderance of the evidence, then you must find for that plaintiff and against GE on this claim.

b.     Monopoly Power Defined

To prove its monopolization claim, a plaintiffs must prove that defendant has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether plaintiffs have met their burden of proving monopoly power in a relevant market.

c.    Relevant Market - General

Plaintiffs must prove by a preponderance of the evidence that GE had monopoly power in a relevant market. Defining the relevant market is essential because you are required to make a judgment about whether GE has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain GE's freedom to set prices for or to restrict the production level of (i) GE anesthesia machine servicing and (ii) the sale of anesthesia machines.

The most likely and most important restraining force will be actual and potential competition from other firms and their products or services. This includes all firms and products or services that act or likely could act as restraints on GE's power to set prices as it pleases because customers could switch to them if GE sets

its own prices too high. All the firms and products or services that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether plaintiff has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

### d.   Relevant Product Market

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products or services compete with each other. In other words, the relevant product market includes the products or services that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products or service providers are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from

that product or service provider to another product or service provider or to performing the service itself such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products or service providers that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors but you may conclude in this case that some other percentage is more applicable to the product or service at issue. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products or service providers are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products or service providers are not in the product market.

In evaluating whether various products or service providers are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of Plaintiffs and GE regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

11

Plaintiffs' claims against GE are based upon conduct affecting two alleged relevant product markets (i) GE anesthesia machine servicing and (ii) the sale of anesthesia machines. By contrast, Defendant contends that Plaintiffs have failed to allege the proper relevant product market. Defendant contends that Plaintiffs have failed to prove a properly defined relevant market. If you find that Plaintiffs have proven a relevant product market, then you should continue to evaluate the remainder of Plaintiffs' claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in GE's favor on this claim.

e. Relevant Geographic Market

The relevant geographic market is the area in which GE faces competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one geographic area have substantial effects on prices or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving the relevant geographic market by a preponderance of the evidence. In this case, Plaintiffs claim that the relevant geographic market for both GE anesthesia machine servicing and the sale of

12

anesthesia machines is the United States. By contrast, GE asserts that any relevant market for anesthesia machine servicing is not national, but rather limited to smaller geographic areas. In determining whether plaintiffs have met their burden and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which GE sells and where GE's customers are located;
- the geographic area to which customers turn for supply of the product;
- the geographic area to which customers have turned or have seriously considered turning;
- the transportation cost differences between areas;
- the geographic areas that suppliers view as potential sources of competition; and
- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

### f.   Monopoly Power

If you find that Plaintiffs have proven relevant markets, then you should determine if GE has monopoly power in those markets.  There can be both direct and indirect proof of the existence of monopoly power in a market.

### (i)   Existence of Monopoly Power - Direct Proof

If you find that plaintiffs have proven a relevant market, then you should determine whether GE has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control price or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably

raise or maintain prices substantially above the competitive level for a significant period of time.

Plaintiffs have the burden of proving that GE has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Plaintiffs must prove that GE has the power to do so by itself— that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiff must also prove that GE has the power to maintain prices above a competitive level for a significant period of time. If GE attempted to maintain prices above competitive levels, but would lose so much business to other competitors, that the price increase would become unprofitable and would have to be withdrawn, then GE does not have monopoly power.

Similarly, Plaintiffs must prove that defendant has the ability to exclude competition. For example, if GE attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then GE does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that GE has monopoly power. Other factors may enable a company

without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that GE would lose a substantial amount of sales if it raised prices substantially, or that GE's profit margins were low compared to its competitors, or that GE's margins go up and down or are steadily decreasing, might be evidence that GE does not have monopoly power.

(ii)    Existence of Monopoly Power - Indirect Proof

Monopoly power may also be proven indirectly.   Plaintiff has introduced evidence of the structure of the market to show that defendant has monopoly power. The evidence presented by the parties includes evidence of defendant's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors. If this evidence establishes that GE has the power to control prices or exclude competition in the relevant antitrust market, then you may conclude that defendant has monopoly power in the market.

***Market Share***

The first factor that you should consider is GE's share of the relevant market. Based on the evidence that you have heard about GE's market share, you should

15

determine GE's market share as a percentage of total sales or machines under contract in the relevant market. GE must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers or servicers to enter the market and begin competing with defendant for sales), the entry and exit by other companies, and the number and size of competitors. Along with GE's market share, these factors should inform you as to whether GE has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that defendant has monopoly power. However, if you find that the other evidence demonstrates that defendant does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that defendant has monopoly power.[5]

**Market Share Trends**

The trend in defendant's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly

power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.[6]

### Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that GE does not have monopoly power, regardless of GE's market share, because new competitors could enter easily if GE attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that GE has monopoly power.

### Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that GE lacks monopoly power. On the other hand, departures from the market, or the

failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that GE has monopoly power.

**Number and Size of Competitors**

You may consider whether GE's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on GE's ability to price its products. If GE's competitors are vigorous or have large or increasing market shares this may be evidence that defendant lacks monopoly power. On the other hand, if you determine that defendant's competitors are weak or have small or declining market shares, this may support an inference that defendant has monopoly power.

**Conclusion**

If you find that GE has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that defendant does not have monopoly power, then you must find for GE and against plaintiffs on this claim.

g.      Willful Acquisition or Maintenance of Monopoly Power

The next element Plaintiffs must prove is that GE willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to

18

competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals. Advertising or marketing is not anticompetitive activity unless the communications are false, not

on the merits of the product or service, and had the potential to eliminate, or did in fact eliminate competition.

In determining whether GE's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

As described below, Plaintiffs' contentions fall within three categories: (1) refusal to deal, (2) monopoly leveraging, and (3) denial of essential facilities.

If you find that plaintiffs have proven by a preponderance of the evidence that defendant willfully acquired or maintained monopoly power through anticompetitive acts under any of the three below theories, then you must consider whether plaintiff has proved the remaining elements of this claim. If, however, you find that plaintiff did not prove this element by a preponderance of the evidence, then you must find for defendant and against plaintiff on this claim.

a.   Unilateral Refusal to Deal with a Competitor

As stated before, one of the elements Plaintiffs must prove is that GE engaged in anticompetitive conduct. Plaintiff claims that this element is satisfied in this case because defendant unlawfully refused to deal with plaintiff, a competitor.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently. Even a company with monopoly power in a relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them. However, businesses may not refuse to deal with the purpose of creating or maintaining a monopoly.

A refusal to deal might take the form of (1) the unilateral termination of a voluntary and profitable course of dealing; (2) an offer to deal with a competitor only on unreasonable terms and conditions, which could amount to a practical refusal to deal; and (3) a refusal to provide competitors with products that were already sold in a retail market to other customers. A decision to alter a course of

dealing together with evidence of anticompetitive malice may constitute a refusal to deal.

Defendant has introduced evidence that its refusal to deal was based on legitimate business purposes. A refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors. In general, the desire to maintain monopoly power or to block entry of competitors is not a legitimate business purpose. A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits.

b.   Leveraging

As stated before, one of the elements plaintiffs must prove is that GE engaged in exclusionary or restrictive conduct. Plaintiffs claim that the conduct element is satisfied in this case by GE's use of anticompetitive conduct and its monopoly power in one product market to obtain or maintain  monopoly power in a second product market.

Plaintiffs claim that the anticompetitive conduct element is satisfied in this case by defendant's use of its monopoly in the GE anesthesia parts and GE anesthesia service training to obtain or maintain monopoly power in the GE

anesthesia machine service market, and the market for the sale of anesthesia machines.

To establish that GE engaged in anticompetitive conduct by leveraging its position from one market to another market, plaintiff must prove the following:

(1)    that GE anesthesia parts or GE anesthesia service training are relevant markets under the instructions you have received concerning relevant market;

(2)    GE had monopoly power in either or both of those markets;

(3)    GE anesthesia machine servicing and the sale of anesthesia machines are separate relevant product markets from the GE anesthesia parts and GE anesthesia service training markets;

(4)    as I previously instructed you, GE, through anticompetitive conduct used its monopoly position in the market for GE anesthesia parts and GE anesthesia service training in an attempt to monopolize the GE anesthesia machine servicing market and the anesthesia machine market; and

(5)    GE in fact monopolized or had a dangerous probability of monopolizing the markets for GE anesthesia machine servicing and the sale of anesthesia machines.

If you find that plaintiffs have failed to prove any of these elements in addition to the elements of a monopolization claim, then you must find for GE and against

plaintiffs on plaintiffs' leveraging claim. If you find that plaintiffs have proved each element in addition to the elements of a monopolization claim, then you must find for plaintiffs on this leveraging claim.

c.    Essential Facility

As stated before, one of the elements plaintiff must prove is that defendant engaged in anticompetitive conduct. Plaintiffs also claim that this element is satisfied in this case because defendant refused to deal with plaintiff and thereby denied plaintiff access to something essential to competition in a relevant market. This claim requires that you examine defendant's conduct under the so-called "essential facility" or "bottleneck" theory of antitrust liability according to the following principles of law.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, as long as it acts independently. A company that has exclusive control over a facility essential to effective competition may refuse to deal with another person as long as it has valid business reasons for that refusal—that is, a company may deny access as long as it has a business reason for the denial of access other than the harmful effect that the denial would have on competitors. However, a company that previously granted access to actual or potential competitors may not deny access to that facility on reasonable terms and conditions if it does not have valid business reasons for the refusal and if denying access would create or maintain monopoly power in the

relevant market. In addition, the company's refusal to deal must have been part of a larger anticompetitive plan, such as seeking to drive a competitor from the market or to discipline it for daring to compete on price.

Plaintiff alleges that defendant denied it access to GE anesthesia parts and GE anesthesia service training without a valid business reason. In order to establish that the denial of access to GE anesthesia parts and GE anesthesia service training constitutes "anticompetitive conduct" and thus satisfies the second element of a monopolization claim, plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1)    defendant controls a facility that is essential to effective competition in the relevant market;

(2)    the facility could not practically or economically be duplicated by potential competitors;

(3)    it is feasible for plaintiff to buy GE anesthesia parts or attend GE anesthesia service training without interfering with GE or significantly inhibiting GE ability to conduct its business;

(4)    GE denied plaintiff reasonable access to GE anesthesia parts and GE anesthesia service training;

(5)    denying reasonable access to GE anesthesia parts and GE anesthesia service training was contrary to GE's independent business interests; and

25

(6)    GE's refusal to grant plaintiff reasonable access to GE parts and GE certified training had the effect of creating or maintaining monopoly power in a relevant market.

A facility is essential to effective competition if it is impracticable for a company or person to compete without it in the relevant market with the firm that controls the facility. The fact that the use of the facility would make it easier or less costly for a firm to compete in the relevant market does not make the facility essential if the firm is able to compete without the use of the facility.

2.    Attempt to Monopolize

a.    Elements

Plaintiffs allege that they were injured by GE's unlawful attempt to monopolize the markets for (i) GE anesthesia machine servicing and (ii) the sale of anesthesia machines. To prevail on its claim of attempted monopolization, plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1)    GE engaged in anticompetitive conduct;

(2)    GE had a specific intent to achieve monopoly power in a relevant market;

(3)    there was a dangerous probability that GE would achieve its goal of monopoly power in the relevant market; and

26

(5)   plaintiffs were injured in its business or property by GE's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for GE and against plaintiffs on plaintiffs' claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to GE, then you must find for plaintiffs and against GE on plaintiffs' claim of attempted monopolization.

      b.    Anticompetitive Conduct

It is not sufficient for plaintiff to prove that defendant intended to monopolize the relevant market. Plaintiff must also show that defendant engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that defendant would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct. You should refer to my prior instructions concerning anticompetitive conduct.

      c.    Specific Intent

The second element that plaintiff must prove is that defendant had a specific intent to monopolize a relevant market. The court has already instructed you on the relevant market, and the court will now discuss specific intent. If plaintiffs prove that GE had a specific intent to monopolize a relevant market—in this case, GE

anesthesia machine servicing or anesthesia machines--you must find that plaintiffs have proven this element of the attempted monopolization claim and you should consider the other elements of the claim. If you find that plaintiffs have failed to prove this element, then you must find for GE on plaintiffs' attempted monopolization claim.

There are several ways in which plaintiffs may prove that GE had the specific intent to monopolize. There may be evidence of direct statements of GE's intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of GE at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of GE. You must be careful, however, to distinguish between GE's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that GE actually intended to obtain a monopoly, specific intent may be inferred from what GE did. For example, if the evidence shows that GE lacked a legitimate business justification and the natural and probable consequence of GE's conduct in the relevant market was to give GE control over prices and to exclude or destroy competition, and that

28

this was plainly foreseeable by GE, then you may (but are not required to) infer that GE specifically intended to acquire monopoly power.

### d.   Dangerous Probability of Success

If you find that GE had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that GE would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

In determining whether there was a dangerous probability that defendant would acquire the ability to control price in the market, you should consider such factors as:

- GE's market share;
- the trend in GE's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on GE's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that GE would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that defendant would ultimately acquire monopoly power.

C.   **Causation and Damages**

I will now instruct you as to the role of injury, causation, and damages, which are common issues for all of Plaintiffs' claims.  If you find that GE has violated Section 2 of the Sherman Act, then you must decide if plaintiffs are entitled to recover damages from GE.

Plaintiffs are entitled to recover damages for an injury to their business or property if each can establish three elements of injury and causation:

(1)   plaintiff was in fact injured as a result of defendant's alleged violation of the antitrust laws;

(2)   GE's alleged illegal conduct was a material cause of plaintiff's injury; and

(3)   plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each plaintiff to establish that they are entitled to recover damages, each must prove that it was injured as a result of GE's alleged violation of the antitrust laws. Proving the fact of damage does not require plaintiffs to prove the dollar value of their injuries. It requires only that each plaintiff prove that it was in fact injured by GE's alleged antitrust violation. If you find that a plaintiff has

30

established that it was in fact injured, you may then consider the amount of that plaintiff's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that each plaintiff separately has established that it was in fact injured.

Plaintiff must also offer evidence that establishes by a preponderance of the evidence that GE's alleged illegal conduct was a material cause of plaintiffs' injury. This means that each plaintiff must have proved that some damage occurred to it as a result of GE's alleged antitrust violation, and not some other cause. Plaintiffs are not required to prove that GE's alleged antitrust violation was the sole cause of their injury; nor need plaintiffs eliminate all other possible causes of injury. It is enough if a plaintiff has proved that the alleged antitrust violation was a material cause of its injury.

Finally, each plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff's injuries are antitrust injuries. On the other hand, if a plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiffs' injuries are not

31

antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.[8]

In summary, if a plaintiff can establish that it was in fact injured by GE's conduct, that GE's conduct was a material cause of that plaintiff's injury, and that plaintiff's injury was the type that the antitrust laws were intended to prevent, then that plaintiff is entitled to recover damages for the injury to its business or property.

a.    Business or Property

Each Plaintiff must establish that the injury it claims to have suffered was an injury to its business or property. The term "business" includes any commercial interest or venture. A Plaintiff has been injured in its business if you find that it has suffered injury to any of its commercial interests or enterprises as a result of GE's alleged antitrust violation. The term property includes anything of value plaintiff owns, possesses, or in which plaintiff has a protectable legal interest. Plaintiff has been injured in its property if you find that anything of value that it owns, possesses,

or has a legal interest in has been damaged as a result of GE's alleged antitrust violation. Plaintiff has been injured in its property if you find that it has paid an inflated price for goods, services, any legal interest of value, or has lost money as a result of GE's alleged antitrust violation.

### 2. Damages

#### a. Antitrust Damages - Introduction and Purpose

If you find that defendant violated the antitrust laws and that this violation caused injury to a plaintiff, then you must determine the amount of damages, if any, that plaintiff is entitled to recover. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any plaintiff should, or should not, prevail in this case. If you reach a verdict for GE on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that each plaintiff should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive

damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to a plaintiff an amount for attorneys' fees or the costs of maintaining this lawsuit.

### b.    Basis for Calculating Damages

You are permitted to make just and reasonable estimates in calculating each plaintiff's damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Plaintiffs must prove the reasonableness of each of the assumptions upon which their damages calculation is based.

If you find that a plaintiff has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that a plaintiff has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

### c.    Causation and Disaggregation

If you find that GE violated the antitrust laws and that plaintiff was injured by that violation, plaintiff is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of GE. Each plaintiff bears the burden of

showing that its injuries were caused by GE's antitrust violation, as opposed to any other factors. If you find that a plaintiff's alleged injuries were caused in part by GE's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of plaintiff's alleged injuries that was caused by GE's alleged antitrust violation.

Plaintiff claims that it suffered injury because it lost sales and profits as a result of GE's alleged antitrust violation. Defendant claims that any profits or sales lost by plaintiff occurred as a result of other factors that have nothing to do with the alleged antitrust violation. These include a change in market conditions, mismanagement, increased competition, changing technology. A Plaintiff is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean plaintiff did not suffer antitrust injury, but plaintiff is not entitled to recovery for damages caused by them. Plaintiff only may recover for damages caused by the alleged antitrust violation.

Each Plaintiff bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that a plaintiff was injured by GE's alleged antitrust violation, and there is a reasonable basis to apportion plaintiff's alleged injury between lawful and unlawful causes, then you may award damages.

If you find that a plaintiff's alleged injuries were caused by factors other than GE's alleged antitrust violation, then you must return a verdict for GE. If you find that there is no reasonable basis to apportion plaintiff's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

### d.   Damages for Competitors - Lost Profits

Plaintiff claims that it was harmed because it lost profits as a result of GE's alleged antitrust violation. If you find that defendant committed an antitrust violation and that this violation caused injury to plaintiffs, you now must calculate the profits, if any, that each plaintiff lost as a result of GE's antitrust violation. To calculate lost profits, you must calculate net profit: the amount by which each plaintiff's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. You may calculate the net profit by the following measures.

### (i)   GE Anesthesia Machine Service Damages

To estimate the share of the GE anesthesia service market ISOs would have obtained, Plaintiffs rely upon Dr. House's methodology. If you find that Dr. House's methodology is a reliable guide to estimate what each plaintiffs' actual net profits would have been in the absence of the antitrust violation, then you may calculate plaintiffs' lost GE anesthesia machine service profits based on his methodology.

However, if you find that his methodology is not reliable, and that each plaintiffs' lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on this measure.

If you find that Plaintiffs have shown reliable evidence of their increased business in the absence of the antitrust violation, then you may calculate Plaintiffs' lost profits by considering that increased business, and evidence relating to the profit margin Plaintiffs would have secured on such sales. You may find, however, that plaintiffs have not shown reasonable evidence of what their increased business would have been in the absence of the alleged antitrust violation, such as if plaintiffs' market shares were impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors. You may also find that Plaintiffs have not shown reasonable evidence of the profit margin they would have incurred in the absence of the alleged antitrust violation. If you find that the evidence of plaintiffs' increased business and/or profit margins is not reasonable, and that lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on market share or profit margins.

Plaintiffs' damages claim includes alleged losses of profits on complementary sales, including servicing other manufacturer anesthesia machines, servicing other medical equipment, selling or brokering other medical equipment sales to customers. You may award Plaintiffs damages for lost profits on complementary sales only if

you find they were "consequential" to GE's alleged monopolization of the GE anesthesia machine service market.  In other words, only if those lost sales were caused by some of the consequences flowing from the monopolization of the GE anesthesia machine service market.

(ii)    Refurbished GE Anesthesia Machine Damages

Plaintiffs have proposed to calculate the GE refurbished machine service profits they would have earned  if there had been no antitrust violation by showing evidence of refurbished anesthesia machines sales trends overall and comparing Plaintiffs' GE refurbished anesthesia machine sales to those trends.  You should follow my prior instructions in determining Plaintiffs award for lost profits on lost GE refurbished anesthesia machine sales.

e.    Damages for Competitors - Future Lost Profits

Plaintiffs claim that they were harmed because, had it not been for GE's alleged antitrust violation, plaintiffs would have earned future profits. If you find that GE committed an antitrust violation and that this violation caused injury to a plaintiff, you now must calculate the future profits, if any, that plaintiff lost as a result of GE's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that plaintiff would have earned in future years, and (2) the length of time for which it would have earned those profits. In making this

calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation. In making this determination, you must consider the various factors that could affect the future success of plaintiff's business, such as general market or economic conditions, lawful competition plaintiff would face in the future, plaintiff's management of business, changes in technology or other business conditions, and other factors affecting plaintiff's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative. If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money. For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year— you would then have something more than $1,000 in a year from now. Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower

amount, reflecting the value that could be earned on that money over the next year. This lower amount is known as an amount discounted to present value.

        f.     Damages for Competitors - Going Concern Value or Goodwill

Two Plaintiffs—Palo Verde and POPN—claim that they were harmed because, had it not been for defendant's alleged antitrust violation, the "going concern" or "goodwill" value of its business would have been higher than it actually was. If plaintiff was forced to sell, shut down, or otherwise terminate its business because of GE's alleged antitrust violation, plaintiff is entitled to damages for any resulting loss to its business's going concern value. Going concern value is the value of a company as an operating venture to a prospective buyer. Going concern damages are designed to compensate plaintiff for the value that plaintiff's business would have had at the point plaintiff went out of business, but for defendant's alleged antitrust violation.

Going concern damages are measured by determining the loss of goodwill suffered by plaintiff's business as a result of defendant's alleged antitrust violation. Goodwill consists of the intangible assets of a business, including customer relationships, an established location, employees and their skill sets, and other elements that lead to profits over and above an amount fairly attributable to the return on capital investment and the labor of the owner. Goodwill also includes the reasonable prospect of continued additional profit in the future.

If you find that defendant committed an antitrust violation and that this violation caused damage to the amount for which plaintiff was able to sell its business, you may award damages for loss of goodwill. You may include both lost past profits and the loss of goodwill in calculating a total damages award.

The most important element of goodwill is the expectation of future profitable operations. Calculate (1) the reasonable expectation of future profits minus (2) an amount attributable to a reasonable return on the capital investment plus a return attributable to the labor of the owner of the business. If that number is positive, that is the goodwill value; otherwise there is no goodwill value. In determining whether goodwill exists, and how much it is if it exists, you should consider how far into the future the profitable operations of the business might have been expected to continue, considering all of the circumstances existing at the time, had it not been for defendant's alleged antitrust violation.

If plaintiff sold its business for more than the value of its tangible assets, plaintiff likely received some compensation for goodwill, and you should take this amount into account in determining plaintiff's lost goodwill.

g.    Mitigation

A Plaintiff may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence. A Plaintiff is not entitled to increase any damages through inaction. The law requires an injured

41

party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If a plaintiff failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to plaintiff than it would have suffered had it taken those steps, then plaintiff may not recover any damages for that part of the injury it could have avoided.

GE has the burden of proof on this issue. Defendant must prove by a preponderance of the evidence that plaintiff:

(1)   acted unreasonably in failing to take specific steps to minimize or limit its losses;

(2)   that the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

(3)   the amount by which plaintiff's loss would have been reduced had plaintiff taken those steps.

In determining whether plaintiff failed to take reasonable measures to limit its damages, you must remember that the law does not require plaintiff to take every conceivable step that might reduce its damages. The evidence must show that plaintiff failed to take commercially reasonable measures that were open to it. Commercially reasonable measures mean those measures that a prudent businessperson in plaintiff's position would likely have adopted, given the

circumstances as they appeared at that time. Plaintiff should be given wide latitude in deciding how to handle the situation, so long as what plaintiff did was not unreasonable in light of the existing circumstances.

### h. Multiple Plaintiffs

If you award damages, you will be asked what sum of money would fairly and reasonably compensate each plaintiff for each pertinent claim. If you find that more than one plaintiff is entitled to recover damages, exercise caution to be sure that each plaintiff is awarded damages only for its own injuries.

## II.  CLOSING INSTRUCTIONS

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your

deliberations, follow all of the instructions that the Court has given you about/on your conduct during trial. After you have reached your verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the Court Security Officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.