**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| RED LION MEDICAL SAFETY, INC. *et al.*, | § § § | |
| | § | CIVIL ACTION NO. 2:15-CV-00308-RWS |
| Plaintiffs, | § | |
| | § | |
| v. | § | **SEALED** |
| | § | |
| GENERAL ELECTRIC COMPANY, *et al.*, | § § | |
| | § | |
| Defendants. | § § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' post-trial motions. Having considered the argument at the October 10, 2017 hearing and the parties' written submissions, and for the reasons detailed below, the Court rules as follows:

- Defendants General Electric Company, GE Healthcare, GE Technology Infrastructure, and Datex-Ohmeda's (collectively "GE") Renewed Motion for Judgment as a Matter of Law Regarding Market Definition, Monopoly Power, Parts and Training Policies (Docket No. 192) is **DENIED**;

- GE's Renewed Motion for Judgment as a Matter of Law for Lack of Injury or Damages (Docket No. 193) is **DENIED**;

- GE's Renewed Motion for Judgment as a Matter of Law as to Allegations Concerning Software Updates and Disparagement Theories (Docket No. 194) is **GRANTED**;

- GE's Renewed Motion for Judgment as a Matter of Law as to Plaintiffs POPN, Palo Verde, and SAS Acquisitions (Docket No. 195) is **DENIED-IN-PART** and **GRANTED-IN-PART**;

- GE's Motion in the Alternative for a New Trial on All Issues (Docket No. 196) is **DENIED-IN-PART** and **GRANTED-IN-PART**; and

- Plaintiffs Anesthesia Services, Inc., Bay State Anesthesia, Inc., Biomedical Concepts, Diversified Anesthesia, LLC, Gasmedix, LLC, Heartland Medical Sales & Services, LLC, Metropolitan Medical Services of NC, Inc., POPN, Inc. successor in interest to Penn Biomedical Support, Inc., Palo Verde Medical Consultants, LLC, Paragon Service, Red Lion Medical Safety, Inc., Universal Medical Services, Inc., West Coast Anesthesia Specialists, Inc.'s (collectively, "Plaintiffs") Post-Trial Motion for Injunction, Attorneys' Fees, and Entry of Judgment Upon the Jury's Verdict (Docket No. 190) is **DENIED-AS-MOOT**.

## BACKGROUND

Plaintiffs Red Lion Medical Safety, Inc. ("Red Lion"); Universal Medical Services, Inc. ("Universal"); Metropolitan Medical Services of NC, Inc. ("Metropolitan"); Biomedical Concepts; Anesthesia Services, Inc. ("ASI"); Diversified Anesthesia, LLC ("Diversified"); Paragon Service ("Paragon"); Bay State Anesthesia, Inc. ("Bay State"); POPN, Inc. ("POPN"); Gasmedix, LLC ("Gasmedix"); West Coast Anesthesia Specialists, Inc. ("West Coast"); Palo Verde Biomedical Consultants, LLC ("Palo Verde"); Medical Application Repair and Sales, LLC ("MARS"); Heartland Medical Sales & Services, LLC ("Heartland"); SAS Acquisitions, Inc. ("SAS Acquisitions"); and Trinity Biomedical Solutions, Inc. ("Trinity") are each independent service organizations that provide service, maintenance and repair for GE anesthesia equipment.  *See* Docket No. 141 at 4–5.  Plaintiffs Metropolitan, Paragon, Heartland, Biomedical Concept, MARS and Gulfstream Anesthesia Service Inc. (d/b/a Doctors Depot) ("Doctors Depot") are also in the business of reconditioning, refurbishing and selling refurbished GE anesthesia machines.  *Id.* at 5.

Plaintiffs filed the instant lawsuit on March 3, 2015, alleging that Defendants General Electric Company, Inc., GE Healthcare, GE Technology Infrastructure, Datex-Ohmeda, and Alpha Source, Inc. engaged in anticompetitive behavior in violation of the antitrust laws.  Particularly, Plaintiffs' complaint accused GE of violating § 2 of the Sherman Act with respect to GE's "parts policy," "training policy," marketing communications, and software notifications and update policies.  *See* Docket No. 141 at 4–6; Docket No. 164.  Trial in this matter was held from April 18, 2017 to April 26, 2017, and the jury returned a verdict that the complained of policies violated § 2 of the Sherman Act.  Docket No. 164. The jury awarded the Plaintiffs a total of $43,803,344.00 in damages for GE's antitrust violations. *Id*. at 21–32.  The parties have filed post-trial motions, which the Court discusses below.

## LEGAL STANDARD

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1); *see also EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 547 (5th Cir. 2016); *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co*., 801 F.3d 512, 525 (5th Cir. 2015). Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc*., 693 F.3d 491, 499 (5th Cir. 2012).  "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000).  The Court will "uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Cousin v. Trans Union Corp*., 246 F.3d 359, 366 (5th Cir. 2001); *see also Int'l Ins. Co. v. RSR Corp*., 426 F.3d 281, 296 (5th Cir. 2005). However, "[t]here must be more

than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc*., 493 F.3d 602, 606 (5th Cir. 2007) (citing *Laxton v. Gap, Inc*., 333 F.3d 572, 577 (5th Cir.2003)).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013). Although the court must review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Ellis v. Weasler Eng'g Inc*., 258 F.3d 326, 337 (5th Cir. 2001). However, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id* (citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150–51 (2000)). The Court gives "credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Arismendez*, 493 F.3d at 606.

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The court can grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "Courts grant a new trial when it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quoting *Del Rio Distributing, Inc. v. Adolph Coors Co*., 589 F.2d 176, 179 n. 3 (5th Cir. 1979)). "A new trial may be granted, for example, if the district court finds the verdict is

against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith*, 773 F.2d at 612–13. The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

### A. GE's Renewed Motion for Judgment as a Matter of Law Regarding Market Definition, Monopoly Power, Parts and Training Policies (Docket No. 192)

In its first post-trial motion, GE moves for judgment as a matter of law because (1) Plaintiffs' national market for servicing GE anesthesia machines fails as a matter of law; (2) Plaintiffs failed to prove their alleged product market for servicing anesthesia machines; (3) GE does not have monopoly power in a national market for servicing GE machines; (4) Plaintiffs failed to introduce any evidence to support product markets consisting of the servicing exclusively of GE machines; (5) GE's parts policies are not anticompetitive; (6) GE's training policies are not anticompetitive; (7) GE's parts and training policies did not injure competition; and (8) Plaintiffs' monopoly leveraging and essential facilities theories are not cognizable. The Court addresses each of GE's arguments in turn.

### *(1) Lack of National Market for Service*

GE first argues that it is entitled to judgment as a matter of law on Plaintiffs' servicing claims because Plaintiffs failed to meet their burden to prove that GE possessed market power in a properly defined relevant market. Docket No. 192 at 4. GE claims that, while Plaintiffs contended at trial that the relevant market for the servicing of GE anesthesia machines is the entire United States, it is undisputed that anesthesia machine customers require nearby technicians and that longer travel brings with it increased costs and delay. *Id.* at 5 (citing Docket No. 177, 4/21 (PM) Tr. at 121:13–122:10 ("[O]ur service base is we try to keep it a four-hour drive from our location. Actually about three-and-a-half hour perimeter so that we can do emergency service. . . .

It's because of the quality. If we get a phone call and we can't respond quickly and service that piece of equipment, it's not the cost. It's the time and the response time.") (Paragon)).  GE argues that Plaintiffs compete in distinct geographic regions and suggests that the competitive dynamics in each region across the country feature different independent service organizations ("ISOs") and asset management companies in competition with GE.  *Id.*  GE also points to the fact that Plaintiffs' expert opined that GE's prices differ among different geographic areas based on the number of competitors in that region and that there was more ISO competition in certain areas than in others. *Id.*

Additionally, GE analogizes the market in this case to that in *It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 682 (4th Cir. 2016), in which the Fourth Circuit rejected a nationwide market for music-concert promotion, finding that concert promoters operated in specific locations and would not typically travel outside of their region to attend a show.  *Id.* at 6–7.  According to GE, a hospital faces more geographic limitations than a concertgoer and Plaintiffs introduced no evidence to suggest that each hospital enjoys the same servicing options, regardless of location. *Id.* at 7.

In response, Plaintiffs argue that the geographic market evidence presented at trial fully supports the jury's finding of a nationwide market for GE anesthesia servicing.  Docket No. 209 at 1.  According to Plaintiffs, GE—along with asset managers and numerous ISOs—all service a national market.  *Id.* at 2 (citing Docket No. 170, 4/18 (PM) Tr. at 84:19–24 (Metropolitan); Docket No. 176, 4/21 (AM) Tr. at 107:6–12 (Heartland); Docket No. 177, 4/21 (PM) Tr. at 59:18–61:5 (Diversified); Docket No. 175, 4/20 (PM) Tr. at 150:6–10 (GE) (testifying that GE and asset managers provide national service); Docket No. 175, 4/20 (PM) Tr. at 104:10–19 (GE)).

In response to GE's argument that GE anesthesia-machine service customers demand timely service and can only turn to local providers, Plaintiffs claim that the trial record and commercial realities of the industry suggest otherwise. *Id.* at 2–3. Plaintiffs argue that substantial evidence supports the jury's finding that customers both can and do turn to providers nationwide for timely service, at least because Plaintiffs and GE are able to provide service far from their home offices by stationing technicians around the country with minimal cost. *Id.* at 3. Plaintiffs also respond that the existence of non-national players does not preclude a finding of a national market. *Id.* (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 575–76 (1966); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 n.10 (D.C. Cir. 2001)).

Additionally, Plaintiffs draw factual distinctions between this case and *It's My Party, Inc. v. Live Nation, Inc.*, contending that, unlike the concert promotion market, the commercial realities of the anesthesia-service market do not require targeting of specific local areas. *Id.* at 4 (citing 811 F.3d 676).

In its reply, GE contends that courts frequently reject arguments that a geographic market is defined by the area in which competitors sell, rather than the area in which the purchaser can practically turn for the product or service. Docket No. 218 at 1 (citing *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 839 (5th Cir. 2002); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002); *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3rd Cir. 1991)). GE contends that the different prices charged in different regions is a hallmark of regional geographic markets and that no reasonable jury could have found Plaintiffs met their burden to prove a national market. *Id.* at 2.

In their surrreply, Plaintiffs respond that the appropriate standard for assessing a geographic market is found in *Apani Sw., Inc. v. Coca-Cola Enters.,* 300 F.3d 620, 626 (5th Cir. 2002), and involves reviewing the area in which the seller operates.  Docket No. 225 at 1.  But even under GE's formulation, Plaintiffs suggest that there was substantial evidence at trial that hospitals can and do in fact turn to servicers located across the country.  *Id.* at 1–2.

Under Fifth Circuit law, the Court focuses on the area of "effective competition" in determining the relevant geographic market.  *Apani*, 300 F.3d at 626 (citing *Jim Walter Corp. v. F.T.C.*, 625 F.2d 676, 682 (5th Cir.1980)).  The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates and to which buyers can practicably turn for supplies. *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).  When determining whether a geographic market corresponds to commercial realities, courts have taken into account practical considerations such as the size, cumbersomeness, and other characteristics of the relevant product.  *Id.*  In addition, determinants that affect the behavior of market participants may also be considered, such as regulatory constraints impeding the free flow of competing goods into the area, perishability of products, and transportation barriers.  *Id.* (citing Earl W. Kintner, Federal Antitrust Law: Volume IV The Clayton Act Section 3; Section 7; Mergers And Markets § 38.3 (1984); *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669–671 (1974); and *United States v. Gen. Dynamics Corp.*, 341 F.Supp. 534 (N.D.Ill.1972)).  Whether a relevant market has been identified is usually a question of fact.  *Apani*, 300 F.3d at 628.

Substantial evidence supports the jury's finding that the area of effective competition for GE anesthesia-machine service is nationwide.  ISOs and GE operate across the country.  For example, Jeffrey Rhinehart, president and CEO of Metropolitan, testified that he works across the

country.  Docket No. 170, 4/18 (PM) Tr. at 84:19–24.  Likewise, Matthew Rolo of Diversified testified that his business operates nationwide and, in the weeks before trial, serviced machines in Georgia, Kentucky, Florida, Virginia, Indiana, Wisconsin, and Texas.  Docket No. 177, 4/21 PM Tr. at 59:18–61:5.  He also testified that, even as an ISO based in Kentucky, he received a service call for Oklahoma in the middle of trial.  *Id.* at 60:15–20.  GE stated at trial that it competes all over the country as well.  4/20 (PM) Tr. at 104:10–19.  The record is replete with testimony that customers solicit service across the country and ISOs operate to meet that need.  *See, e.g.,* Docket No. 176, 4/21 (AM) Tr. at 107:6–12 (Heartland); Docket No. 170, 4/18 (PM) Tr. at 85:4–5 (Metropolitan); Docket No. 171, 4/19 (AM) Tr. at 51:1–10 (Biomedical Concepts); Docket No. 175, 4/20 (PM) Tr. at 32:22–33:9 (Universal Medical); Docket No. 179, 4/24 (PM) Tr. at 64:6–12 (House); Docket No. 177, 4/21 (PM) Tr. at 117:14–20 (Paragon)).  Accordingly, substantial evidence supports the jury's finding at trial that the market for GE anesthesia-machine service is nationwide, as customers turn to a national market when seeking service, and both the ISOs and GE are able to provide those services nationwide.    Accordingly, GE's motion for judgment as a matter of law on this basis is **DENIED**.

### (2) Failure to Prove Product Market for Servicing Machines

GE also moves for judgment as a matter of law that in-house technicians are part of the product market.  Docket No. 192 at 8.  Particularly, GE notes that servicing prices are constrained by the threat that customers can choose to service machines in-house and that some hospital networks have begun to market their ability to service machines to other hospitals.  *Id.*  According to GE, the facts at trial overwhelmingly showed that in-house technicians are reasonably interchangeable with GE and Plaintiffs' technicians, and no reasonable jury could have excluded in-house technicians from the product market.  *Id.* at 9.

Plaintiffs respond that products are part of the same relevant market if consumers view the products as substitutes and that product interchangeability may be measured by how buyers would respond to a monopolist's imposition of a small but significant non-transitory increase in price. Docket No. 209 at 5.  According to Plaintiffs, the only evidence of the consumer's perspective on the interchangeability of GE, asset manager and ISO technicians with in-house technicians came from Plaintiffs' expert Charles McMaster, a hospital sourcing manager with over 25 years of experience overseeing the retention of anesthesia-machine servicers.  *Id.*  Plaintiffs point to McMaster's testimony that a hospital's ability to provide service in-house does not act as a price constraint on servicing provided by outside vendors and that, if the price of an anesthesia-servicing contract went up by ten percent, a hospital would not be moved to vertically integrate that contract. *Id.* at 5–6 (citing Docket No. 177, 4/21 (PM) Tr. at 157:8–11(McMaster)).  Plaintiffs suggest that McMaster's opinion is at least substantial evidence supporting the jury's finding. *Id.* at 6.

In addition, however, Plaintiffs point to the testimony of their expert, Dr. Donald House. *Id.*  Dr. House opined that hospitals who move their business in-house are exiting the market and that there was no evidence that their exits constrained pricing.  Docket No. 178, 4/24 (AM) Tr. at 44:6–47:2 (House); Docket No. 179, 4/24 (PM) Tr. at 58:16–60:6 (House).  Plaintiffs also cite to the testimony of GE's expert, Dr. Craig Schulman, who testified he could not identify a single instance when GE lowered its prices in response to the threat of competition from in-house servicing.  Docket No. 209 at 6 (citing Docket No. 181, 4/25 (PM) Tr. at 61:1–24 (Schulman)).

In its reply, GE argues that Plaintiffs introduced no evidence of the cross-elasticity of demand to substantiate their claim that in-house biomeds do not compete and that Plaintiffs' evidence of the lack of interchangeability of in-house biomeds is insubstantial.  Docket No. 218 at 3.  GE dismisses Mr. McMaster's opinion as baseless speculation insufficient to withstand its

motion for judgment as a matter of law.  *Id.* at 3 n.5.  GE also discounts Dr. House's testimony that he doesn't "see" in-house biomeds enter the market when prices are high because GE servicing prices did not increase over the relevant time period.  *Id.*  GE further reprises its argument that it lacks monopoly power when in-house biomeds are excluded.  *Id.* at 3.

In response, Plaintiffs argue that they presented "uncontroverted customer-perspective evidence that the ability of a hospital to service its own GE anesthesia machine does not act as a price constraint on external servicers such as GE and Plaintiffs."  Docket No. 225 at 2.  Plaintiffs also rebuff GE's attack on Mr. McMaster, noting that GE did not contest McMaster's expertise or attack his testimony on cross.  *Id.* at 2–3.  Plaintiffs further note that GE did not present any customer-perspective evidence that contradicted his testimony.  *Id.*

In defining the relevant product market, courts consider the extent to which the seller's product is "interchangeable in use" and the degree of "cross-elasticity of demand between the product itself and substitutes for it."  *Apani*, 300 F.3d at 626 (citing *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Within the product market, submarkets may exist, which, in themselves, represent product markets for antitrust purposes.  *Apani*, 300 F.3d 626.  The boundaries of a product market can be determined by evaluating practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.  *Id.* (citing *Brown Shoe Co.*, 370 U.S. 294, 325 (1962)).

A reasonable jury could have found that in-house technicians were not a part of the product market based on the evidence presented at trial.  There was sufficient evidence for a reasonable jury to determine that the products were not substitutes when evaluating the cross-elasticity of

demand between in-house service and service from GE, the ISOs, and asset managers,   For example, Plaintiffs' expert, Mr. McMaster, opined at trial that a hospital's ability to provide service in-house would not act as a price constraint on servicing provided by outside vendors.  Docket No. 177, 4/21 (PM) Tr. at 157:8–11 (McMaster).  This expert opinion was confirmed by the testimony of Dr. Schulman, who noted that he could not identify a single instance in which GE lowered prices in response to the threat of competition from in-house service.  Docket No. 181, 4/25 (PM) Tr. at 61:1–24 (Schulman)).  McMaster also testified that a ten percent increase in price of an anesthesia servicing contract would not be sufficient for a hospital to vertically integrate that contract, suggesting that in-house technician service is not interchangeable with ISO, GE, or asset-manager service.  *Id.* at 5–6 (citing Docket No. 177, 4/21 (PM) Tr. at 157:8–11 (McMaster)).  McMaster further testified that in-house solutions are not interchangeable with external service vendors because of the cost and investment incidental to vertical integration.  Docket No. 177, 4/21 (PM) Tr. at 157:12–24 (McMaster).  Relatedly, Dr. House testified that vertical integration required considerable investment and that in-house biomeds were exiting the market.  Docket No. 178, 4/24 (AM) Tr. at 44:6–47:2 (House); Docket No. 179, 4/24 (PM) Tr. at 58:16–60:6 (House) ("But the question is, after that hospital has the in-house biomed, does that biomed enter that market and provide services when prices are high? And that is the interaction that we don't see.").  A reasonable jury could determine from this evidence that in-house technicians were not part of the product market.

GE's arguments to the contrary are not persuasive.  GE identifies statements by several Plaintiffs suggesting that, if a hospital could perform service for cheaper than an ISO, the hospital may keep that work in house.  *See, e.g.*, Docket No. 171, 4/19 (AM) Tr. at 131:14–22 ("Q: For that particular hospital, you're competing potentially against the in-house folks for the contract,

right? A. Yes. Q. If you do it better and cheaper, the hospital's probably going to hire you. If the hospital thinks that their in-house people do it better and cheaper, they're probably not going to hire you. They're going to go with their in-house people. Right? A. Yes."); *see also* Docket No. 176, 4/21 (AM) Tr. at 102:15–23 ("Q. That makes sense to you, right, based on your understanding of the market? A. That an in-house biomed could take their service in-house? Q. Yes. A. Yes. Q. And if you don't provide -- whether it's based on price or service or whatever, if you don't provide an adequate alternative, others, they can just bring it in-house? A. Sure."). The evidence in the record that certain ISOs believed themselves to compete with in-house technicians does not "point so strongly and overwhelmingly in . . . favor [of GE's market definition] that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498. Accordingly, substantial evidence supports the jury's finding of a product market exclusive of in-house technicians, and GE's motion for judgment as a matter of law on this basis is **DENIED**.

### (3) Lack of Monopoly Power in National Market for Service

Next, GE moves for judgment as a matter of law that it did not have monopoly power in the national service market because Plaintiffs failed to introduce any direct evidence of monopoly power and failed to show GE's market power through indirect means. Docket No. 192 at 9. GE argues that inclusion of in-house technicians in the product market would drop GE's market share to below 50 percent, which is insufficient to support market power. *Id.* at 9–10. According to GE, Plaintiffs failed to present sufficient evidence of GE's ability to control prices or exclude competition, particularly in light of an absence of evidence of restricted output in either market. *Id.* at 10. GE further suggests that Plaintiffs provided no evidence to rebut the significance of GE's declining market share. *Id*. at 10–11. GE maintains that it did not control the market for parts or training because Plaintiffs could obtain parts from other providers and because Plaintiffs could receive training from DeVry and the U.S. military. *Id.* at 11.

Plaintiffs respond that they provided ample proof—through direct and indirect means—that GE possesses monopoly power in the market for GE anesthesia-machine service.  Docket No. 209 at 7.  According to Plaintiffs, direct proof is evidence of the ability to control prices or exclude competition, and GE controlled two essential inputs for GE anesthesia-machine service—GE parts and training.  *Id.* at 8 (citing *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009)).  Plaintiffs also argue that they presented proof that GE possessed monopoly power via indirect means, particularly by introducing evidence that GE controlled 70 percent of the product market.  *Id.* at 10 (citing Docket No. 178, 4/24 (AM) Tr. at 40:21–25 (House)).

To the extent GE's argument about monopoly power relies on the inclusion of in-house technicians in the product market, the Court rejects it for the reasons detailed above.  *See supra* Section A.(2).

There is also ample evidence in the record from which a reasonable jury could determine that GE had market power.  And evidence in the record suggests that GE had control over two essential inputs—parts and training.  First, the record contains substantial evidence that GE is the only source for GE parts and that alternative sources for parts were unreliable and insufficient to provide service.  *See* Docket No. 170, 4/18 (PM) Tr. at 114:25–115:15, 120:20–121:3 (Metropolitan); Docket No. 171, 4/19 (AM) Tr. at 136:15–23; *Id.* at 140:16–19 (West Coast); Docket No. 172, 4/19 (PM) Tr. at 50:12–51:9, 61:13–18 (Doctors Depot); Docket No. 174, 4/20 (AM) Tr. at 15:3–5, 17:5–10 (GE); PX-699; Docket No. 175, 4/20 (PM) Tr. at 88:14–19 (GE) ("Q. And you agree that having access to GE anesthesia parts is essential to providing servicing for GE anesthesia machines, right? A. I do."); *Id.* at 17:5–10 (GE); Docket No. 176, 4/21 (AM) Tr. at 83:14–19 (Heartland); Docket No. 178, 4/24 (AM) Tr. at 34:18–37:10, 36:9–22 (House); Docket

No. 180, 4/25 (AM) Tr. at 156:22–25 (GE) (testifying that 80 percent of GE anesthesia machine parts are proprietary and must be purchased from GE).

Second, the record contains substantial evidence that training was necessary for competition in the market. *See* Docket No. 170, 4/18 (PM) Tr. at 107:25–108:22, 112:3–12, 16–23, 113:2–14 (Metropolitan); Docket No. 171, 4/19 (AM) Tr. at 26:19–27:7 (Metropolitan); Docket No. 172, 4/19 (PM) Tr. at 43:16–44:6, 46:8–13 (Doctors Depot); Id. at 84:22–85:1, 102:1–103:4, 110:5–16, 113:18–22 (MARS); Docket No. 174, 4/20 (AM) Tr. at 92:8–25 (Bay State); Docket No. 175, 4/20 (PM) Tr. at 10:3–8 (Palo Verde); *Id.* at 40:25–41:4 (Universal Medical); Docket No. 176, 4/21 (AM) Tr. at 115:8–18, 115:23–116:3, 119:18–120:1, 132:7–17 (Trinity); Docket No. 177, 4/21 (PM) Tr. at 8:24–9:6 (GasMedix); *Id.* at 62:7–17 (Diversified); *Id.* at 94:5–19 (Paragon); *Id.* at 153:23–154:2, 162:5–11 (McMaster).

Relatedly, Plaintiffs presented sufficient evidence at trial that GE directly controlled access to training and that GE was the only source for training. *See, e.g.*, Docket No. 177, 4/21 (PM) Tr. at 62:15–17 (Diversified) ("Q. And with regard to GE anesthesia machine training, who provides that training? A. Only GE."); Docket No. 172, 4/19 (PM) Tr. at 54:15–19 (Doctors Depot); Docket No. 176, 4/21 (AM) Tr. at 76:15–22 (Heartland).

Plaintiffs also introduced substantial evidence that training from DeVry Institute or the military were unacceptable substitutes for GE training. *See e.g.*, Docket No. 176, 4/21 (AM) Tr. at 116:7–22 (Trinity);  Docket No. 175, 4/20 (PM) Tr. at 41:5–12 (Universal); *Id.* at 79:22–81:1 (GE);  Docket No. 170, 4/18 (PM) Tr. at 100:8–101:8 (Metropolitan);  Docket No. 180, 4/25 (AM) Tr. at 73:1–7, 76:17–25, 80:4–7 (GE).

Accordingly, substantial evidence supports the jury's finding that GE maintained market power in the relevant product market and GE's motion for judgment as a matter of law on this basis is **DENIED**.

### (4) Lack of Evidence to Support Product Markets Consisting of the Servicing of Only GE Machines

Next, GE argues that Plaintiffs failed to introduce evidence as to why the servicing market should be limited to the service of GE anesthesia machines and exclude the service of machines produced by other manufacturers.  Docket No. 192 at 12.  According to GE, Plaintiffs claimed at trial that hospitals want a "one stop shop" for their servicing needs and, because of this, Plaintiffs service Drager and Mindray machines in addition to GE machines.  *Id.* (citing Docket No. 171, 4/19 (AM) Tr. at 81:14–19, 52:19–53:4).

Plaintiffs respond that they introduced evidence that technicians can only work on GE anesthesia machines if they use GE parts and have been GE-trained.  Docket No. 209 at 11.  A technician trained on Drager machine cannot substitute, Plaintiffs suggest, for a technician qualified to work on GE machines.  *Id.*  According to Plaintiffs, the proper market definition for GE anesthesia-machine service necessarily excludes technicians who are only capable of servicing non-GE brands.  *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) ("Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.")).  Plaintiffs also point to Dr. House's opinion that the cost of switching anesthesia machines is high and consumers will tolerate some level of price increase before changing equipment brands.  *Id.* at 11–12.

There is substantial evidence in the record supporting a product market consisting only of anesthesia-machine service for GE machines.  Evidence in the record suggests that only GE-

trained technicians can service GE machines and that Mindray or Drager machine training would not be insufficient.   *See, e.g.,* Docket No. 170, 4/18 (PM) Tr. at 142:4–5 (Metropolitan) ("Is Dräger a competitor for GE service? A. Not that I know of."); Docket No. 175, 4/20 (PM) Tr. at 121:22–122:24 (GE) (explaining that GE believes in-house and asset managers to be GE's biggest competitors for service); Docket No. 171, 4/19 (AM) Tr. at 26:19–27:7 (Metropolitan); Docket No. 172, 4/18 (PM) Tr. at 107:25–108:22, 112:3–12, 16–23, 113:2–14, 120:20–121:3 (Metropolitan); *Id.* at 43:16–44:6, 46:8–13 (Doctors Depot); *Id.* at 84:22–85:1, 102:1–103:4, 110:5– 10, 113:18–22 (MARS); Docket No. 174, 4/20 (AM) Tr. at 92:8–25 (Bay State); Docket No. 175, 4/20 (PM) Tr. at 10:3–8 (Palo Verde); *Id.* at 40:25–41:4 (Universal); Docket No. 176, 4/21 (AM) Tr. at 115:8–18, 115:23–116:3, 132:7–17 (Trinity); Docket No. 177, 4/21 (PM) Tr. at 62:7–17 (Diversified);   *Id.* at 94:5–19 (Paragon); *Id.* at 153:23–154:2, 162:5–11 (McMaster); Docket No. 178, 4/24 (AM) Tr. at 34:18–37:10 (House).   From the evidence in the record, a reasonable jury could determine that the relevant product market was limited to service for GE machines.   Accordingly, GE's motion for judgment as a matter of law on this basis is **DENIED**.

### *(5) GE's Parts Policy is Not Anticompetitive*

GE also moves for judgment as a matter of law that its parts policy is not anticompetitive conduct.   GE contends that it had no duty to sell parts directly to plaintiffs because "even if GE had an antitrust obligation to make its parts available to its competitors, it has no duty to sell them directly to those competitors."   Docket No. 192 at 13.   GE argues that it could have lawfully raised its prices without its distributor appointment and that its choice to rely on Alpha Source does not violate the antitrust laws.   *Id.* at 13–14.   GE also argues that judgment must be entered in GE's favor because no court has ever extended *Aspen Skiing* to prohibit the appointment of a distributor and because it has no duty to aid its competitors.   *Id.* at 14–15.

Relatedly, GE maintains that no reasonable jury could have found GE's parts policies anticompetitive under any theory because Plaintiffs have access to parts through Alpha Source and because Plaintiffs failed to introduce any economic evidence that the prices Alpha Source charged were a *de facto* refusal to deal.  *Id.* at 15–16.   GE also contends that its appointment of Alpha Source did not sacrifice short-term profits and that no reasonable jury could have found that GE lacked a legitimate business reason for appointing a distributor.  *Id.* at 16–17.  According to GE, its Alpha Source appointment was made to mitigate the burdens on GE caused by the ISOs abusing GE's warehousing and logistics services and to lessen the expenses associated with the provision of customer service.  *Id.* at 17–18 (citing Docket No. 175, 4/20 (PM) Tr. at 119:2–21; Docket No. 180, 4/25 (AM) Tr. at 122:9–127:13; DX029).

Plaintiffs respond that GE improperly recasts each piece of its scheme as procompetitive in isolation and that GE's conduct must be viewed as a whole.  Docket No. 209 at 12 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653, 654 (2d Cir. 2015)).  Even when viewed in isolation, however, Plaintiffs contend that each facet of GE's conduct is anticompetitive.  *Id.* Plaintiffs argue that the evidence at trial showed that timely access to GE parts is essential to compete, that GE has monopoly power in the parts market and that GE refused to sell parts to Plaintiffs, denying them access to inputs essential to compete and leveraging its monopoly over parts into a monopoly over anesthesia-machine service and sales markets.  *Id.* at 13.

According to Plaintiffs, they introduced substantial evidence that GE's appointment of Alpha Source was a scheme to stifle a competitive threat to GE's competitive position.  *Id.* at 13. Plaintiffs argue that GE testimony and documents demonstrate that, prior to 2011, ISOs like the Plaintiffs were achieving double-digit growth and that GE's appointment of a parts distributor to

supply its competitors was in response to this threat, not any business justification.  *Id.* (citing Docket No. 174, 4/20 (AM) Tr. at 20:1–10, 26:4–7, 47:17–21, 48:1–4, 49:5–7, 53:13–22, 53:25– 54:22, 56:2–57:15 (GE); Docket No. 180, 4/25 (AM) Tr. at 158:25–160:15, 161:3– 22, 162:16–24 (GE).)  Plaintiffs identify a GE document, which states that the Alpha Source appointment would "dis(enable)" competitors by slowing down competitor fulfillment capability and adding costs to them, with the end result being customers returning to GE.  *Id.* at 14 (citing PX-224; Docket No. 174, 4/20 (AM) Tr. at 49:5–50:3, 166:17–167:10 (GE)).  Plaintiffs also identify an email sent between GE executives discussing the Alpha Source appointment in late 2010 that stated that as ISO "costs rise and their delivery slow[s], we expect end user customers to choose GE."  *Id.* (citing DX-51).  Plaintiffs further point to the testimony from a GE executive that the parts policy rendered GE's competitors slower and more costly.  *Id.* at (citing Docket No. 174, 4/20 (AM) Tr. at 44:6– 45:17 (GE)).  Plaintiffs maintain that, based on this evidence, the jury was correct in finding GE's parts policy to be anticompetitive.

In response to GE's argument that a reasonable jury could not have found GE's parts policy constituted an illegal refusal to deal because Plaintiffs retained access to parts, Plaintiffs argue that timely access to parts is necessary to compete for GE anesthesia-machine service and machine sales.  *Id.*  Plaintiffs further note that they presented evidence that Alpha Source's exclusive distributorship was expected to and did cause delay in the sales of parts to ISOs.  *Id.* at 14–15 (citing PX-278; PX-690; PX-224; Docket No. 174, 4/20 (AM) Tr. at 31:25–32:4, 44:6–45:17 (GE); Docket No. 178, 4/24 (AM) Tr. at 65:18–66:6 (House)).  Relatedly, Plaintiffs suggest that a refusal to deal need not be total to violate the antitrust laws.  *Id.* at 15 (citing *SmithKline Beecham Corp. v. Abbott Labs.*, 2014 U.S. Dist. LEXIS 164367, at *13–14 (N.D. Cal. Nov. 24, 2014)).

Plaintiffs respond to GE's argument that it did not sacrifice profits by arguing that profit sacrifice is not required to show a refusal to deal. *Id.* at 16 (citing *Del. & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (1990)). Even still, however, Plaintiffs suggest that GE did sacrifice profits in pursuing its parts policy: Plaintiffs point to GE's documents which state that the reduced profits from the parts policy were "as hoped for the most part–flat with decline." *Id.* (citing PX-515; Docket No. 180, 4/25 (AM) Tr. at 166:6–16 (GE)). Plaintiffs also contend that GE's decision to sell Alpha Source parts at a one percent discount off list price when Alpha Source was marking up parts by 24 percent demonstrates a profit sacrifice. *Id.* at 16–17.

Finally, Plaintiffs contend that GE's parts policy had no business justification. *Id.* at 17. Plaintiffs argue that they demonstrated that the actual driving force behind the creation and implementation of the parts policy was a desire to harm competition and any post-hoc justifications were debunked on cross examination. *Id.*

Substantial evidence supports the jury's finding that GE's parts policy is anticompetitive. Evidence was presented to the jury that GE's appointment of Alpha Source was designed to and did disenable competitors by slowing down their fulfillment capabilities and increasing their costs. *See* Docket No. 174, 4/20 (AM) Tr. at 20:1–10, 26:4–7, 47:17–21, 48:1–4, 49:5–7, 53:13–22, 53:25–54:22, 56:2–57:15 (GE); Docket No. 180, 4/25 (AM) Tr. at 158:25–160:15, 161:3–22, 162:16–24 (GE).) PX-224; Docket No. 174, 4/20 (AM) Tr. at 49:5–50:3, 166:17–167:10 (GE). DX-51. Docket No. 174, 4/20 (AM) Tr. at 44:6–45:17 (GE). Substantial evidence also supports the jury's finding that *timely* access to parts was necessary to compete for GE anesthesia-machine service and machine sales and that the Alpha Source exclusive distributorship was expected to and did cause delay in the sales of parts to ISOs. PX-278; PX-690; PX-224; Docket No. 174, 4/20 (AM) Tr. at 31:25–32:4, 44:6–45:17 (GE); Docket No. 178, 4/24 (AM) Tr. at 65:18–66:6 (House)).

A reasonable jury could have also found that the Alpha Source distributorship lacked a legitimate business justification.  Whether the defendant has a legitimate business reason for its refusal to deal is a determination that can be left to the jury, and the jury may evaluate the credibility of the justifications offered.  *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988).

In light of the evidence presented at trial, the jury was entitled to reject GE's justification of efficiency and customer service as not credible.  Indeed, evidence at trial suggested that some of the purported efficiencies of the system—mitigating the burden of warehousing caused by the ISOs abusing GE's warehousing and logistics services and reducing the expenses associated with the provision of customer service—were challenged at trial.  GE suggested a reduction in call center volume was a procompetitive justification for the parts policy but, at trial, admitted the policy only reduced the number of calls by 320 out of over 300,000.  DX-1429; Docket No. 174, 4/20 (AM) Tr. at 54:23–57:15 (GE).  Likewise, Mr. Porter also admitted that GE's parts policy did not save it any warehousing space, logistics expense, or carrying costs, which it had previously been passing on to customers at a 300 percent markup.  Docket No. 174, 4/20 (AM) Tr. at 53:25– 54:8 (GE); Docket No. 180, 4/25 (AM) Tr. at 159:2–7 (GE); Id. at 159:17–22; Docket No. 174, 4/20 (AM) Tr. at 52:11–53:24 (GE); DX-1433 at 2.  Additionally, GE admitted that the parts policy may harm customers.  Docket No. 180, 4/25 (AM) Tr. at 164:12–22 (GE); Docket No. 180, 4/25 (AM) Tr. at 40:8–16 (GE); 65 Docket No. 174, 4/20 (AM) Tr. at 29:18–22, 33:10–13, 49:5–7 (GE) ("Q. Can you think of any, from the hospital's viewpoint, procompetitive thing about you raising prices to one of their low-cost service providers? A. No.").  In light of the record, the jury was entitled to reject GE's business justification for lacking credibility.

Finally, as the Court has noted in the past, whether GE sacrificed short-term profits for an anticompetitive reason is relevant to the § 2 analysis.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 593–594 (1985); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004).  Plaintiffs put forth sufficient evidence for a reasonable jury to conclude that GE sacrificed short-term profits for an anticompetitive reason at trial.  For example, GE's documents stated that it had "hoped for" and achieved reduced profits as a result of the parts policy.  PX-515 ("December is not yet complete, but the trend was as hoped for the most part – flat with decline."); Docket No. 180, 4/25 (AM) Tr. at 166:6–16 (GE).

Accordingly, GE is not entitled to judgment as a matter of law that the parts policy was not anticompetitive, and its motion is **DENIED**.

### (6) GE's Training Policies Are Not Anticompetitive

GE also argues that its training policies do not constitute a refusal to deal as a matter of law.  Docket No. 192 at 19.  According to GE, it continued to train third parties and it has no duty to train its competitors.  Even still, GE argues that the number of third party trainees since 2009 has not declined despite its change in facilities in 2013 and the advent of the customer endorsement requirement in 2015.  *Id.* at 20.  GE maintains that ISOs, including one Plaintiff, have continued to attend training by GE, which GE contends is fatal to Plaintiffs' claims.  *Id.* at 20–21.

According to GE, it did not sacrifice profits because GE training policies have been profitable for GE and the number of third-party individuals trained did not decline during the same period.  *Id.* at 21 (citing See Docket No. 176, 4/21 (AM), Kurt Page, at 11:19–12:7; Docket No. 179, 4/24 (PM), Art Larson, at 140:21–142:6, 171:11–172:11).

GE suggests that a reasonable jury could not have found that GE lacked a legitimate business justification in its training policies.  According to GE, it made the reasonable business decision to prioritize service providers used by its customers for the remaining few class slots,

rather than offering those slots to competitors who may or may not at some point service GE customers. *Id.* at 22 (Docket No. 178, 4/24 (AM) Tr. at 16:6–10; Docket No. 175, 4/20 (PM) Tr. at 109:21–110:11; Docket No. 179, 4/24 (PM) Tr. at 126:3–11, 137:25–138:12.). GE also suggests that any temporary unavailability of training because of a changed training class location was justified by legitimate business purposes as well. *Id.* (citing Docket No. 179, 4/24 (PM) Tr. at 178:16–25.).

In response, Plaintiffs argue they presented substantial evidence that GE's training policies are anticompetitive under a refusal to deal, essential facilities or monopoly leveraging rubric. Docket No. 209 at 18. According to Plaintiffs, evidence at trial established that GE training was essential to compete; that GE has a monopoly over training; and that GE refused to sell training to Plaintiffs, denying them access to inputs essential to compete and leveraging its monopoly over training into a monopoly over anesthesia-service and machine sales. *Id.* Plaintiffs maintain that the lack of precedent with respect to training in particular—as opposed to a good or service—does not absolve GE of liability because the antitrust laws do not demand that anticompetitive conduct come in pre-specified forms. *Id.* (citing *Conwood Co. v. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) ("[a]nticompetitive conduct can come in too many different forms, and is too dependent on context, for any court or commentator to have ever enumerated all the varieties"); *LePage's, Inc. v. 3M,* 324 F.3d 141, 152 (3d Cir. 2003)).

According to Plaintiffs, the evidence at trial shows that the training policy was exclusionary and anticompetitive. *Id.* at 19. Plaintiffs contend that the evidence at trial suggests GE that training is required to service and refurbish GE anesthesia machines; GE's policies acted to bar ISOs, including Plaintiffs, from attending training classes; without the necessary training ISOs would be forced out of the market; and that this would harm competition. Plaintiffs also argue that they

presented substantial evidence that GE's training policies precluded them from attending GE service training.  Particularly, Plaintiffs note that GE began denying Plaintiffs access to training as early as 2011; that GE closed its training facility in 2013 and did not train ISOs for nearly a year; that GE implemented a customer endorsement policy, which made it economically unfeasible for ISOs to sign up for and attend training; and that the number of ISOs trained dropped precipitously as a result of these policies.  *Id.* at 20–21.

Plaintiffs also maintain that GE's training policies sacrificed profits.  Particularly, Plaintiffs point to the fact that GE earns a 70 percent profit margin on training sales and that numerous Plaintiffs applied for training and were rejected.  Plaintiffs also note that GE admitted at trial that it was "giving up the money it could be making by training as many third parties as it . . . possibly could[.]" *Id.* at 22 (citing Docket No. 178, 4/24 (AM) Tr. at 17:11–18:5 (GE)).

Similarly, Plaintiffs contend that GE had no legitimate business justification for restricting third party access to training.  According to Plaintiffs, GE and its economist admitted at trial that GE's policy limiting technicians to a single customer was "wrong" and did not help GE's customers. *Id.* at 22.  Plaintiffs also point out that GE tried to convince the jury that the policy's exclusivity language was meaningless and that the present suit was the result of a misunderstanding between the parties.  *Id.* at 22–23 (citing Docket No. 175, 4/20 (PM) Tr. at 111:1–21 (GE); Docket No. 177, 4/21 (PM) Tr. at 30:20–32:10 (GE); Docket No. 180, 4/25 (AM) Tr. at 16:19–17:1, 18:5–19:22 (GE)).  According to Plaintiffs, substantial evidence was presented at trial indicating that the customer endorsement policy was a final step in GE's scheme to "phase-out" third party training.  *Id.* at 29.  Plaintiffs contrast this evidence with GE's statement in its brief that the policy was meant to prioritize service providers used by its customers as opposed to competitors who may or may not at some point service GE customers. *Id.* (citing Docket No. 192

at 22).  According to Plaintiffs, there is no credible business reason to prioritize ISOs that currently service GE customers, and GE did not offer one.  *Id.*  Plaintiffs also argue that limiting access to training could not be beneficial to consumers.  *Id.* at 23–24.

In its reply, GE advances its argument that the same number of third parties continued to access GE training after the endorsement policy was implemented.  Docket No. 218 at 4–5.  GE also contends that "intent to harm" is insufficient and that its business justification was not pretextual because a business reason is only pretexual when the evidence suggests it played no part in the decision to act.  *Id.* at 6 (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997)).

Plaintiffs respond that they have presented evidence "debunking every single one of GE's preferred business justifications" and that they did not merely rely on GE's "intent" to harm Plaintiffs through its policies.  Docket No. 225 at 7.  Instead, Plaintiffs contend that they demonstrated the actual effect of GE's parts and training policies was anticompetitive.  Plaintiffs suggest that the fact that GE's intent comports with Plaintiffs' evidence that the business justifications were pretextual is "telling."  *Id.*  Plaintiffs also note that their evidence included (1) GE's own documents, which reveal that the purpose of its policies was to "slow down," "add cost" and to "phase out" its competition; (2) testimony from GE's witnesses that its policies actually had the intended effect; (3) GE's admissions that its policies actually acted to harm its customers; and (4) the absence of any efficiency gains as a result of GE's policies.  *Id.* at 8 (citing PX-278,  PX-690, PX-789, Docket No. 209 at 14 n.50, 19 n.67, *Id.* at 18 n.65).

Plaintiffs presented ample evidence at trial that GE's training policies were anticompetitive.  There is evidence in the record from which a reasonable jury could have determined that GE sacrificed short-term profits, including the fact that, in limiting ISOs' access

to training, GE was foregoing selling a service on which it maintained a 70 percent margin.  Docket No. 178, 4/24 (AM) Tr. at 17:11–18:5, 19:19–25 (GE).  Indeed, even GE's witness at trial admitted that GE was giving up money it could be making by training as many third parties as it possibly could.  *Id.*

While GE contends that the number of trainees has not declined since 2009, Plaintiffs presented evidence that the Plaintiffs' access to training was restricted through the endorsement policy.  Several Plaintiffs testified that the customer endorsement policy restricted their ability to do business.  Docket No. 170, 4/18 (PM) Tr. at 85:8–16, 125:1–5 (Metropolitan);  Docket No. 171, 4/19 (AM) Tr. at 58:10–16, 59:14–23 (Biomedical Concepts); Docket No. 171, 4/19 (AM) Tr. at 118:8–19, 129:17–130:1 (West Coast); Docket No. 172, 4/19 (PM) Tr. at 47:21–48:5 (Doctors Depot); *Id.* at 87:14–21, 115:14–116:7 (MARS); *Id.* at 129:24–131:14, 131:4–18 (ASI); Docket No. 174, 4/20 (AM) Tr. at 87:8–14, 90:2–19 (Bay State); Docket No. 175, 4/20 (PM) 42:9–15 (Universal Medical); *Id.* at 169:8–17, 172:11–18 (SAS); Docket No. 176, 4/21 (AM) Tr. at 81:13–16 (Heartland); *Id.* at 59:21–60:1 (GE) (indicating that training was unavailable for a year); *Id.* at 80:2–81:1, 81:20–23 (Heartland); *Id.* at 117:7–17 (Trinity); *Id.* at 104:4–10 (Paragon); Docket No. 177, 4/21 (PM) Tr. at 24:10–12 (Gasmedix); *Id.* at 66:4–10 (Diversified); *Id.* at 95:23–97:14, 102:23–103:6 (Paragon).  Conflicting evidence at trial was presented with respect to the number of ISOs trained after the policy was instituted.  *See* Docket No. 178, 4/24 (AM) Tr. at 55:5–56:8 (stating that GE trained five ISOs in 2016), 56:25–57:11, 58:7–13 (House);  Docket No. 176, 4/21 (AM) Tr. at 11:19–12:6 (GE) (testifying that close to three dozen ISOs received training after filling out the endorsement form in 2016); Docket No. 179, 4/24 (PM), 140:21–142:6 (GE) (stating that three ISOs had been trained in 2017 at the time of trial), 171:11–172:11 (testifying that, since 2013 "at least four ISOs … have received training").

While the jury may not evaluate the "sufficiency" of GE's proffered legitimate business reasons, the jury may evaluate the credibility of the justifications offered.  *Bell*, 847 F.2d at 1186 ("The fact determination that may be left to a jury is whether the defendant has a legitimate business reason for its refusal, not whether that reason is sufficient."); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997) ("The presumption [of a valid business justification] . . . may be rebutted by evidence of pretext.").

There is substantial evidence in the record from which a reasonable jury could dismiss GE's business justifications as incredible.  GE contends that it made the reasonable business decision to prioritize service providers used by its customers for the remaining few class slots, rather than offering those slots to competitors who may or may not at some point service GE customers.  *See* Docket No. 178, 4/24 (AM) Tr. at 16:6–10; Docket No. 175, 4/20 (PM) Tr. at 109:21–110:11; Docket No. 179, 4/24 (PM) Tr. at 126:3–11, 137:25–138:12.  GE also suggests that any temporary unavailability of training because of a changed training class location was justified by legitimate business purposes as well.  Docket No. 179, 4/24 (PM) Tr. at 178:16–25.) But there is evidence in the record that GE's reasoning lacked credibility, including GE's own documents, which reveal that the purpose of its policies was to slow down, add cost, phase out, and disenable competitors; testimony from GE's witnesses that its policies actually had the intended effect; GE's admissions that its policies actually acted to harm its customers; and the absence of any efficiency gains as a result of GE's policies.  *See, e.g.*, PX-278 ("(dis)enable competitors," "slow down services," "order de-prioritization," "New Price Structure . . . List Price for ISPs only?"),  PX-690 ("The distributor strategy would slow down the competitions fulfillment capabilities and add cost to them. . . . Remember, in the future, when these competitors call, we will tell them to go to this one distributor"), PX-789 ("Final Resolution (waiting your update);

Training shifted to Jupiter only; GE customers still trained; Phase out 3rd party over next year (2014)."). To the extent that GE argued it needed to prioritize customers over ISOs for training classes, Plaintiffs also presented evidence that training classes had excess capacity. *See* Docket No. 180, 4/25 (AM) Tr. at 35:17–36:19 (GE) (indicating excess capacity in training courses).

At trial, GE itself claimed that, if the policy operated the way that ISOs believed—to restrict ISOs to only service one site—that "would be wrong." *See* Docket No. 176, 4/21 (AM) Tr. at 40:4–8 (GE) ("if we are putting a policy in place that says that that training can only be used at that site and limited to go out to other sites, I agree that would be wrong."); Docket No. 178, 4/24 (AM) Tr. at 18:6–25, 22:1–4, 25:24–26:7 (GE) ("The intent of the form is that the customer is verifying that this individual works for their site. Q. And meaning that they can't go out then and service that -- the same machine at other sites, right? A. . . . that's the intention of the form, yes."); Docket No. 180, 4/25 (AM) Tr. at 25:22–26:9 (GE) ("If the policy were, previously to yesterday -- now, when it said exclusive, it meant they could only work at that hospital and none other, that would be wrong, wouldn't it? A. That would be wrong, yes. Q. It would be wrong of GE to enforce that policy, wouldn't it? A. It would."); Docket No. 181, 4/25 (PM) Tr. at 60:9–14 (Schulman). The jury was entitled to consider this evidence and was reasonable in determining that GE did not have a credible, legitimate business justification. In light of the record evidence in total, substantial evidence supports the jury's determination that the training policy was anticompetitive, and GE's motion for judgment as a matter of law on this basis is **DENIED**.

### (7) *GE's Policies did not Injure Competition*

GE's next argument is that Plaintiffs failed to show that GE's policies harmed competition. According to GE, Plaintiffs retain the ability to purchase the parts that they need and Plaintiffs introduced no evidence that the appointment of a distributor has caused a decrease in the number of competitors in the alleged relevant markets. Docket No. 192 at 23–24. Similarly, GE contends

that Plaintiffs' claims regarding training should also fail because the policies have not and do not exclude GE competitors from competing in the service and machine markets.  *Id.* at 24.  GE suggests that numerous witnesses conceded that GE training was not necessary to service machines and that most Plaintiffs could not even demonstrate that they have requested training since 2005, which further shows training is unnecessary to compete.  *Id.*

GE also contends that customers have not been harmed by either policy.  *Id.* at 25.  GE contends that Dr. House's regression analysis is are inaccurate and that GE's monthly contract revenues for servicing have actually declined during the relevant time period.  *Id.* at 26.  GE also contends that its margins and prices for service have decreased in recent years.  *Id.*  GE also suggests that the price for anesthesia machines during the relevant time period has also decreased. *Id.* at 27.

Plaintiffs respond that GE's parts and training policies hurt both competition and customers.  According to Plaintiffs, ISOs were growing by double digits in the GE anesthesia-service market prior to the enactment of the policies and substantial evidence showed that GE's policies precluded ISOs from continuing this growth.  Docket No. 209 at 24 (citing Docket No. 178, 4/24 (AM) Tr. at 81:3–25 (House)). Plaintiffs also suggest that their sales of refurbished machines have fared similarly.  *Id.* (citing Docket No. 170, 4/18 (PM) Tr. at 133:15–23 (Metropolitan); Docket No. 176, 4/21 (AM) Tr. at 86:11–15 (Heartland); Docket No. 177, 4/21 (PM) Tr. at 118:16–22 (Paragon); Docket No. 178, 4/24 (AM) Tr. at 31:20–32:4, 79:3–79:9, 85:2– 9, 86:19–87:7, 101:5–20 (House)).

Specifically, with respect to the parts policy, Plaintiffs argue that substantial evidence supported that timely access to GE parts was essential for servicing and refurbishing anesthesia machines; the imposition of Alpha Source was designed to and succeeded in slowing down

competition; the denial of access harmed Plaintiffs by hamstringing their ability to service and refurbish GE anesthesia machines; and this diminished service excluded low-cost ISOs from the market, thereby harming competition. *Id.* at 24–25.

With respect to the training policy, Plaintiffs contend that substantial evidence showed GE training to be necessary to compete for GE anesthesia servicing and machine sales. *Id.* at 25. Particularly, Plaintiffs note that McMaster testified that hospitals require training certificates and that Dr. House opined training to be a necessary input because hospitals demanded it. *Id.* at 24–25 (citing Docket No. 177, 4/21 (PM) Tr. at 162:5–8, 153:21–153:2 (McMaster); Docket No. 178, 4/24 (AM) Tr. at 34:18–35:8 (House)).

Plaintiffs also argue that the policies harmed customers by leading to higher prices, lower quality service, and reduced customer choice. *Id.* at 27 (citing *Ginzburg v. Memorial Healthcare Sys.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (holding that increased prices and diminished quality may constitute harm to competition) (citing *Rebel Oil*, 51 F.3d at 1433); *Universal Hosp. Servs. v. Hill-Rom Holdings, Inc.*, 2015 U.S. Dist. LEXIS 154154 (W.D. Tex. Oct. 15, 2015) ("reduction in consumer choice is evidence of harm to competition")).

In response to GE's argument that customers have not been harmed because they remain able to order parts directly from GE and can endorse their preferred service provider, Plaintiffs note that McMaster testified at trial that service customers prefer their service providers to obtain and manage parts necessary for service rather than have to handle that themselves. *Id.* at 28 (citing Docket No. 177, 4/21 (PM) Tr. at 160:18–162:1 (McMaster); Docket No. 174, 4/20 (AM) Tr. at 83:9–85:20 (Bay State)).

With respect to GE's argument that anesthesia machine customers have not been harmed because the price for GE anesthesia machines has decreased over the relevant time period,

Plaintiffs suggest that GE's policies have limited the supply of refurbished machines, which are typically 50 percent cheaper than new machines sold by GE. *Id.* at 29 (citing Docket No. 176, 4/21 (AM) Tr. at 86:5–7 (Heartland)).  Additionally, Plaintiffs suggest that overall anesthesia machine prices are higher than they would be in a competitive market. *Id.* (citing Docket No. 178, 4/24 (AM) Tr. at 31:15–19, 79:3–80:7, 85:2–9, 86:19–87:7, 101:5–20 (House)).

Plaintiffs produced substantial evidence of harm to both competition and customers.  For example, Plaintiffs presented evidence suggesting that ISOs, the low cost providers in the market, were growing by double-digits before GE's policies.  PX-224.  Similarly, Plaintiffs were unable to compete as a result of the parts and training policy, and their exclusion from the market harmed competition. *See supra* Section A.(5)–(6) (explaining that Plaintiffs presented substantial evidence the ISOs were harmed as a result of the parts and training policies and that timely access to parts and access to training are necessary to compete); *see also*  Docket No. 178, 4/24 (AM) Tr. at 79:16–81:2 (House) (explaining that the parts policy impeded refurbished machine business); Docket No. 177, 4/21 (PM) Tr. at 153:21–156:16, 158:18–160:11 (McMaster) (explaining that increased prices for service as a result of the parts policy harm hospitals and that some hospitals rely on refurbished machines to cut costs).  Plaintiffs also presented evidence that the policies led to price increases, deterioration in service quality, and more limited customer choice with respect to service.  Docket No.178, 4/24 (AM) Tr. at 82:1–84:10; 84:11–20 (House) (explaining that when ISOs are retarded or have retrenched, GE's prices rise and that the delays from the parts policy led to deterioration in service quality); 31:2–9 (House) (same).

Accordingly, there is also sufficient evidence in the record to support a reasonable jury's finding of an injury to competition.  GE's motion for judgment as a matter of law on this basis is **DENIED**.

*(8) Plaintiffs' Monopoly Leveraging and Essential Facilities Theories are not Cognizable*

Finally, GE argues that Plaintiffs' monopoly leveraging and essential facilities claims are not cognizable.  GE suggests that a monopoly leveraging claim cannot constitute an additional claim in an antitrust suit and necessarily relies on an underlying refusal to deal claim.  Docket No. 192 at 28 (citing *Z-Tel Commc'ns*, 331 F. Supp. 2d at 542).  GE contends that, since it has not engaged in a refusal to deal, there can be no monopoly leveraging claim.  *Id.*

GE also argues that the essential-facilities doctrine is not a valid basis for antitrust liability.  Docket No. 192 at 28–29.  GE points to the Supreme Court's opinion in *Trinko*, which held that the essential facilities doctrine, to the extent it exists, serves no purpose where access exists.  *Id.* at 29 (citing *Trinko*, 540 U.S. at 411).  GE contends that, here, because access to GE parts and training is available to Plaintiffs, the doctrine would be irrelevant, even if it was recognized.  *Id.* GE suggests the doctrine is inapplicable because training is not essential for servicing anesthesia machines and because some Plaintiffs have received training since GE moved its training facility in 2013 and since GE implemented its customer endorsement policy.  *Id.* at 29–30.

Plaintiffs respond that monopoly leveraging and the essential facilities doctrine are both well-recognized theories of antitrust liability.  Docket No. 209 at 29–30 (citing Docket No. 146 at 9 (citing *Z-Tel Commc'ns*, 331 F. Supp. 2d at 543; *Eastman Kodak Co.*, 504 U.S. at 479 n.29; ABA Model Jury Instructions in Civil Antitrust Cases § 3.B.3)).

"[A] firm may not employ its market position as a lever to create or attempt to create a monopoly in another market."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979).  While the Fifth Circuit has not addressed whether monopoly leveraging is a basis for recovery, this Court has previously held that it is not inconsistent with Supreme Court precedent.  *Z-Tel Commc'ns*, 331 F. Supp. 2d at 543.  To the extent GE suggests that monopoly leveraging "presupposes anticompetitive conduct" and would require an underlying refusal to deal claim,

substantial evidence supports Plaintiffs' refusal to deal theory with respect to the parts and training policies. *See supra* Section A.(1)–(7).

A monopolist who controls a "facility or resource that is essential to competitive viability in the marketplace must grant access to it on reasonable terms to (its) competitors." *Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, n. 13 (5th Cir. 1980). "The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988). While the essential-facilities theory is recognized in multiple circuits, it has neither been recognized nor repudiated by the Supreme Court. *Trinko,* 540 U.S. at 411.

With respect to essential facilities, as detailed above, Plaintiffs advanced substantial evidence that they did not have meaningful access to parts or training, which are essential inputs to compete in the anesthesia machine servicing market. *See supra* Section A.(1)–(7).

Accordingly, GE's motion for judgment as a matter of law on Plaintiffs' essential facilities and monopoly leveraging theories is **DENIED**.[1]

## B. GE's Renewed Motion for Judgment as a Matter of Law for Lack of Injury or Damages (Docket No. 193)

GE separately renewed its motion for judgment as a matter of law alleging that Plaintiffs failed to show GE's allegedly anticompetitive policies were the proximate cause of Plaintiffs' injuries. Docket No. 193.

---

[1] GE also claims that extending *Aspen Skiing* to require a company to train its competitors is improper in light of First Amendment concerns, but GE did not raise this argument in its Rule 50(a) motion. Docket No. 192 at 20; *compare* Docket No. 157. "If a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives . . . its right to file a renewed post-verdict Rule 50(b) motion." *Flowers v. S. Reg'l Physician Servs. Inc*., 247 F.3d 229, 238 (5th Cir. 2001). Accordingly, GE's First Amendment argument is waived.

GE claims that several Plaintiffs lacked an injury in fact because Alpha Source was not the ISOs' sole source of GE parts.   Particularly, GE notes that Plaintiffs ASI, Metropolitan, and Diversified each testified that they continued to purchase parts from other ISOs undisturbed by GE's new policies.  *Id.* at 2–3 (citing Docket No. 170, 4/18 (PM) Tr. at 149:1–13 (Metropolitan); Docket No. 172, 4/19 (PM) Tr. at 134:7–10 (ASI); Docket No. 177, 4/21 (PM) Tr. at 71:16–72:4 (Diversified)).   GE also suggests that Metropolitan, Palo Verde, and ASI have continued to purchase parts directly from GE distributors other than Alpha Source and Parts Source.  *Id.* at 3 (citing Docket No. 170, 4/18 (PM) Tr. at 149:8–9; Docket No. 172, 4/19 (PM) Tr. at 134:5–6; Docket No. 175, 4/20 (PM) Tr. at 15:18–16:4).  Palo Verde, according to GE, testified that it never purchased parts from Alpha Source.  *Id.* (citing Docket No. 175, 4/20 (PM) Tr. at 15:18–16:4).

GE also contends that Penn Biomedical, MARS, and Paragon each testified that they were not harmed by the appointment of Alpha Source.  *Id.* at 5.  GE suggests that Penn Biomedical testified that it voluntarily purchased parts from Alpha Source over GE before GE made Alpha Source its distributor, that MARS testified it could not identify a time when Alpha Source refused to or could not sell to them a part for a GE anesthesia machine, and that Paragon testified similarly, adding that Alpha Source did a "pretty good job."  *Id.* (citing Docket No., 172 4/19 (PM) Tr. at 23:23–24:8; Docket No. 172, 4/19 (PM) Tr. at 99:2–15; Docket No. 177, 4/21 (PM) Tr. at 137:22– 138:18).   According to GE, similarly fatal to Plaintiffs' claims is the fact that no Plaintiff introduced evidence of actual lost business as a result of GE's parts policy.  *Id.* at 4.

GE likewise argues that several Plaintiffs failed to establish they were injured by GE's training policies because they either did not request training or because they serviced equipment without training.  Specifically, GE suggests that (1) GasMedix had not requested training since 2005; (2) Metropolitan could not produce any evidence that anyone at the company sought training

on the Aisys machine; (3) MARS never contacted GE to request training on either the Avance or the Aisys machines;  (4) Bay State had not requested training since 2012; (5) SAS stated that it had not been impacted by the allegedly limited availability of GE trainings because they had not attempted to enroll in any GE classes; (6) Trinity did not seek training prior to the endorsement policy's introduction in 2015 because they were too small to afford such training and did not seek training after the endorsement policy was enacted in 2015; and (7) Red Lion has serviced various GE anesthesia machines at hospitals and surgery centers despite the fact that it does not have GE certified training certificates on those respective machines.  *Id.* at 4–5.

GE argues that Plaintiffs who GE accepted for training or who actually attended training during the relevant period could not have been injured and cannot claim injury based on others' inability to attend training.  *Id.* at 5 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69 (1992)).  GE also contends that Plaintiffs' anecdotal evidence of lost sales from 2015 cannot support a damages award that compensates them for lost business back to 2011.  *Id.* at 5–6.

With respect to the refurbishment Plaintiffs, GE contends that lack of evidence of injury relating to Doctors Depot, Metropolitan, Paragon, Heartland, Biomedical Concepts, and MARS also requires judgment as a matter of law.  *Id.* at 6.  Particularly, GE notes that Aaron Frye, who testified for Doctors Depot, stated that no regulations require a machine to be certified to be refurbished and resold.  *Id.* at 6 (citing Docket No. 172, Tr., 4/19 (PM) Tr. at 60:17–2).  Similarly, GE argues that Metropolitan and Heartland testified at trial that training was not required for an ISO to refurbish machines.  *Id.*  at 7 (citing Docket No. 171, 4/19 (AM) Tr. at 13:14–19 ("Q. Are you aware of any training requirement for the refurbishment of anesthesia machines? A. And I assume that's for an FDA or a requirement for theirs . . . . Q. No–no legal requirement? A. Not

that I know of.")).  GE also argues that its own employees who refurbish machines do not take the training classes at issue in this case.  *Id.* (citing Docket No. 175, 4/20 (PM) Tr. at 127:6–19).

GE also suggests that Doctors Depot was not injured by Alpha Source, but, instead, preferred that GE shouldered its inventory management costs.  *Id.* at 7.  With respect to Metro, GE argues that it sold more machines every year after Alpha Source was appointed.  *Id.*

Finally, GE also argues that no reasonable jury could have found damages.  *Id.* at 8–9.  Particularly, GE argues that Dr. House's damages opinion was deficient and no reasonable jury could have credited it.  *Id.*  GE faults Dr. House's methodology for relying on "First Mover" literature, for grouping competitors into sets of market entrants, and for incorrectly applying the literature by failing to identify second and third movers.  *Id.*

According to GE, no reasonable jury could have found lost machine sales damages because Dr. House's methodology was based on speculation and unreliable methodology, namely that all Plaintiffs' refurbishing businesses would grow significantly, year after year.  *Id*. at 9.  Likewise, GE argues that Dr. House failed to account for other reasons why Plaintiffs' businesses did not grow.  *Id.* at 9–10.  Finally, GE suggests that no reasonable jury could have found that each Plaintiff was poised to expand by 2.72 times.  *Id.* at 10.

Plaintiffs respond that GE's motion improperly discounts the "synergistic effect and full array of GE's anticompetitive conduct."  Docket No. 210 at 3 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962); *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653–54 (2d Cir. 2015) (considering "the overall effect" of a monopolist's conduct); *City of Anaheim v. S. Cal. Edison Co*., 955 F.2d 1373, 1376 (9th Cir. 1992) (it is "not [] proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect")).  Plaintiffs suggest that there was overwhelming evidence

that GE's refusal to sell parts to Plaintiffs directly and requiring them to use Alpha Source increased costs and slowed down Plaintiffs' service, preventing Plaintiffs from competing and forcing customers to a higher priced option.  Plaintiffs point to the fact that GE's denial of training prevented Plaintiffs from acquiring software cards essential to working on newer machines like the Aisys.  *Id.* at 4.

In response to GE's argument that certain Plaintiffs had access to GE parts and training, Plaintiffs urge that timely access to fairly-priced parts and training are essential to compete.  *Id.* at 6.  Plaintiffs argue that Dr. House showed the Alpha Source policy to result in a price increase on average of 24 percent and a delay in shipments for all ISOs.  *Id.*  Plaintiffs maintain that, even if Alpha Source was not the sole source of parts for Plaintiffs, substantial evidence showed that a servicer's ability to pick up stray parts in some unreliable manner or to acquire parts for older machines does not translate to viable competition in the GE anesthesia-service market.  *Id.* at 6–7.

With respect to training, Plaintiffs maintain that GE refused requests for training and the endorsement policy made it impossible for Plaintiffs to request training because it would be economically infeasible to meet GE's demands.  *Id.* at 7.  In response to GE's argument that some Plaintiffs have serviced machines that they were not trained on, Plaintiffs argue that substantial evidence showed that training is a prerequisite to meaningfully compete because customers demand it, and, for newer machines, a technician cannot service a machine without it.  *Id.* at 8 (citing  Docket No. 170, 4/18 (PM) Tr. at 100:8–101:4 (Metropolitan); Docket No. 177, 4/21 (PM) Tr. at 153:21–154:2, 162:5–164:13 (McMaster); Docket No. 180, 4/25 (AM) Tr. 22:6–10 (GE); Docket No. 178, 4/24 (AM) Tr. at 35:9–36:1 (House)).  Similarly, Plaintiffs maintain that even if a single technician may have managed to obtain training, GE's policies still injure that Plaintiff by

preventing it from getting additional technicians trained or from having that technician trained on additional machines.  *Id.*

Plaintiffs argue that they are not required to point to specific lost accounts to be injured by GE's conduct.  *Id.*  Instead, Plaintiffs maintain that they need only prove that the injury sustained has been an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations … would be likely to cause." *Id.* at 8–9 (citing *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 303 (5th Cir. 1984)).  With respect to refurbished machines in particular, Plaintiffs argue that GE's policies prevented Plaintiffs from reconditioning and selling refurbished GE anesthesia machines, which injured Plaintiffs because GE parts and training are essential to recondition and refurbish machines.  *Id.* at 13.

Finally, Plaintiffs argue that GE's attacks on Dr. House's methodology should be rejected because they (1) were waived, (2) raise methodological challenges to expert opinions that are not properly interposed in a Rule 50 motion, (3) rehash arguments that the Court already rejected in its *Daubert* Order, and/or (4) are untenable based upon the trial record.  Docket No. 210 at 9.

The Court has addressed most of GE's concerns in the context of GE's previous motion for judgment as a matter of law.  *See supra* Section A.  As detailed in Sections (5)–(6), Plaintiffs have adduced substantial evidence that timely access to parts was necessary to compete and that GE training was necessary to service GE machines.  Additionally, the Court determined *supra* Section A.(5) that there was substantial evidence indicating that the parts policy increased costs and slowed down Plaintiffs' service, preventing Plaintiffs from competing and forcing customers to a higher priced option.  The Court will "uphold [the] jury verdict unless the facts and inferences

point so strongly and so overwhelmingly in favor of [GE] that reasonable men could not arrive at any verdict to the contrary." *Cousin*, 246 F.3d at 366.  That some Plaintiffs obtained parts from non-Alpha Source sources does not defeat the jury's finding, supported by substantial evidence, that Plaintiffs were denied access to timely parts.  Likewise, that individual Plaintiffs did not seek training is not fatal to Plaintiffs' cases because substantial evidence was presented that the customer endorsement policy prevented Plaintiffs from even seeking training.  *See supra* Section A.(6).  GE's identification of a handful of instances where Plaintiffs were able to obtain training during the relevant period does not defeat the substantial evidence in the record that GE's policies injure each Plaintiff by preventing that Plaintiff from getting additional technicians trained on GE anesthesia machines or from having the particular technician trained on additional machines.  Accordingly, judgment as a matter of law for lack of injury to Plaintiffs is inappropriate, and GE's motion is **DENIED**.

With respect to damages, the Court notes that the majority of GE's argument comes from its *Daubert* motion.  To the extent that the arguments contained in GE's motion mirror those considered in the *Daubert* motion—particularly with respect to the applicability of the First Mover literature—GE's motion is **DENIED** and the Court herein incorporates by reference its *Daubert* Order.  *See* Docket No. 149.  To the extent GE raises new arguments not raised at trial—including Dr. House's failure to identify a second and third mover and Dr. House's 2.72 growth factor—the Court declines to consider those arguments at the Rule 50(b) stage because they were not properly preserved.  *See Montano v. Orange Cnty., Texas*, 842 F.3d 865, 875 (5th Cir. 2016) ("Rule 50(a) requires specificity for good reason. Its 'specific grounds' requirement for a pre-verdict motion for judgment as a matter of law . . . serves both to make the trial court aware of the movant's position

and to give the opposing party an opportunity to mend its case."). Accordingly, GE's motion for judgment as a matter of law with respect to Dr. House's methodology is **DENIED**.

### C.  GE's Renewed Motion for Judgment as a Matter of Law as to Allegations Concerning Software Updates and Disparagement Theories (Docket No. 194)

In its Renewed Motion for Judgment as a Matter of Law on Software Updates and Disparagement, GE argues that the Court should grant judgment as a matter of law on Plaintiffs' liability theories based on disparagement and failure to provide software updates because (1) Plaintiffs' alleged disparagement theory fails as a matter of law after the Fifth Circuit's decision in *Retractable Techs., Inc. v. Becton Dickinson & Co*, 842 F.3d 883 (5th Cir. 2016) ("*RTI*"); (2) even if false advertising could form the basis for antitrust liability, only three of the 17 Plaintiffs attempted to offer any evidence of disparagement and no reasonable jury could have found disparagement as to any of the Plaintiffs; and (3) Plaintiffs' refusal to deal claims based on software updates fail as a matter of law because those claims depend on copyrighted material.  Docket No. 194.

The Fifth Circuit recently clarified in *RTI* that there is an extremely high bar for a false-advertising antitrust claim, and, "absent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie." 842 F.3d at 894–95.  In *RTI*, the Fifth Circuit recognized that "false advertising alone hardly ever operates in practice to threaten competition . . . because [it] simply sets the stage for competition in a different venue: the advertising market," and because "it will often be difficult to determine whether such false statements induced reliance by customers and produced anticompetitive effects, or whether the buyer attached little weight to the statements and instead regarded them as biased and self-serving." *Id.* at 895.  In cases where the relevant customers are

sophisticated, the latter is more likely.  *Id.*  The customers at issue in *RTI* were sophisticated parties: hospitals and [group purchasing organizations] that used multidisciplinary committees which had experience with the competing products.  *Id.* at 896.  In finding that "no facts adduced at trial indicated that [Defendant's] advertising in fact harmed competition," the Fifth Circuit particularly noted that there was no testimony from customers themselves.  *Id.* at 897.

Plaintiffs' disparagement-based claim, which amounts to Plaintiffs' claim regarding GE's marketing materials sent directly to customers, fails for lack of evidentiary support.  As noted in *RTI*, it will often be difficult to determine whether false statements induced reliance by consumers and produced anticompetitive effects or whether the buyer attached little weight to the statements and instead regarded them as biased and self-serving.  842 F.3d at 895.  Here, however, as in *RTI*, the intended recipients of the marketing materials are hospitals, sophisticated parties who are more likely to discount disparagement as bias or self-serving.  *Id.*  The evidence Plaintiffs point to in response to GE's motion includes a general statement from Dr. House that disparagement harms competition because customers are less likely to secure the services of a disparaged party and statements from ISOs about the existence of the marketing materials.  *See* Docket No. 211 at 6, n.7 (citing Docket No. 178, 4/24 (AM) Tr. at 78:17–79:2 (House)).  But a single statement from Plaintiffs' expert that the statements rendered customers less likely to secure Plaintiffs' services— without more—does not amount to evidence of harm or potential for harm to competition.  Further, 14 Plaintiffs offered no evidence at all of disparagement—identifying no specific marketing materials or statements by GE that even referred to them.  None of them identified a customer that had heard any alleged disparagement, and none of them identified any customer or opportunity they lost because of alleged disparagement.  Three Plaintiffs testified to disparagement— Biomedical Concepts, Metropolitan and Gasmedix.  But Biomedical Concepts could not identify

evidence that anyone from GE ever disparaged it.  *See* Docket No. 171, 4/19 (AM) Tr. at 86:20–

25 ("Q. You yourself, sir, you don't have any evidence that anyone from GE ever disparaged you

or your company, right? A. I can't remember any per se, you know, and -- Jeff and that -- you

know, they have a -- a larger organization than we do, and they -- they see more people. And so

I'm sure that would be more likely to happen with him than maybe me.").  Metropolitan claimed

that it had been a victim of disparagement but provided no details.  Docket No. 170, 4/18 (PM) Tr.

at 126:15–19 ("Q. Are those the GE people out there in the hospitals disparaging your crowd? A.

Yes. Q. Have you been a victim of that. A. Yes."). And Gasmedix stated that GE characterized its

services as "dangerous" to a customer but never lost that account.  Docket No. 176, 4/21 (PM) Tr.

at 11:21-12:19.

Plaintiffs also argue that they could not "possibly identify all of the contracts or

opportunities they have lost on account of GE's illegal conduct." *Id.*  Even if that is true, Plaintiffs

did not attempt to show that the marketing materials had the *potential* to eliminate competition.

*See RTI*, 842 F.3d at 894–95.  Indeed, like in *RTI*, Plaintiffs presented no testimony from customers

themselves about the effect of GE's marketing materials.  Accordingly, GE's motion with respect

to Plaintiffs' disparagement theory is **GRANTED**.

With respect to GE's motion on software updates, the Court is persuaded that GE's

copyrights afford it exclusive rights over its works, which GE is not required to license to others,

and, under the circumstances of this case, GE's refusal to provide software updates to Plaintiffs is

simply an exercise of its intellectual property rights that does not violate the antitrust laws.  *See,*

*e.g., Service Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992) (stating that

"limiting the use of software to repair and maintenance of specific computer hardware [is] an

activity that is protective as an exclusive right of a copyright owner"); *Tricom, Inc. v. Electronic*

*Data Sys. Corp.,* 902 F. Supp. 741, 743–44 (E.D. Mich. 1995) ("under patent and copyright law, EDS may not be compelled to license its proprietary software to anyone"); *Advanced Computer Serv. of Mich. v. MAI Sys. Corp.*, 845 F. Supp. 356, 368–69 (E.D. Va. 1994) ("it is within [the manufacturer's] discretion to protect its copyrighted works, and this discretion includes the right to license its software to whomever it chooses").

There is a dearth of evidence in the record that the software update policy constituted a refusal to deal.  Plaintiffs have identified no evidence suggesting that GE's previous conduct of notifying the ISOs of software updates was a profitable course of dealing for GE; instead, Plaintiffs merely argue that third-party access to software and updated notifications were "important to GE customers."  Docket No. 211 at 8 (citing Docket No. 174, 4/20 (AM) Tr. at 52:4–8 (GE); Docket No. 175, 4/20 (PM) Tr. at 85:21–25 (GE); Docket No. 174, 4/20 (AM) Tr. at 119:11–17 (Bay State); Docket No. 177, 4/21 (PM) Tr. at 91:10–20 (Paragon)).  Plaintiffs' cited evidence includes testimony from Thomas Birmingham of Bay State that customers "would prefer that we're knowledgeable about those technical bulletin updates," testimony from Thomas Green, president of Paragon, suggesting that some service contracts from customers require the ability to perform software upgrades and testimony from Kurt Page, the general manager of LCS Services for GE Healthcare, who agreed that "it's pretty important to customer safety" for a technician to know about important updates for the operation of a machine.  Docket No. 175, 4/20 (PM) Tr. at 85:21–25 (GE); Docket No. 174, 4/20 (AM) Tr. at 119:11–17 (Bay State); Docket No. 177, 4/21 (PM) Tr. at 91:10–20 (Paragon)).[2]  These statements do suggest that the software updates were viewed as important by both GE and the ISOs, but a policy can be both important to customers and not a profitable course of dealing.

---

[2] Plaintiffs also cite the testimony of Mr. Porter from GE who stated that an average part order costs $650 and bears an 80 percent profit margin. Docket No. 174, 4/20 (AM) Tr. at 52:4-8 (GE).

Relatedly, Plaintiffs did not present substantial evidence at trial that GE's software update policy had no legitimate business justification.  In its response to GE's motion, Plaintiffs simply claim that GE failed to present any evidence attempting to justify its conduct.  Docket No. 211 at 8–9.  But, as Plaintiffs note, GE explains that it ceased providing software updates to the ISOs because it does not know "the service provider for every owner of GE machines."  *Id.* at 9 (citing Docket No. 194 at 7).  In response to GE's business justification, Plaintiffs only offer attorney argument and cite to no relevant evidence in the record.[3]

Because Plaintiffs have not presented substantial evidence regarding the software policy, GE's motion with respect to its software notifications and update policies is **GRANTED**.

### D.  GE's Renewed Motion for Judgment as a Matter of Law as to Plaintiffs POPN, Palo Verde, and SAS Acquisitions (Docket No. 195)

GE also requests that judgment as a matter of law be granted, it asks the Court to grant judgment as a matter of law as to three Plaintiffs for lack of injury: (1) POPN, (2) Palo Verde, and (3) SAS.  Docket No. 195.

*(1) POPN*

GE contends that POPN is a non-operational holding company and has suffered no injury from the challenged policies.  *Id.* at 2.  According to GE, the trial record established that POPN does not perform service on anesthesia machines, does not purchase anesthesia parts, and has not attempted to receive training from GE.  *Id.* (citing Docket No. 171, 4/19 (AM), Donald Yanusko (POPN, Inc.), at 141: 22–25; at 142: 1; Docket No. 172, 4/19 (PM), Donald Yanusko (POPN, Inc.), at 5:14–24)).  GE claims that POPN's antitrust claims rest upon a term from the Penn Biomedical sale transaction that excluded from the sale proceeds from a class action lawsuit, but GE notes that

---

[3] Plaintiffs also cite the trial transcript—particularly to the testimony of Mr. Birmingham from Bay State.  *See id.* (citing Docket No. 174, 4/20 (AM) at 87:4–24.)  But Mr. Birmingham's testimony about the customer-endorsement form is irrelevant to whether GE had a valid business justification for restricting access to its software updates.

this is not a class action lawsuit and that POPN suffered no independent, cognizable injury as required to establish an antitrust claim. *Id.* at 3.

Plaintiffs respond that GE's argument amounts to a true party-in-interest argument that POPN lacks standing, an argument that is waived because GE failed to raise it earlier in the litigation. Docket No. 212 at 2. Alternatively, Plaintiffs contend that the evidence at trial established that POPN, as Penn Biomedical's successor-in-interest, retained Penn Biomedical's antitrust claims against GE. *Id.* at 3.

Based on the record established at trial, POPN is "simply a holding company that was made for the transition of the sale of a company called Penn Biomedical Support, so POPN, Inc. receives funds for the sale of that company." Docket No. 171, 4/19 AM 141:22– 42:1. It was Plaintiffs' burden to show at trial that POPN suffered an injury, and it is unclear from the record whether Penn Medical properly assigned its antitrust claim to POPN. The only evidence in the record that Penn Medical's antitrust claims were assigned to POPN was Mr. Donald Yanusko's agreement that he "didn't sell any right to recovery from this lawsuit" when Penn Biomedical was sold, which is insufficient as a matter of law. Docket No. 172, 4/19 (PM) Tr. at 8:3–22 (POPN); *DNAML Pty, Ltd. v. Apple Inc.,* No. 13CV6516 (DLC), 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015) (explaining that "[t]o effect a transfer of the right to bring an antitrust claim, the transferee must expressly assign the right to bring that cause of action, either by making specific reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim") (collecting cases). Because Plaintiffs did not meet their burden to show that POPN sustained an injury from the challenged conduct and that POPN does not have standing to pursue the claims of Penn Biomedical, GE is entitled to judgment as a matter of law on POPN's claims. *See Geoffrion v. Nationstar Mortg. LLC*, 182 F. Supp. 3d 648,

669–71 (E.D. Tex. 2016) (…"[T]he Fifth Circuit has made clear that as standing is not subject to waiver by the parties, a party's pretrial, and even post-trial, failures to contest standing cannot, ipso facto, create jurisdiction in federal court.") (internal citations omitted).  Accordingly, GE's motion with respect to POPN is **GRANTED**.

*(2) Palo Verde*

GE also argues that Palo Verde suffered no injury from the challenged policies because it never bought parts from Alpha Source and went out of business before the challenged changes to GE's training policy.  Docket No. 195 at 4.

In response, Plaintiffs argue that GE's exclusion of Palo Verde from essential training dates back to 2011 and that GE had been restricting ISO access to training to harm the competition since 2011.  Docket No. 212 at 3–4.

Mark Ruthem of Palo Verde testified that Palo Verde received training on the Aestiva in 2009, the Aespire in 2010, the Avance in 2010, and the Aespire in 2011.  Docket No. 175, 4/10 PM 18:24–19:8.   Additionally, Palo Verde never purchased any parts from Alpha Source and did not claim to have been injured by the parts policy.  *See id.* at 15:14–23.  Substantial evidence does not support the jury's finding that Palo Verde was injured by GE's parts or training policies, and GE's motion for judgment as a matter of law on Plaintiff Palo Verde's claims is **GRANTED**.

*(3) SAS*

According to GE, SAS has not suffered any injury because it never requested training, was not denied training, and its customers—veterinary clinics—do not require training.  GE also notes that SAS testified that it was unaffected by the Alpha Source appointment.  Docket No. 195 at 5 (citing Docket No. 175, 4/20 (PM) Tr. at 187:21–25, 188:1–3, 187:3–20, 190:20–22, 172:11–15, 190:17–22).

Plaintiffs respond that, at trial, SAS's representative, John Uber, listed contracts that SAS lost when the last trained technician left SAS and explained how SAS could not obtain new customers because it lacked training.  Docket No. 212 (citing Docket No. 175, 4/20 (PM) Tr. at 168:1–4 (SAS) (listing ISS Solutions, UHSS, and Akron Oral as "examples of some of the business that [SAS] [wasn't] able to continue working on because [SAS] didn't have training"), 167:9–16, 189:22–190:16 (explaining SAS's inability to retain customers that had used Drager machines but were transitioning to GE machines because of an inability to take GE training courses)).  Plaintiffs also contend that, because of the customer endorsement policy, the fact that SAS did not request training is not fatal to its claim.  *Id.*

Substantial evidence supports SAS's claim that it was injured as a result of the training policy.  SAS outlines specific customers it was unable to continue working for when its last trained employee left the company and that it was unable to enroll in the necessary training because of the customer endorsement policy.  Docket No. 175, 4/20 PM 164:17–168:20.

Conversely, however, substantial evidence does not support SAS's claim that it was injured as a result of the parts policy.  Mr. Uber specifically testified that SAS did not have a problem getting parts from Alpha Source and that its purchase of parts through Alpha Source did not affect its relationship with its customers.  *Id.* at 162:10–163:4.

Accordingly, GE's motion for judgment as a matter of law as to SAS is **GRANTED** with respect to the parts policy and **DENIED** with respect to the training policy.

### E.  GE's Motion in the Alternative for a New Trial on All Issues (Docket No. 196)

In GE's final post-trial motion, it moves in the alternative for a new trial on several bases. Docket No. 196.  First, GE requests a new trial because it argues that the Court improperly rejected GE's proposed jury instructions on geographic market and improperly included instructions related to monopoly leveraging, essential facilities, and direct evidence.  *Id.* at 1.  Second, GE argues that

it is entitled to a new trial because Dr. House's damages methodology is flawed.  *Id.* at 2.  Third, GE argues that a new trial should be granted because of Plaintiffs' counsel's closing argument that Plaintiffs could not obtain any relief if the jury failed to award damages.  *Id.* at 14–15.  And finally, GE requests a new trial in the event the Court grants any of its judgment as a matter of law motions on the parts, training, disparagement, or software update policies.  *Id.* at 7–8.

*(1) Jury instructions*

To successfully challenge a jury instruction, GE "must demonstrate that the charge as a whole create[d] substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Hartsell v. Dr. Pepper Bottling Co. of Tex.*, 207 F.3d 269, 272 (5th Cir. 2000) (quoting *Johnson v. Sawyer*, 120 F.3d 1307, 1315 (5th Cir.1997)).  Even if substantial and ineradicable doubt is shown, the instruction will still be upheld if the Court determines, "based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Id.*  "In addition, to the extent there is claimed error in refusing to give an instruction, the challenger must show as a threshold matter that [the] proposed instruction correctly states the law." *Johnson v. Sawyer*, 120 F.3d at 1315 (citing *FDIC v. Henderson*, 61 F.3d 421, 425 (5th Cir. 1995); *see also Salinas v. State Farm Lloyds*, 267 F. App'x 381, 387 (5th Cir. 2008)).

GE contends that the appointment of an exclusive distributor is presumptively legal and that the jury should have been so instructed.  GE also argues that, in the refusal to deal and essential facilities instructions, the Court should have instructed the jury that GE must have sacrificed short-term profits to be liable.  Docket No. 196 at 6.

GE provides no Fifth Circuit case law suggesting that an exclusive distributorship instruction was necessary.  Even still, its exclusion was harmless because the concept was captured in the Court's refusal to deal instruction.  The Court explained to the jury that a "refusal to deal that is based on legitimate business reasons does not violate the antitrust laws, even if it is also

motivated by the desire to harm competitors or does in fact harm competitors." Docket No. 161 at 22.  With respect to the profit-sacrifice instruction, GE cites no Fifth Circuit or Supreme Court case law holding that a showing of short-term profit sacrifice is a *necessary* predicate to liability under a refusal to deal or essential facilities theory.

With respect to the geographic market instruction, GE faults the Court's instructions for failing to include language regarding the geographic areas in which Plaintiffs sell their services and the geographic areas where each of Plaintiffs' customers are located.  Docket No. 196 at 4. The Court relied on the ABA Model Instruction[4] for geographic market, listing for the jury six nonexhaustive factors to consider.  *See* Docket No. 161 at 4.  These factors instruct the jury to consider where Plaintiffs sell and compete, and are consistent with Fifth Circuit precedent holding that "[t]he geographic market must 'correspond to the commercial realities' of the industry." *Apani*, 300 F.3d at 626.  GE has not demonstrated that the Court's geographic market instruction misguided the jury, and the instruction does not warrant a new trial.

GE also complains that the Court should have included an instruction on refusals to sell intellectual property and that its exclusion resulted in prejudice to GE.  The jury was instructed that activity based even in part of legitimate business reasons does not violate the antitrust laws. *See* Docket No. 161 at 22.  The jury was entitled to consider GE's intellectual property in its evaluation of whether GE's conduct was motivated by a legitimate business purpose.  In light of GE's failure to identify any specific prejudice caused by the instruction and the fact that the jury was instructed regarding legitimate business purposes, the Court did not err in excluding GE's proposed instruction.

---

[4] The Court relied on the ABA Model Jury Instructions in Civil Antitrust Cases in its jury instructions extensively because the current Fifth Circuit Pattern Jury Instructions suggest that they may be helpful in drafting jury charges in antitrust cases.  *See* Fifth Circuit Pattern Jury Instructions (Civil Cases) at § 6.

GE next faults the Court for instructing the jury on direct proof of monopoly power.  GE states that the instruction given by the Court is unsupported by case law and the evidence presented at trial.  The instruction given by the Court came directly from the ABA Model Instruction, and the ability to prove market power by direct evidence has been recognized by this Court in the past. *See Z-Tel Commc'ns,* 331 F. Supp. 2d at 521 ("There are two ways to establish . . . that the defendant holds monopoly power. The first is by presenting direct evidence showing the exercise of actual control over prices or the actual exclusion of competitors.  The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market.") (internal citations omitted).  As explained *supra* Section A.(3), Plaintiffs presented direct evidence of GE's monopoly power at trial.  Additionally, GE's argument that monopoly power cannot be shown via direct evidence is at odds with its argument that judgment as a matter of law should be granted for lack of direct evidence of market power.  *See* Docket No. 192 at 9. Accordingly, GE's objection to the jury charge on this basis is without merit.

GE also complains that the Court included instructions related to monopoly leveraging and essential facilities in its jury charge.  As stated with respect to GE's motion for judgment as a matter of law on legal issues (*see supra* Section A.), monopoly leveraging and essential facilities claims were supported by substantial evidence and the Court did not err in providing an instruction thereto.

### (2) Dr. House's testimony

GE also asks for a new trial because Dr. House's damages testimony was unreliable and should have been excluded.  Docket No. 196 at 8.  GE's arguments largely mirror its arguments in its *Daubert* challenge—namely, that Dr. House should not have relied on the first-mover literature and that Dr. House erred in relying on an industry publication from 2015 to calculate lost profits.

*Id.* at 8–14.   These arguments were thoroughly addressed in the Court's *Daubert* Order.   *See*

Docket No. 149.

GE's arguments related to refurbished machine damages, along with its challenges to Dr.

House's methodology with respect to the 2.72 growth factor, alleged failure to identify second and

third movers, and alleged failure to account for other causes of the ISOs lack of growth, were not

identified in any Rule 50(b) motion and have been waived.   *See Jimenez v. Wood Cnty., Tex.*, 660

F.3d at 845; *see also supra* Section A.8.

### (3) Improper Closing Argument

GE also moves for a new trial based on Plaintiffs' counsel's statement in its closing

argument that "without damages, there won't be any relief."   Docket No. 196 at 5.   In light of the

Court's grant of a new trial on damages, GE's argument is moot.

### (4) GE's Motion for a New Trial Based on JMOL Motions

Finally, the Court is persuaded its grant of judgment as a matter of law on the software

update policy and disparagement claims requires a new trial.   The general rule is "that 'when a

case is submitted to the jury on a general verdict, the failure of evidence or a legal mistake under

one theory of the case generally requires reversal for a new trial.   This is because the Court cannot

determine whether the jury based its verdict on a sound or unsound theory.' " *McCaig v. Wells*

*Fargo Bank (Texas), N.A.*, 788 F.3d 463, 476 (5th Cir. 2015) (citing *Muth v. Ford Motor Co.,* 461

F.3d 557, 564 (5th Cir.2006)).

The verdict form provided to the jury did not ask the jury to provide separate damages

accountings for each theory of liability advanced at trial.   *See* Docket No. 164.   It is unclear, in

light of the jury's general damages verdict, whether the jury awarded damages based on Plaintiffs'

disparagement and software update policy claims, and, as a result, the Court determines that GE

is entitled to a new trial, at least with respect to damages.   It bears noting that this possibility is

*more* likely as both theories were referred to in Plaintiffs' opening statement, in the Court's jury charge and in the verdict form. *See* Docket No. 170 4/18 (PM) Tr. at 24:5–7 (referring to marketing materials); Docket No. 161 at 6; Docket No. 164 (listing "GE marketing communications" and "Software notifications and update policies" for each Plaintiff); *cf. Muth*, 461 F.3d at 565 (finding that grant of judgment as a matter of law on restraint system defect "made no difference" in upholding a jury's verdict when the inadequate restraint system played "little role during the trial" and when the jury "had no reason to think the restraint was at issue").

The Court is not convinced that a new trial on liability is required based on the record at trial but finds that it would benefit from additional briefing on this matter. The parties are **ORDERED** to each submit a brief by **April 20, 2018** detailing whether they believe the new trial should include liability in addition to damages. Each brief shall not exceed **ten (10) pages**. Each party may file a response to the other's brief by **April 27, 2018**. The responses shall not exceed **five (5) pages**.

In light of the above,  Plaintiffs' Post-Trial Motion for Injunction, Attorneys' Fees, and Entry of Judgment Upon the Jury's Verdict (Docket No. 190) is **DENIED-AS-MOOT**.

## CONCLUSION

As detailed above, the Court has ruled as follows:

- GE's Renewed Motion for Judgment as a Matter of Law Regarding Market Definition, Monopoly Power, Parts and Training Policies (Docket No. 192) is **DENIED**;

- GE's Renewed Motion for Judgment as a Matter of Law for Lack of Injury or Damages (Docket No. 193) is **DENIED**;

- GE's Renewed Motion for Judgment as a Matter of Law as to Allegations Concerning Software Updates and Disparagement Theories (Docket No. 194) is **GRANTED**;

- GE's Renewed Motion for Judgment as a Matter of Law as to Plaintiffs POPN, Palo Verde, and SAS Acquisitions (Docket No. 195) is **DENIED-IN-PART** and **GRANTED-IN-PART**;

- GE's Motion in the Alternative for a New Trial on All Issues (Docket No. 196) is **DENIED-IN-PART** and **GRANTED-IN-PART** with the parties to submit supplemental briefing; and

- Plaintiffs' Post-Trial Motion for Injunction, Attorneys' Fees, and Entry of Judgment Upon the Jury's Verdict (Docket No. 190) is **DENIED-AS-MOOT**.

**So ORDERED and SIGNED this 30th day of March, 2018.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE